THOMAS G. MOUZES (SBN 099446)
IAN K. MCGLONE (SBN 315201)
**BOUTIN JONES INC.**
Attorneys at Law
555 Capitol Mall, Suite 1500
Sacramento, CA 95814
Phone: 916.321.4444
Fax: 916.441.7597
Email: tmouzes@boutinjones.com
imcglone@boutinjones.com

Attorneys for TRI COUNTIES BANK

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO DIVISION)

| | |
|---|---|
| In re<br><br>OROVILLE HOSPITAL, *et al.*,[1]<br><br>Debtor. | **Case No. 2025-26876**<br><br>Jointly Administered with:<br>**Case No. 2025-26877**<br><br>Chapter 11 |
| ☒ Affects All Debtors<br>☐ Affects Oroville Hospital<br>☐ Affects OroHealth Corporation: A Nonprofit Healthcare System | |
| OROHEALTH CORPORATION: A NONPROFIT HEALTHCARE SYSTEM, chapter 11 Debtor and Debtor in Possession, and OROVILLE HOSPITAL, chapter 11 Debtor and Debtor in Possession,<br><br>Plaintiffs,<br><br>DOVE'S LANDING, LLC, a California limited liability company; ROBERT J. WENTZ, an individual; OROVILLE SPORTS CLUB, LLC, | **Adv. Proc. No. 2026-02092**<br><br>**DCN: BJI-1**<br><br>**EXHIBITS TO DECLARATION OF IAN K. MCGLONE IN SUPPORT OF TRI COUNTIES BANK'S MOTION TO INTERVENE IN ACTION**<br><br>Date: October 20, 2026<br>Time: 11:00 a.m.<br>Department: B, Crtrm 32<br>501 I Street, Suite 3-200<br>Sacramento, California 95814 |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the debtors is 2767 Olive Highway, Oroville, California, 95966.

a California limited liability company; and ROB BONTA, as Attorney General of California, a nominal defendant,

Defendants.

Judge: Honorable Christopher D. Jaime


| EXHIBIT | DOCUMENT | PAGE |
|---|---|---|
| A | Verified Complaint | 3-117 |
| B | Motion Regarding Arbitration | 118-124 |
| C | Proposed Verified Answer | 125-186 |

# EXHIBIT A

60

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone: (310) 598-4150
Facsimile: (310) 556-9828

*Counsel to Oroville Hospital, et al.,*
*Plaintiffs and the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re:<br><br>OROVILLE HOSPITAL, *et al.*,[1]<br><br>Debtors and Debtors in Possession. | Lead Case No. 25-26876<br><br>Jointly Administered With:<br>Case No. 25-26877<br><br>Adv. Proc. No.:<br><br>Chapter 11<br><br>Hon. Christopher D. Jaime |
| ☒ Affects All Debtors<br><br>☐ Affects Oroville Hospital<br>☐ Affects OroHealth Corporation: A Nonprofit Healthcare System<br><br>Debtors and Debtors in Possession. | **VERIFIED COMPLAINT FOR:**<br><br>**(1) Declaratory Relief/Recharacterization;**<br><br>**(2) Quiet Title;**<br><br>**(3) Imposition of Equitable Mortgage [Cal. Civ. Code § 2925];** |
| OROHEALTH CORPORATION: A NONPROFIT HEALTHCARE SYSTEM, chapter 11 Debtor and Debtor in Possession, and OROVILLE HOSPITAL, chapter 11 Debtor and Debtor in Possession,<br><br>Plaintiffs,<br><br>v.<br><br>DOVE'S LANDING, LLC, a California limited liability company; ROBERT J. WENTZ, an individual; OROVILLE SPORTS CLUB, LLC, | **(4) Breach of Fiduciary Duty [Common Law];**<br><br>**(5) Breach of Fiduciary Duty [Cal. Corp. Code § 5233(c)];**<br><br>**(6) Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(1) – Actual Fraud;** |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the Debtors is 2767 Olive Highway, Oroville, California, 95966.

| | |
|---|---|
| a California limited liability company; and ROB BONTA, as Attorney General of California, a nominal defendant | **(7) Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(2) – Constructive Fraud;**<br>**(8) Common Law Fraudulent Conveyance;**<br>**(9) Fraudulent Transfer [11 U.S.C. § 548];**<br>**(10) Avoidance of Fraudulent Transfer [11 U.S.C. § 544(b)];**<br>**(11) Avoidance and Recovery of Post-Petition Transfer of Estate Property [11 U.S.C. §§ 549(b) and 550];**<br>**(12) Violation of the Automatic Stay [11 U.S.C. §§ 105(a) and 362(a)(3)];**<br>**(13) Accounting; and**<br>**(14) Constructive Trust** |

OroHealth Corporation ("OroHealth") and Oroville Hospital ("Oroville Hospital" or the "Hospital") (collectively OroHealth and Oroville Hospital shall be referred to as "Plaintiffs"), the debtors and debtors-in-possession (the "Debtors") in the above-captioned lead chapter 11 case (the "Chapter 11 Case"), and the plaintiffs in the instant adversary proceeding, hereby allege as follows:

**I.**

**NATURE OF THE ACTION**

1. This is an adversary proceeding brought pursuant to, *inter alia*, Federal Rule of Bankruptcy Procedure 7001, to recharacterize the two written lease agreements (the "Lease Transactions") between Plaintiff OroHealth and Defendant Dove's Landing, LLC ("Dove's Landing") from multiple agreements to lease real property to a single sale-and-finance agreement, which grants the Hospital a fee simple interest in, and grants Dove's Landing a deed of trust encumbering, the real property commonly known as 2450 Oro Dam Boulevard, Oroville, California (the "Property"), which is also described by the following legal description:

PARCEL I:
PARCEL 1, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF

CALIFORNIA, ON OCTOBER 25, 2012, IN BOOK 183 OF MAPS, AT PAGE(S) 29, 30 AND 31.

EXCEPTING THEREFROM ONE HALF OF ALL MINERAL, OIL OR OTHER HYDROCARBON SUBSTANCES. SAID EXCEPTION AFFECTS ALL THAT PORTION OF THE HEREIN DESCRIBED PROPERTY LYING WITHIN THE BOUNDARIES OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN DEED FROM ANTHONY C. MORICI, AN UNMARRIED MAN TO SAFEWAY STORES, INC., A MARYLAND CORPORATION, DATED SEPTEMBER 27, 1971 AND RECORDED FEBRUARY 3, 1972, IN BOOK 1733, PAGE 296, OFFICIAL RECORDS.

PARCEL II:
AN UNDIVIDED 50% INTEREST IN THE FOLLOWING DESCRIBED PROPERTY:

PARCELS 3 AND 4, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CAUFORNIA, ON OCTOBER 25, 2012, IN BOOK 183 OF MAPS, AT PAGE(S) 29, 30 AND 31.

2. The Lease Transactions are not true leases. In 2011, Dove's Landing acquired the Property—which at the time, consisted of an abandoned Montgomery Ward Department Store that had been out of use for over a decade—solely so that Plaintiffs would invest millions of dollars in refurbishments and renovations to the existing improvements on the Property, pay all taxes and insurance, and otherwise would assume all risks and responsibilities that are customarily assumed by a landlord or land owner without the benefits of owning the Property. Instead of being leases, the Lease Transactions were a form of so-called "disguised financing" – sale documents characterized as leases, but which in fact function as a loan secured by a deed of trust.

3. The conduct surrounding the Lease Transactions also constitutes both a usurpation of corporate opportunity and officer self-dealing by Defendant Robert J. Wentz, which were aided and abetted by the other Defendants. Mr. Wentz was, at all times material to this proceeding, the Chief Executive Officer ("CEO") and a trustee (the legal and functional equivalent of a director) on the board of trustees of both OroHealth and the Hospital, he held the position of non-voting trustee and led the board in an *ex officio* capacity. On information and belief, at all times from its creation and up to the present, Mr. Wentz owned a 60% membership interest in Dove's Landing. On information

and belief, Mr. Wentz failed to fully and fairly present the respective boards of either of Plaintiffs with the opportunity to purchase the Property or disclose the true nature of the Lease transaction, failed to disclose the true nature or scope of his interest in Dove's Landing, and at all relevant times had a personal and material financial interest in these transactions to the detriment of both Plaintiffs' interests. Plaintiffs were not given the opportunity to purchase the Property, entered the Lease Transactions, and not only were required to pay for significant capital improvements, but were also significantly and routinely overcharged during the Lease Transactions. These fiduciary breaches constitute further evidence both of the Lease Transactions' true nature as a disguised loan, as well as independent breaches of fiduciary duties owed to Plaintiffs.

4. The "disguised financing" nature of the Lease Transactions and the fiduciary duty breaches are further evidenced by a written Memorandum of Understanding (the "MOU") concerning the Property, which has only recently been discovered by Plaintiffs. The MOU contemplates that another entity owned by Mr. Wentz named Oroville Sports Club, LLC (the "Sports Club") would acquire a 51% interest in the Property, while the party from whom the Sports Club would acquire that interest, Gold Town Plaza, LLC ("Gold Town Plaza"), would retain a 49% interest in the Property. The MOU states that after twenty years, the 51% interest in the Property would be given to the Hospital as a "gift" as long as the Hospital remained in the space – but that the remaining 49% interest in the Property would still belong to the former owner. This reversionary interest is proof that Plaintiffs were essentially financing their ownership of the Property through a twenty-year mortgage instrument, and were always intended to be purchasers of the Property. However, the fact that the reversionary interest was never intended to grant Plaintiffs complete control of the Property constitutes evidence of corporate insider self-dealing. In essence, Defendants captured the value of ownership of the Property for themselves twice: once in the form of inflated rent under the Lease that more than remunerated them for the value of the improved Property, and once in the form of a final payment (or continued lease payments) for half of the value of the improved Property – ensuring a final "golden parachute" for Mr. Wentz and the other Defendants. Under either the disguised financing theory or the breach of fiduciary duty theory, the outcome is the same: Plaintiffs are entitled to fee simple ownership of the Property.

## II.

## JURISDICTION

5. This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b). This action is commenced pursuant to 11 U.S.C. §§ 362(a)(3), 549 and 550 and Rules 7001(1) and (9) of the Federal Rules of Bankruptcy Procedure.

6. This Court has personal jurisdiction over each of the Defendants under Rule 7004(f) of the Federal Rules of Bankruptcy Procedure.

7. This adversary proceeding relates to the underlying Chapter 11 Case and is a core proceeding as set forth in 28 U.S.C. §§ 157(b)(2)(A), (E), and (K).

8. This Court may hear and determine this proceeding and enter appropriate orders and judgments pursuant to 28 U.S.C. § 157(b)(1) and (2).

9. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, Plaintiffs hereby consent to the entry of final orders or judgment by the Court.

10. Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## III.

## PARTIES

11. On December 8, 2025 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*) in the United States Bankruptcy Court for the Eastern District of California ("Bankruptcy Court"). The Order Authorizing Joint Administration of Chapter 11 Cases was entered by the Bankruptcy Court on December 9, 2025.

12. OroHealth is a healthcare system and a California nonprofit corporation, organized and governed pursuant to California Corporations Code § 5110, *et seq.*

13. Oroville Hospital is a hospital, and is a California nonprofit corporation, organized and governed pursuant to California Corporations Code § 5110, *et seq.*

14. Upon information and belief, Defendant Dove's Landing, LLC is a California limited liability company duly organized and existing under the laws of the United States and the State of California.

15. Upon information and belief, Defendant Oroville Sports Club, LLC is a California limited liability company duly organized and existing under the laws of the United States and the State of California.

16. Upon information and belief, Defendant Robert J. Wentz, is and was at all times material under this Complaint an individual with his usual residence in the County of Butte, in the State of California. Plaintiffs are further informed and believe that Mr. Wentz was at all times material under this Complaint the CEO of Plaintiffs OroHealth and Oroville Hospital, and served on the board of trustees (directors) of both organizations.

17. Defendant Rob Bonta is the Attorney General of the State of California and is a nominal defendant whose joinder as an indispensable party is mandatory pursuant to California Code of Civil Procedure § 5233(b)(3).

## IV.

## FACTS COMMON TO ALL CAUSES OF ACTION

18. OroHealth, Oroville Hospital, and their affiliated nondebtor entities operate as a California nonprofit health care system in and around Butte County, California, with approximately 133 general acute care beds (including 10 intensive care and 10 perinatal beds), an active emergency room, 14 "flex" beds separately authorized by the California Department of Public Health on an annual basis, and 126 skilled nursing facility beds. Plaintiffs also provide 33 specialty services at their 31 clinics (including 10 rural health clinics) in Oroville, Yuba City, and Chico, and provide laboratory services through Valley Clinical Laboratory with 23 outpatient laboratory draw stations in Oroville, Yuba City, Chico, Grass Valley, Orland, and Redding. In its fiscal year ended 2024, Plaintiffs recorded 98,018 patient days (adjusted to account for outpatient visits), 26,416 emergency room visits, 2.2 million lab tests, 361,558 clinic visits, and 384 births at their facilities. Each of the Plaintiffs is exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, and each of the Plaintiffs is organized and governed pursuant to California Corporations Code § 5110, *et seq*.

**A. The Bylaws of OroHealth and Oroville Hospital**

19. OroHeath and Oroville Hospital have each adopted separate sets of corporate bylaws which govern each respective entity. The corporate activities and affairs of both corporations are and have been conducted, and all corporate powers are or have been exercised by or under, the direction of the respective board of directors of each corporation. However, OroHealth and Oroville Hospital each refer to their board of directors as their "board of trustees," and the term "trustees" is the functional and legal equivalent of the term "directors" as that term is defined in California Corporations Code § 5047.

20. At all times relevant to this proceeding, the bylaws of OroHeath and Oroville Hospital each mandated that the board of trustees of each respective organization maintain a slate of at least seven directors.

21. On information and belief, the trustees of OroHealth and Oroville Hospital from 2011 to the present are listed as follows:

a. Robert J. Wentz (resigned 2026)
b. Matthew J. Bazzani, M.D.
c. Margaret Mallette
d. Roy C. Shannon, M.D.
e. Sultan Chopan, M.D.
f. James H. Moll
g. Kelly Albrecht (resigned prior to 2016)
h. William N. Morris
i. Edward R. Gilbert
j. Seng Yang
k. Richard Cochrane
l. T.C. Dennis
m. Narinder Singh

22. On information and belief, at all times relevant to this proceeding, the tenures of the trustees on the boards of both OroHealth and Oroville Hospital substantially overlapped. During any

given period, most of the members of the board of OroHealth also served on the board of Oroville Hospital, such that any meeting of the board of trustees of OroHealth constituted a voting quorum for Oroville Hospital. The Bylaws of OroHealth state that, "The Trustees of the Corporation shall also be the members of the Board of Trustees of Oroville Hospital." Ex. 2, Art. IV, § 3(a). On information and belief, at all times relevant to this proceeding, every meeting of the OroHealth board of trustees also constituted a meeting of the board of trustees of Oroville Hospital.

23. At all times relevant to this proceeding, the bylaws of OroHeath and Oroville Hospital each contained the following provision entitled "Conflict of Interest":

> The Board of Trustees shall enforce a policy on conflicts of interest and self-dealing that requires a disclosure by all Trustees and officers of this Corporation and other persons in a position to influence corporate decisions of actual and potential conflicts of interest and that will assure that no person holding such a position will be permitted to vote on any issue, motion or resolution that directly or indirectly inures to his or her benefit financially or with respect to which he or she shall have any other conflict of interest, except that such individual may be counted in order to qualify a quorum, and, except as the Board may otherwise direct, may participate in a discussion of such an issue, motion, or resolution if he or she first discloses the nature of his or her own interest.

24. At all times relevant to this proceeding, the bylaws of OroHeath and Oroville Hospital each contained the following provision entitled "Appropriation of Business Opportunity and Confidential Information":

> No Trustee or officer of this Corporation may appropriate or divert to others any opportunity for profit in connection with a transaction in which it is known or could be anticipated that this Corporation is or would be interested. Such opportunities include but are not limited to, acquisition of real or personal property, appointment of suppliers, or design or development of new products, services or areas of business related to this Corporation's present or planned services or service areas.

**B. Mr. Wentz's Domination and Control of the Boards of Trustees of Both OroHealth and Oroville Hospital, and the Sustained or Systematic Failure of the Boards to Exercise Oversight**

25. On information and belief, Mr. Wentz was first appointed as a trustee on the boards of trustees of OroHealth and Oroville Hospital in 1988. On information and belief, Mr. Wentz became CEO of OroHealth and Oroville Hospital at some time in 1988.

26. On information and belief, at all times relevant to this proceeding, Mr. Wentz completely dominated and controlled the boards of trustees of both OroHealth and Oroville Hospital, had full control of the business of both entities in his hands, and the other trustees on the boards of OroHealth and Oroville Hospital had in all respects ceased to function as trustees of those entities and had instead vested the full direction and control of the two entities in Mr. Wentz. Mr. Wentz unilaterally determined all financial operations of Plaintiffs, including budgets, employee compensation for all employees of both entities, and determination of which contractors could do business with Plaintiffs.

27. On information and belief, at all times relevant to this Complaint the boards of trustees of both OroHealth and Oroville Hospital suffered from a sustained or systematic failure to exercise oversight of financial initiatives led by Mr. Wentz. The boards of both OroHealth and Oroville Hospital utterly failed to even attempt to assure that a reasonable information and reporting system was in existence at any time during the applicable period. On information and belief, neither of the boards ever implemented written or even oral policies at the board-level system of monitoring and reporting with respect to the financial decisions proposed by Mr. Wentz. On information and belief, this lack of controls occurred at the behest and under the control of Mr. Wentz.

28. On information and belief, at the time of the transactions alleged in this Complaint, each trustee had been directly appointed upon the recommendation of Mr. Wentz. On information and belief, each of the trustees serving alongside Mr. Wentz was further a "controlled director," in that they were either dominated by Mr. Wentz through close personal relationships that had been carefully cultivated by Mr. Wentz to assure compliance, and/or through a reputational need to follow

Mr. Wentz's desired directives upon pain of dire personal or professional consequences for any dissent.

29. On information and belief, because Oroville Hospital is the largest employer in the area, Mr. Wentz did not need to have direct supervisory control over a trustee in order to exert influence. On information and belief, virtually all members of the community have a close family member or loved one who works for Oroville Hospital, and virtually all of those trustees would rely on Oroville Hospital for medical care at some point in their lives or the lives of their loved ones.

30. On information and belief, as the chief administrator of Plaintiffs in their capacities as a hospital and hospital system, Mr. Wentz exercised control over access to virtually every resource at the disposal of the other trustees, and all other employees of the Plaintiffs.

31. On information and belief, on a trustee-by-trustee basis, Mr. Wentz held close relationships with, as well as a strong level of financial control over, all of the trustees appointed to the boards of both OroHealth and Oroville Hospital for the entire period from 2011 to the present:

a. Matthew J. Bazzani, M.D. has, on information and belief, served on the boards of trustees of OroHealth and Oroville Hospital for over twenty years. Dr. Bazzani is an obstetrician/gynecologist with nearly thirty years of experience as a physician, and Dr. Bazzani specializes in high-risk deliveries of babies. Dr. Bazzani was appointed to the boards of OroHealth and Oroville Hospital based on Mr. Wentz's recommendation. Prior to becoming a trustee, Mr. Wentz and Dr. Bazzani had worked together every workday at the Hospital in close contact with each other, and by the time the boards were first presented with any details about the transactions involving the Property, Dr. Bazzani had known Mr. Wentz for over a decade. Dr. Bazzani had reposed deep of trust in Mr. Wentz's business judgment. Dr. Bazzani was trained and provided all of his formative instruction as to how to perform his duties as a member of the board of trustees of OroHealth and Oroville Hospital by Mr. Wentz. Dr. Bazzani had been steadily promoted at Oroville Hospital throughout his medical career due to the decisions of Mr. Wentz, who

unilaterally controlled hiring, promotions, and budgets at the Hospital. On information and belief, Dr. Bazzani knew that Mr. Wentz had the power to hire and fire Dr. Bazzani, and controlled the amount of money Dr. Bazzani could earn at the Hospital. In Dr. Bazzani's entire time on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

b. Margaret Mallette is a member of the Oroville community who has served on the board of directors of OroHealth starting years before the issues surrounding the Property were ever brought to the boards' attention. Ms. Mallette was a registered nurse and worked as the Intensive Care Unit director for Oroville Hospital. Ms. Millette had known Mr. Wentz for many decades, and on information and belief, was hand-picked by Mr. Wentz to serve on the board, and because Mr. Wentz believed that she would be loyal to him. Mr. Wentz provided all of her training in terms of how to be a board member for a hospital. During Ms. Millette's tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous, and her votes were always in lock-step with Mr. Wentz's proposals to the board.

c. Roy C. Shannon, M.D., an internist, has been a doctor at Oroville Hospital for over thirty years, and was recruited and hired by Mr. Wentz to work for Oroville Hospital. Dr. Shannon was appointed to the board of OroHealth on or about twenty-five years ago pursuant to a recommendation by Mr. Wentz. Mr. Wentz and Dr. Shannon have close personal ties, who like many other members of the board of directors, have known each other for more than two decades. Dr. Shannon has been promoted to several high-profile positions at Oroville Hospital, including as a former chairman of the board of trustees, chairman of the pharmacy committee at the Hospital, and also to head the prestigious Pharmacy & Therapeutics, Infection Control, and Blood

Utilization Committee at the Hospital. Mr. Wentz unilaterally controlled Dr. Shannon's promotions at Oroville Hospital. On information and belief, Dr. Shannon knew that Mr. Wentz had the power to hire and fire Dr. Shannon, and controlled the amount of money Dr. Shannon could earn at the Hospital. In Dr. Shannon's entire time on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

d. Sultan Chopan, M.D. specializes in primary care and family medicine, and has been a physician for over twenty years. On information and belief, Dr. Chopan's practice was acquired by Oroville Hospital in 2015, after being a long-standing private practice in Oroville. In 2017, Dr. Chopan was appointed to the board of OroHealth, based on Mr. Wentz's recommendation. Mr. Wentz unilaterally controlled Dr. Chopan's hiring and promotion at Oroville Hospital. On information and belief, Dr. Chopan holds one of the largest non-hospital investments in OHPAC Partners, LLC, which is an affiliate formerly managed through Mr. Wentz, and obtained interests in OHPAC Partners, LLC based on Mr. Wentz's solicitation. On information and belief, Dr. Chopan holds investments in Oroville Medical Partners, LLC, which is an affiliate formerly managed through Mr. Wentz, and obtained interests in Oroville Medical Partners, LLC based on Mr. Wentz's solicitation. On information and belief, Dr. Chopan knew that Mr. Wentz had the power to hire and fire Dr. Chopan, and controlled the amount of money Dr. Chopan could earn at the Hospital. During Dr. Chopan's tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

e. James H. Moll is a vice president of Stifel Financial Advisors. Mr. Moll has lived in Oroville since 1974, and is very active in the community, having served as a master of ceremonies for several community outings. He has

known Mr. Wentz since Mr. Wentz's arrival in the late 1980s, and on information and belief, Mr. Moll was chosen by Mr. Wentz to serve on the OroHealth board of trustees due to Mr. Wentz's belief that Mr. Moll would be loyal to Mr. Wentz, and would defer to Mr. Wentz's authority on business matters concerning Oroville Hospital. Mr. Moll has served on the OroHealth board of trustees for over twenty years, having formerly served as chairman of the board, and virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

f. Kelly Albrecht is a former attorney who practiced for approximately fifty years, and was a longtime Oroville resident. Mr. Albrecht served on the board of trustees of OroHealth for several years, resigning from the board in 2016. On information and belief, Mr. Albrecht knew Mr. Wentz prior to serving on the OroHealth board, and had been hired by Mr. Wentz to serve as his personal attorney on at least one occasion. On information and belief, Mr. Albrecht was appointed to the board of OroHealth based on Mr. Wentz's recommendation, and because Mr. Wentz believed he would be loyal to Mr. Wentz and would not question him. During Mr. Albrecht's tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

g. William N. Morris served on the OroHealth board of trustees for several years, resigning from the board in 2022. Mr. Morris served on the board for the entire period during which the board addressed issues regarding Mr. Wentz and the Property. Mr. Morris is a general contractor based in Oroville, and on information and belief, knew Mr. Wentz for several years before he was appointed by Mr. Wentz to become a trustee. Mr. Morris does not have any special experience relating to medical facility management or general business governance, and was chosen based on Mr. Wentz's recommendation. On information and belief, Mr. Wentz chose Mr. Morris because he believed

Mr. Morris would vote loyally for the initiatives proposed by Mr. Wentz. During Mr. Morris' tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

h. Edward R. Gilbert served on the board of OroHealth for over a decade, and was appointed to the position based on Mr. Wentz's recommendation. On information and belief, Mr. Gilbert works at a casino in the Oroville area, and served for a time as the casino's general manger. Mr. Gilbert knew Mr. Wentz based on their involvement in the community. Mr. Gilbert does not have any special experience relating to medical facility management, and was chosen to serve on OroHealth's board of trustees based on Mr. Wentz's recommendation. On information and belief, Mr. Gilbert was chosen by Mr. Wentz to serve on the board of trustees of OroHealth because Mr. Wentz believed Mr. Gilbert would vote loyally for the initiatives proposed by Mr. Wentz. During Mr. Gilbert's tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

i. Seng Yang is the Manager of the Hmong Cultural Center of Butte County, and is very active in nonprofit organizations in the Oroville area. On information and believe, Mr. Yang was appointed to the board of OroHealth in 2013, based on Mr. Wentz's recommendation. On information and belief, Mr. Yang does not have any special experience relating to medical facility management, and was chosen based on Mr. Wentz's recommendation. On information and belief, Mr. Yang was chosen by Mr. Wentz to serve on the board of trustees of OroHealth because Mr. Wentz believed Mr. Yang would vote loyally for the initiatives proposed by Mr. Wentz. During Mr. Yang's tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

j. Richard Cochrane is a former trustee and physician with over thirty years of experience as an ophthalmologist, and has been with Oroville Hospital for the majority of his medical career. Dr. Cochrane served on the board of OroHealth at the time Dove's Landing acquired the Property. Prior to becoming a trustee, Mr. Wentz and Dr. Cochrane had worked together every workday at the Hospital in close contact with each other, and by the time the boards were first presented with any details about the transactions involving the Property, Dr. Cochrane had known Mr. Wentz for over a decade. Dr. Cochrane was trained and provided all of his formative instruction as to how to perform his duties as a member of the board of trustees of OroHealth and Oroville Hospital by Mr. Wentz. On information and belief, Dr. Cochrane knew that Mr. Wentz had the power to hire and fire Dr. Cochrane, and controlled the amount of money Dr. Cochrane could earn at the Hospital. During Dr. Cochrane's entire tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

k. Thoeplis C.C. ("T.C.") Dennis (deceased) was a District Manager for the Oroville/Marysville districts of the California Water Service Company, and served on the board of OroHealth at the time Dove's Landing acquired the Property. Mr. Dennis was very active in the community, and on information and belief, Mr. Wentz recommended his appointment to the board of trustees of OroHealth because Mr. Wentz believed Mr. Dennis would vote loyally for the initiatives proposed by Mr. Wentz. On information and belief, Mr. Dennis did not have medical facilities, hospital experience, or expertise outside of his experience on the board of trustees of OroHealth, and was trained to act as a trustee of OroHealth exclusively by Mr. Wentz. During Mr. Dennis' tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

1. Narinder Singh, M.D. is a former trustee and physician with over thirty years of experience as an internist and primary care doctor, and has been with Oroville Hospital for nearly thirty years. Dr. Singh served on the board of OroHealth at the time Dove's Landing acquired the Property. Prior to becoming a trustee, Mr. Wentz and Dr. Singh had worked together every workday at the Hospital in close contact with each other, and by the time the boards were first presented with any details about the transactions involving the Property, Dr. Singh had known Mr. Wentz for over a decade. Dr. Singh had reposed deep of trust in Mr. Wentz's business judgment. Dr. Singh was trained and provided all of his formative instruction as to how to perform his duties as a member of the board of trustees of OroHealth and Oroville Hospital by Mr. Wentz. On information and belief, Dr. Singh knew that Mr. Wentz had the power to hire and fire Dr. Singh, and controlled the amount of money Dr. Singh could earn at the Hospital. During Dr. Singh's entire tenure on the board of OroHealth, virtually all of the board's decisions relating to the financial operations of Oroville Hospital were unanimous.

32. On information and belief, while the list of trustees alleged in this Complaint may not represent the entire panel of trustees of OroHealth and Oroville Hospital for any given period, the list of trustees alleged in this Complaint represented a quorum under the bylaws of both OroHealth and Oroville Hospital during any period from 2011 to the present.

33. On information and belief, by the time the transactions at issue in this Complaint occurred, Mr. Wentz had gained complete and unilateral control over all functional aspects of the day-to-day operations of the Plaintiffs, including payroll and compensation. On information and belief, at the time of the transactions at issue in the Complaint, all of the trustees on the boards of both Plaintiffs were so dominated by Mr. Wentz that they were unable to consider the corporate merits of the challenged transaction objectively, and demonstrated objective voting patterns which showed that they felt their financial well-being was tied to their agreement and lock-step voting with Mr. Wentz on all matters of corporate governance of the Plaintiffs.

**C. January 25, 2011 – March 1, 2011: Mr. Wentz Approaches the Boards of OroHealth and Oroville Hospital With the Opportunity to Purchase the Property, But Misinforms Them About Key Details About the Potential Acquisition**

34. On information and belief, at the joint meeting of OroHealth's and Oroville Hospital's boards of trustees held on January 25, 2011, Mr. Wentz introduced the idea of expanding Oroville Hospital's facilities using the building located on the Property, which at the time was an abandoned Montgomery Ward department store.

35. On information and belief, Mr. Wentz explained at the meeting that the Sports Club's (a Debtor affiliate) participation would be required in order for the Hospital to occupy space in the building on the Property, due to its position as a contiguous neighbor of the Property. On information and belief, this was not a true statement, and at the time Mr. Wentz made the statement, he knew it was not true. At the time Mr. Wentz made this comment, he was the owner of a majority interest in the Sports Club.

36. On information and belief, at the same meeting, Mr. Wentz stated that any acquisition of the Property by the Hospital would be fraught with controversy, and that any acquisition of the Property would be viewed as a conflict of interest on a host of unspecified issues. On information and belief, this comment arose in the context that the Sports Club's participation in the sale was a required part of any purchase of the Property by OroHealth or Oroville Hospital. This comment made it appear to the boards as though Mr. Wentz's participation in the sale, as a part owner of an entity that would be purchasing the Property, was a foregone conclusion, when in fact it was not.

37. On information and belief, at the same meeting, Mr. Wentz stated that if OroHealth and Oroville Hospital were interested in purchasing the Property, their funds to do so would be limited, and that they should use as little of OroHealth's cash as possible.

38. On information and belief, after raising the possibility of the purported potential conflicts of interest without discussing what conflict issues were actually implicated, Mr. Wentz then circulated a memorandum purportedly drafted by former attorney Robert Schuchard, entitled "Self-Dealing and Intermediate Sanctions, Stark, and Anti-Kickback" (the "Schuchard Memorandum"), without further discussion from the board members. On information and belief, among the topics

covered in the Schuchard Memorandum were the so-called "Stark Laws" enumerated under 42 U.S.C. § 1395nn, which are designed to curb kickbacks for business referrals and excessive compensation for directorships. The Schuchard Memorandum's discussion of Stark Laws included a section regarding the Stark Laws' prohibition against entering into leasing agreements charging an artificially low amount of rent pursuant to 42 U.S.C. §§ 1395nn(a)(1), (a)(2), and (e)(1)(A)(iv). Under 42 U.S.C. § 1395nn(e)(1)(A)(iv), a physician or health care entity which receives Medicare funds may not enter into a lease fall below fair market value because such sub-market leases are considered evidence of prohibited kickback arrangements for patient referrals between landlords and tenants who participate in, and receive claim payments under, Medicare.

39. On information and belief, Mr. Wentz highlighted the rental portion of the Schuchard Memorandum to accentuate the fact that any real property rented by a health care entity must be entered into in advance with the rental amount set at a fair market value, in order to make the board members feel that they had to pay market rent for the Property even before it was properly outfitted for use by a health care entity.

40. On information and belief, Mr. Wentz circulated the Schuchard Memorandum in combination with his comments about the difficulties in legality and available funds to purchase the Property, because he wanted to mislead the other trustees. Specifically, Mr. Wentz wanted the other trustees to believe that: (i) the Hospital needed to expand and that the Property would be the best location to do so; (ii) the trustees were compelled to vote against the Hospital acquiring title to the Property in its own name because the Hospital did not have sufficient funds or credit to do so, and that such an acquisition would create a conflict of interest; and (iii) the Hospital was required by law to pay full market rent for the Property even before it was renovated for a suitable purpose, because to pay less rent would be considered an illegal kickback. This was tantamount to not presenting the opportunity to the boards of OroHealth and Oroville Hospital at all.

41. At a subsequent joint meeting of the boards of trustees of OroHealth and Oroville Hospital held on March 1, 2011, Mr. Wentz again initiated a discussion about the acquisition of the Property. At this meeting, Mr. Wentz raised the possibility of OroHealth being a part owner of the

Property along with a group of private investors. In support of these discussions, Mr. Wentz again distributed copies of the Schuchard Memorandum to the other trustees.

42. On information and belief, after another discussion among the board members, Mr. Wentz moved the boards to allow him to investigate the options ranging from OroHealth having full ownership, to OroHealth having partial ownership, to OroHealth simply being a lessee only of the Property. The boards approved Mr. Wentz's motion unanimously.

**D. <u>May 31, 2011: At a Meeting of the Boards of Trustees of OroHealth and Oroville Hospital, the Boards Approve the MOU, and After the Meeting, OroHealth and Sports Club Enter Into the MOU</u>**

43. On information and belief, on May 31, 2011, at the joint meeting of OroHealth's and Oroville Hospital's boards of trustees held on May 31, 2011, Mr. Wentz presented a draft of the MOU to the boards of trustees. Under the proposed terms of the draft MOU, the Sports Club, as a promoter for a "limited liability company [which] will be created to own the property[,]" would acquire a 51% interest in the Property. The draft MOU further stated that, "In consideration for the acquisition and availability of said property," Oroville Hospital would lease the Property for a period of twenty years at a market rate set by the parties. Finally, the draft MOU stated that at the end of the twenty-year lease period, the new limited liability company would gift its entire fifty-one percent interest to Oroville Hospital.

44. On information and belief, the draft MOU was presented to the boards of trustees of OroHealth and Oroville Hospital as an opportunity to lease fifty-one percent of the space inside the Property, and not the entire Property. This significantly affected the joint boards' decisionmaking, as they believed that the renovations of the Property would only be required for the Hospital's portion of the Property, and not the full Property, and that the Hospital would not be able to acquire the entire Property for itself without a co-owning tenant-in-common.

45. On information and belief, after presenting the draft MOU, Mr. Wentz recused himself from further discussion or voting at the meeting.

46. On information and belief, after Mr. Wentz recused himself at the May 31, 2011 joint board meeting, the other board members discussed the terms of the proposed MOU. Upon objections

by trustee Kelly Albrecht, the MOU was amended to change the lease term from twenty years to "ten years with an option to renew[,]" that the term of any lease would be subject to approval of the board of trustees of Oroville Hospital, that the rental amount would be subject to approval by the OroHealth board of trustees, that OroHealth had the right to reject the gift of the Property, and that the new limited liability company would be "responsible for any major replacement or construction."

47. On information and belief, while trustee Kelly Albrecht was an attorney at the time the MOU was discussed by the boards, Mr. Albrecht was misinformed about the nature and mechanics of the transaction by Mr. Wentz, which rendered Mr. Albrecht's practical and legal advice regarding real estate inapplicable. Mr. Albrecht had been led to believe that the Sports Club was required to be a purchaser of the Property pursuant to the information that had been provided to him by Mr. Wentz, and that any interest of the Property that the Sports Club would purchase would be a partial, tenant-in-common interest. Therefore, Mr. Albrecht, and all of the other trustees but Mr. Wentz, were under the misapprehension that OroHealth and Oroville Hospital would not be contemplating full ownership of the Property, but only a fractional ownership interest with another co-owning tenant in common. Such an ownership arrangement in a commercial setting is far less valuable, and far less marketable, than a single owner holding title in fee simple, particularly an owner like a hospital or hospital system which accepts Medicare and is therefore subject to stringent regulations that can complicate any co-ownership arrangement and possibly place the hospital or hospital system at risk of violating federal, state, and local laws and regulations.

48. On information and belief, after the joint board's discussion, the board unanimously approved the MOU as amended, with Mr. Wentz recusing himself from the vote.

49. Directly after the joint meeting of the boards of OroHealth and Oroville Hospital concluded on May 31, 2011, the Sports Club and OroHealth entered into a the MOU. A true and correct copy of the MOU is attached hereto as Exhibit 1 and incorporated herein by this reference. Mr. Wentz signed the MOU on behalf of the Sports Club, and Dr. Bazzani signed the MOU on behalf of OroHealth. As discussed and approved in the joint board meeting that day, the terms of the MOU contemplated that Mr. Wentz, through the Sports Club, would acquire a 51% interest in Gold Town Plaza, LLC, which owned the Property. Further,

> [i]n consideration for the acquisition and availability of said property, Hospital is prepared to lease a portion of said property for its use for a term of no less than ten years with an option to renew. The lease will provide that Hospital will make all tenant improvements and be responsible and be responsible for its portion of taxes, maintenance and insurance. The term of the lease will be subject to the approval by OroHealth Board of Trustees.
>
> MOU, ¶ 2 at p. 1.

50. The MOU further provides that, at the end of the lease period, "the parties agree that [Sports Club] will transfer its 51 percent interest to Hospital as a gift, provided that the Hospital retains its independent nonprofit status and has remained an occupant of the space." *Id.*, ¶ 3 at 2.

51. On information and belief, the MOU was presented to the joint boards of trustees of both Plaintiffs by Mr. Wentz in a manner that was misleading and ultimately rendered the boards incapable of determining the true nature of the opportunity to purchase the Property, or the true risks that Plaintiffs would be assuming by leasing real property which they would be required to improve at their own sole cost, without any price concessions for the build-out term.

52. Moreover, the nature of Mr. Wentz's self-interest in the transaction—namely, that he would be a part-owner of the acquiring limited liability company—was never disclosed to the boards of Plaintiffs before they approved the MOU.

**E. <u>August 2011 – December 2012: Mr. Wentz Forms Dove's Landing, Mr. Wentz Receives Further Assurances From the Boards of OroHealth and the Hospital That They Will Lease the Entire Property If and Only If Dove's Landing Acquires the Entire Property</u>**

53. On information and belief, on August 11, 2011, Mr. Wentz formed Dove's Landing. On information and belief, Mr. Wentz owns 60% of the membership interests in this entity. On information and belief, a non-affiliated physician owns 20% of the membership interests in Dove's Landing, and the remaining 20% membership interest in Dove's Landing is owned by the spouse of a physician affiliated with Oroville Hospital.

54. At all times, Mr. Wentz and all of the other persons holding membership interests in Dove's Landing had a material financial interest in the business of Dove's Landing.

55. At a joint meeting of the boards of trustees of OroHealth and Oroville Hospital that occurred on November 29, 2011, Mr. Wentz informed the boards that Dove's Landing would be

purchasing the entire interest in the Property, and that OroHealth had the opportunity to lease the entire building situated on the Property, but that the lease should be contingent upon Dove's Landing's ownership of the entire building.

56. On information and belief, at the meeting which occurred on November 29, 2011, the joint boards voiced no objections to Mr. Wentz's proposed course of action with respect to the ownership of the Property and the lease being contingent upon Dove's Landing's ownership of the entire Property. On information and belief, the joint boards of trustees did not consider this a conflict of interest, or demand participation in the ownership of the Property, because they believed, pursuant to the information previously provided to them by Mr. Wentz, that OroHealth or Oroville Hospital's ownership of the Property would represent a conflict of interest based on the mechanics of the sale using the Sports Club as a proxy.

**F. December 15, 2011: OroHealth Enters Into the Initial Lease With Dove's Landing, Even Though Dove's Landing Has Not Yet Acquired the Property**

57. On December 15, 2011—and even though Dove's Landing had not yet even acquired the Property—OroHealth entered into a written lease agreement (the "Initial Lease") with Dove's Landing. A true and correct copy of the Initial Lease is attached hereto as Exhibit 2 and incorporated herein by this reference.

58. The Initial Lease provided that the term of the lease was to start either from the date of OroHealth's occupancy or four months from the date of Dove's Landing's acquisition of the Property, whichever occurred first. Initial Lease § 2. The Initial Lease stated that it would run for a ten-year term, and that OroHealth would have the option to renew the Initial Lease for two additional terms of five years each. *Id.*

59. The Initial Lease contemplates that the Property will be used by, and improved by, OroHealth, and provides for the lease of approximately 60,000 square feet of the Property. Initial Lease §§ 1, 6, Ex. B. Rent would commence at $1.10 per square foot, per month, with annual increases based on the Consumer's Price Index. *Id.*, § 3. OroHealth was required to pay all property taxes, maintenance costs, and insurance. *Id.*, §§ 5-7.

60. The Lease further includes charges for common area maintenance, or "CAMs" charges, which are itemized and expressly enumerated in the Lease. Initial Lease § 6.

**G. June 26, 2012 – July 31, 2012: Mr. Wentz Offers OroHealth the Opportunity to Purchase a "Non-Recourse Ownership" Interest in the Property, But Mr. Wentz Subsequently Rescinds the Offer**

61. At another joint meeting of the boards of trustees of OroHealth and Oroville Hospital that occurred on June 26, 2012, Mr. Wentz informed the joint boards that he and the two other members of Dove's Landing were seeking additional capital, and offered a portion of "non-recourse ownership" in the Property to OroHealth and the Hospital. On information and belief, the term "non-recourse ownership" was used by Mr. Wentz to denote an ownership interest that would be subject to turnover to the Hospital after a lease term. On information and belief, this offer of "non-recourse ownership" was the first time that OroHealth or Oroville Hospital had been offered the opportunity for record title ownership of the Property by Mr. Wentz without the inclusion of onerous co-owners who wished to lease a portion of the Property to different tenants. Even then, however, Mr. Wentz did not offer either OroHealth or Oroville Hospital the opportunity to purchase the full share of the Property, as he was doing through Dove's Landing.

62. On information and belief, at the joint meeting of the boards of trustees of OroHealth and Oroville Hospital that occurred on June 26, 2012, Mr. Wentz told the joint boards of trustees that the partnership agreement between the investors in Dove's Landing included language committed to gifting the Property back to OroHealth at the end of an extended lease term with the conditions that had been included previously in the MOU. Therefore, OroHealth and Oroville Hospital accepted not being presented with complete "non-recourse ownership" of the Property on the basis that they were in fact the "recourse owners" of the Property and were simply financing their purchase of the Property through Dove's Landing.

63. On information and belief, at the joint meeting of the boards of trustees of OroHealth and Oroville Hospital that occurred on June 26, 2012, Mr. Wentz told the joint boards of trustees that OroHealth's investment of cash at the time of purchase would reduce the cost of the bank loan and therefore reduce OroHealth's lease payments.

64. On information and belief, and in reliance upon the representations of Mr. Wentz, the joint boards of trustees of OroHealth and Oroville Hospital unanimously approved a motion to participate in the purchase of the Property.

65. At another joint meeting of the boards of trustees of OroHealth and Oroville Hospital that occurred on July 31, 2012, Mr. Wentz informed the joint boards that the lender with whom Dove's Landing was engaging to provide financing for the purchase of the Property was no longer offering OroHealth or Oroville Hospital the ability to participate as an owner of the Property. On information and belief, this representation was not true, and Mr. Wentz knew the representation was not true when he made it. However, because the joint boards of trustees believed that they were in fact going to be the owners of the Property after a term of years, and that Dove's Landing's ownership of the Property was in fact just a vehicle to finance Oroville Hospital's eventual ownership of the Property, the boards did not take any issue with not being offered an immediate ownership stake in the Property.

**H. December 24, 2012: Dove's Landing Acquires the Property**

66. Dove's Landing ultimately acquired the Property on or about December 24, 2012, for a purchase price of $5,700,000, pursuant to a grant deed (the "Grant Deed") recorded in the Butte County Clerk-Recorder's Office as Instrument No. 2012-0050716 on December 28, 2012. A true and correct copy of the Grant Deed is attached hereto as Exhibit 3 and incorporated herein by this reference.

67. Dove's Landing financed its purchase of the Property pursuant to a loan secured by a deed of trust (the "First Deed of Trust"). A true and correct copy of the First Deed of Trust is attached hereto as Exhibit 4 and incorporated herein by this reference.

**I. January 2013 – August 2015: OroHealth Begins Its Occupancy of the Property, and Builds $7 Million in Improvements on the Property Which Are Paid for By the Hospital**

68. On information and belief, OroHealth and Oroville Hospital began their occupancy of the Property in approximately January of 2013.

69. On information and belief, at the time OroHealth began its occupancy, the fair market value of the monthly rental payments under the Initial Lease were grossly excessive for the square

footage, location, and condition of the Property that Plaintiffs received in return. Plaintiffs were essentially given possession of a dilapidated department store in an undesirable area, but were paying a monthly rental amount commensurate with a completed, updated, and state-of-the-art hospital facility in a desirable area.

70. Upon taking possession of the Property, the Hospital spent approximately $7 million on improvements to the Property to refit the Property suitable to standards applicable to California hospital operations. The refit was necessary because the Hospital contemplated moving licensed services to the Property, including clinic operations, which must be compliant with standards applicable to the Hospital's license. The improvements were completed in approximately August of 2015, at which time the Hospital received a certificate of occupancy from the City of Oroville's Building Division.

71. During the renovation period, neither of the Plaintiffs received revenue from the operation of the Property. Yet Plaintiffs timely made all payments to Dove's Landing under the Initial Lease.

72. During the renovation period, OroHealth took out a loan with Comerica Bank.

J. **January 1, 2018 – July 5, 2018: OroHealth Enters the Renewal Lease With Dove's Landing Approximately Four Years Early, and Dove's Landing Refinances Its Initial Loan**

73. On January 1, 2018, OroHealth entered into a renewed lease (the "Renewal Lease") with Dove's Landing. A true and correct copy of the Renewal Lease is attached hereto as Exhibit 5 and incorporated herein by this reference. The Renewal Lease contemplates the lease of approximately 60,000 square feet of the Property that will be used by, and improved by, the Hospital. Renewal Lease, §§ 1, 6. The Renewal Lease provides for a ten-year term, commencing in January of 2018, and that OroHealth would have the option to renew the Initial Lease for two additional terms of five years each. *Id.* § 2. Rent commenced at $1.19 per square foot, per month, with annual increases based on the Consumer's Price Index. *See id.* Under the Renewal Lease, Plaintiffs lease approximately 92% of the property owned by Dove's Landing and utilize the

facilities for physician offices, clinical operations, and executive offices for the Hospital's operations.

74. The Renewal Lease further includes CAMs charges, which are itemized and expressly enumerated in the Lease. Renewal Lease § 6.

75. On information and belief, in or around January of 2018, Dove's Landing was also in the process of refinancing its original purchase money loan that it had used to purchase the Property.

76. On information and belief, the terms of the Renewal Lease were drafted to reflect the additional costs that a new refinancing note would cost, and matched the anticipated amount of the debt service, with some profit for Dove's Landing. On information and belief, the terms and timing of the Renewal Lease are strong indicia that Oroville Hospital was to receive the Property at the end of the Renewal Lease.

77. On information and belief, from the onset of the Renewal Lease, Dove's Landing began overcharging OroHealth, by charging OroHealth for 5,000 square feet of space that OroHealth was not using.

78. On information and belief, from the onset of the Renewal Lease, Dove's Landing began overcharging OroHealth for CAMs charges, including charges that were not properly considered CAMs as enumerated under the Renewal Lease.

79. On information and belief, the rental amount charged by Dove's Landing was not fair and reasonable to OroHealth, and was approximately 7.8% above the fair market value range for the Property.

**K. <u>February 13, 2019: In the Official Statement Provided to Potential Bond Purchasers Financing Oroville Hospital's Operations Signed By Mr. Wentz, Oroville Hospital's Disclosures Indicate That the Property is Owned By Oroville Hospital</u>**

80. On February 13, 2019, Oroville Hospital issued an Official Statement (the "<u>Official Statement</u>") as part of an effort to raise bond money to support the Hospital's operations. The Official Statement was signed by Mr. Wentz on behalf of Oroville Hospital.

81. In the in the "Notes to Consolidated Financial Statements," portion of the Official Statement, Oroville Hospital disclosed a schedule of Notes Payable (the "<u>Notes Payable Schedule</u>").

The Notes Payable Schedule includes the following disclosure: "Note payable to Comerica Bank in monthly installments of $77,380, plus interest based on a variable rate through May 2022. The variable rate is one month LIBOR plus 0.75 %, effectively 1.374% as of November 30, 2017. The note is secured by the Dove's Landing medical complex[.]" The entry then lists the note payoff of $4,101,219 for 2017 and a payoff of $5,029,790 for 2016. The context of the Notes Payable schedule shows several other notes which are secured by real and personal property owned by the hospital.

82. It would not have been compliant with Generally Accepted Accounting Principles ("GAAP") to classify a note payable as a liability of the Hospital unless the Hospital owned the Property which secured the note.

**L. December 8, 2025-Present: Plaintiffs File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code, and Discover Evidence of Disguised Financing and Self-Dealing By Mr. Wentz, and Mr. Wentz Resigns From the Boards of Trustees of OroHealth and Oroville Hospital**

83. On December 8, 2025 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, initiating the chapter 11 cases upon which this adversary proceeding is based.

84. Plaintiffs inadvertently paid a post-petition invoice in the amount of approximately $380,000 to Dove's Landing on account of prepetition CAMs charges. Moreover, upon Plaintiffs' evaluation of the CAMs charges asserted by Doves' Landing, Plaintiffs determined that certain CAMs charges were not provided for under the Renewal Lease, yet were still being sought by Dove's Landing.

85. Plaintiffs further discovered post-petition that they had paid for 5,000 square feet that were not included in the Renewal Lease or used by Plaintiffs, and the addition of this square footage resulted in approximately $721,329 in excess rent charges during the term of the Renewal Lease.

86. On information and belief, the rent increases under the Renewal Lease have resulted in rent that was 7.8% above the fair market value range for the Property.

87. In approximately February of 2026, Mr. Wentz resigned from his positions on the boards of trustees of both OroHealth and Oroville Hospital following negotiations concerning the

Debtors' postpetition financing. In approximately April of 2026, Mr. Wentz resigned from his position as Chief Executive Officer of OroHealth and Oroville Hospital. On information and belief, he did so believing that he would not have to honor the promises he made to the boards of trustees of OroHealth and Oroville Hospital to transfer title to the Property to Oroville Hospital. Despite incurring the reliance of OroHealth and Oroville Hospital and causing them to spend millions of dollars in improvements funded in large part by Medicare payments and other taxpayer-funded medical subsidies, Mr. Wentz now believes he can simply take the Property for himself, as his "retirement." He is mistaken.

## FIRST CLAIM FOR RELIEF

### Declaratory Relief/Recharacterization

### (Plaintiffs Against Dove's Landing)

88. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 87 as if fully set forth herein.

89. An actual controversy has arisen and now exists between Plaintiffs and Dove's Landing as to whether the Lease Transactions constitute a "lease" under the Bankruptcy Code or instead should be recharacterized as a financing arrangement pursuant to which Plaintiffs purchased the Property. *See* 28 U.S.C. § 2201.

90. As alleged above, the Lease Transactions were not "leases" at all, but were made solely as security for the repayment of the purchase price paid by Dove's Landing. Plaintiffs and Dove's Landing mutually intended and understood that the Lease Transactions were not true leases, but rather were given to secure Dove's Landing's financing of the Property.

91. In uncovering financing arrangements disguised as leases, courts in this Circuit conduct a contextual analysis that scrutinizes the economic realities of the transaction or transactions at issue. The Ninth Circuit requires courts to apply a threshold true sale test for which the transfer-of-risk is a primary factor. If the risks associated with ownership have been wholly transferred to the party who is not the owner of record title to the property under the transaction, the transaction is considered a true sale disguised as a lease.

92. Several factors demonstrate dispositive indicia that the Lease Transactions at issue in this action were intended to reflect a true sale and financing, and not a lease as those documents have been previously characterized.

93. First, on information and belief, as part of his disclosures to the boards of trustees of both OroHealth and Oroville Hospital, Mr. Wentz stated that the Property would be beneficially owned by the Hospital, and that title to the entire Property would be given to the Property upon the end of two lease terms. The boards of both OroHealth and Oroville Hospital approved the Lease Transactions in reliance upon Mr. Wentz's representation that the Property would be beneficially owned by the Hospital with title to eventually vest in the Hospital, and incurred over $7 million in renovation charges in further reliance upon this representation.

94. Second, on information and belief, the Initial Lease requires OroHealth to make monthly payments of approximately $77,380, plus CAMs that totaled six figures each year of the existence of the Initial Lease. The Renewal Lease requires OroHealth to make monthly payments of $1.19 per square foot of leased area used by the Hospital, but also charges the Hospital for 5,000 square feet of space that is not used by the Hospital or OroHealth. The Renewal Lease also charges OroHealth for CAMs, and these payments amounted to over six figures for each year of the existence of the Lease. On information and belief, the "lease" charges paid each year by Plaintiffs mirrored those paid by Dove's Landing to the secured note-holders with security interests in the Property, and also covered all other costs of ownership incurred by Dove's Landing (along with conferring additional profits to Dove's Landing), including any down payment made by Dove's Landing as part of the sale of the Property.

95. Third, the Renewal Lease, which dramatically increases the rent OroHealth must pay for the Property, does not align with the term of the Initial Lease, and instead, on information and belief, was done in anticipation of a refinancing of the Property by Dove's Landing which all parties knew would increase the monthly debt service associated with the acquisition costs of the Property. The Initial Lease term was set to begin, at the earliest, in January of 2012, and was to run for ten years at a lower monthly payment amount, or until January of 2022. Yet OroHealth and Dove's Landing entered into the Renewal Lease, which offers less advantageous terms to OroHealth, on

January 1, 2018, four years ahead of schedule. Meanwhile, the Second Deed of Trust was recorded on July 5, 2018, and was executed on or about June 14, 2018. On information and belief, the only reason OroHealth would have to enter into the Renewal Lease which required it to pay substantially greater rent, is because the Renewal Lease is not a lease at all, but merely part of the disguised financing of the Property.

96. Fourth, all of the costs associated with the ownership and operation of the Property have been borne exclusively by Plaintiffs. Plaintiffs funded all improvements and renovations to the Property after it was acquired by Dove's Landing. Plaintiffs have further paid all property taxes, insurance, CAMs, maintenance costs, and other carrying costs that would normally be associated with ownership of the Property.

97. Fifth, the publicly disclosed documents in the Official Statement provided to bondholders by OroHealth and Oroville Hospital in 2019—whose final preparation and approval had been entirely delegated to Mr. Wentz by the boards of both entities—discloses that the "Note payable" to a third-party lender, which was at that time secured by the Property, is a liability of Oroville Hospital. It would not have been GAAP-compliant to classify a note payable as a liability of the Hospital unless the Hospital owned the Property which secured the note.

98. Sixth, the MOU signed by Mr. Wentz on behalf of the Sports Club (as a promoter for a "limited liability company [which] will be created to own the property") and by Dr. Bazzani on behalf of OroHealth, contemplates a reversionary interest in the Property indicative of a grant of the Sports Club's promotee's entire interest in the Property, which requires OroHealth to part with no additional consideration.

99. Seventh, the aggregate combined term-of-years of the Lease Transactions spans the entire useful life of the Property. While the core and shell of the original building that had served as a department store was approximately 70 years old and nearing the end of its useful life, the Hospital's renovations to the building extended its useful life and altered its use. The specific improvements which allow the Property to function as a medical facility—all of which were paid for by Plaintiffs—have a useful life of approximately fifteen to twenty years before significant reinvestment and renovation in the Property is required. Much of the depreciation schedule of a

medical facility is dependent upon the medical equipment inside of it, as well as the electrical and HVAC facilities, all of which require regular updates in order to comply with applicable medical standards as regulated by federal, state, and local government authorities.

100. For these reasons, Plaintiffs request a declaration that the Lease Transactions do not constitute "leases" under the Bankruptcy Code, but instead should be recharacterized as a financing arrangement pursuant to which Oroville Hospital is the rightful owner of beneficial and record title to the Property.

**SECOND CLAIM FOR RELIEF**

**Quiet Title**

**(Plaintiffs Against Dove's Landing)**

101. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 100 as if fully set forth herein.

102. As alleged above, the Lease Transactions were not "leases" at all, but were made solely as security for the repayment of the purchase price paid by Dove's Landing. Plaintiffs and Dove's Landing mutually intended and understood that the Lease Transactions were not true leases, but rather were given to secure Dove's Landing's financing of the Property.

103. At all times relevant to this action, Defendant Dove's Landing claims an adverse interest in beneficial ownership and fee simple title to the Property, which claim is without right. Defendant Dove's Landing's interest, if any, is not an ownership interest, but a lien interest, subject to offset and equitable adjustment, including a determination that such lien is entirely subsumed by existing financing encumbering the Property, which shall be assumed by Plaintiffs upon the transfer of title to the Property to Plaintiffs.

104. At all times relevant to this action, Oroville Hospital held and now holds an interest in the Property as sole owner in fee simple, and is entitled to exclusive possession of the Property, subject to such liens as are appropriate by title and equity. Oroville Hospital holds this interest as the true owner of the Property pursuant to a disguised financing arrangement and true sale as discussed in the First Claim for Relief.

105. Several factors demonstrate dispositive indicia that the Lease Transactions at issue in this action were intended to reflect a true sale and financing, and not a lease as those documents have been previously characterized.

106. First, on information and belief, as part of his disclosures to the boards of trustees of both OroHealth and Oroville Hospital, Mr. Wentz stated that the Property would be beneficially owned by the Hospital, and that title to the entire Property would be given to the Property upon the end of two lease terms. The boards of both OroHealth and Oroville Hospital approved the Lease Transactions in reliance upon Mr. Wentz's representation that the Property would be beneficially owned by the Hospital with title to eventually vest in the Hospital, and incurred over $7 million in renovation charges in further reliance upon this representation.

107. Second, on information and belief, the Initial Lease requires OroHealth to make monthly payments of approximately $77,380, plus CAMs that totaled six figures each year of the existence of the Initial Lease. The Renewal Lease requires OroHealth to make monthly payments of $1.19 per square foot of leased area used by the Hospital, but also charges the Hospital for 5,000 square feet of space that is not used by the Hospital or OroHealth. The Renewal Lease also charges OroHealth for CAMs, and these payments amounted to over six figures for each year of the existence of the Lease. On information and belief, the "lease" charges paid each year by Plaintiffs mirrored those paid by Dove's Landing to the secured note-holders with security interests in the Property, and also covered all other costs of ownership incurred by Dove's Landing (along with conferring additional profits to Dove's Landing), including any down payment made by Dove's Landing as part of the sale of the Property.

108. Third, the Renewal Lease, which dramatically increases the rent OroHealth must pay for the Property, does not align with the term of the Initial Lease, and instead, on information and belief, was done in anticipation of a refinancing of the Property by Dove's Landing which all parties knew would increase the monthly debt service associated with the acquisition costs of the Property. The Initial Lease term was set to begin, at the earliest, in January of 2012, and was to run for ten years at a lower monthly payment amount, or until January of 2022. Yet OroHealth and Dove's Landing entered into the Renewal Lease, which offers less advantageous terms to OroHealth, on

January 1, 2018, four years ahead of schedule. Meanwhile, the Second Deed of Trust was recorded on July 5, 2018, and was executed on or about June 14, 2018. On information and belief, the only reason OroHealth would have to enter into the Renewal Lease which required it to pay substantially greater rent, is because the Renewal Lease is not a lease at all, but merely part of the disguised financing of the Property.

109. Fourth, all of the costs associated with the ownership and operation of the Property have been borne exclusively by Plaintiffs. Plaintiffs funded all improvements and renovations to the Property after it was acquired by Dove's Landing. Plaintiffs have further paid all property taxes, insurance, CAMs, maintenance costs, and other carrying costs that would normally be associated with ownership of the Property.

110. Fifth, the publicly disclosed documents in the Official Statement provided to bondholders by OroHealth and Oroville Hospital in 2019—whose final preparation and approval had been entirely delegated to Mr. Wentz by the boards of both entities—discloses that the "Note payable" to a third-party lender, which was at that time secured by the Property, is a liability of Oroville Hospital. It would not have been GAAP-compliant to classify a note payable as a liability of the Hospital unless the Hospital owned the Property which secured the note.

111. Sixth, the MOU signed by Mr. Wentz on behalf of the Sports Club (as a promoter for a "limited liability company [which] will be created to own the property") and by Dr. Bazzani on behalf of OroHealth, contemplates a reversionary interest in the Property indicative of a grant of the Sports Club's promotee's entire interest in the Property, which requires OroHealth to part with no additional consideration.

112. Seventh, the aggregate combined term-of-years of the Lease Transactions spans the entire useful life of the Property. While the core and shell of the original building that had served as a department store was approximately 70 years old and nearing the end of its useful life, the Hospital's renovations to the building extended its useful life and altered its use. The specific improvements which allow the Property to function as a medical facility—all of which were paid for by Plaintiffs—have a useful life of approximately fifteen to twenty years before significant reinvestment and renovation in the Property is required. Much of the depreciation schedule of a

medical facility is dependent upon the medical equipment inside of it, as well as the electrical and HVAC facilities, all of which require regular updates in order to comply with applicable medical standards as regulated by federal, state, and local government authorities.

113. Plaintiffs seek to quiet title against all or any right, title, estate, or interest in the Property outside of a possible lien interest, which Defendant Dove's Landing claims pursuant to the Grant Deed whose priority relates back to December 28, 2012, the date on which the Grant Deed was recorded. Ex. 3.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Imposition of Equitable Mortgage [Cal. Civ. Code § 2925]**

**(Plaintiffs Against Dove's Landing)**

114. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 113 as if fully set forth herein.

115. To the extent that the Court should grant the relief requested under the First and Second Claims for Relief, and determine that there is any amount due and owing to Dove's Landing, Plaintiffs bring this cause of action to convert the existing Renewal Lease into an equitable mortgage for any such amounts that the Court determines are due and owing to Dove's Landing.

116. Pursuant to California Civil Code § 2924, "Every transfer of an interest in property, other than in trust, made only as a security for the performance of another act, is to be deemed a mortgage." *Id.*

117. Pursuant to California Civil Code § 2925, "The fact that a transfer was made subject to defeasance on a condition, may, for the purpose of showing such transfer to be a mortgage, be proved (except as against a subsequent purchaser or incumbrancer for value and without notice), though the fact does not appear by the terms of the instrument." *Id.*

118. A deed absolute in form, such as the Grant Deed, will be declared an equitable mortgage where the evidence demonstrates that the parties intended the conveyance as security for a debt, regardless of the language of the instrument. (*Beeler v. American Trust Co.* (1944) 24 Cal.2d 1, 7 ["It is without doubt the law, as repeatedly declared in our decisions, that clear and convincing

evidence is required to justify a court in finding that a deed which purports to convey land absolutely in fee simple was intended to be a mortgage"]; *Sheehan v. Sullivan* (1899) 126 Cal.189, 193.)

119. Whether a deed absolute in form constitutes a mortgage is a question of the parties' intention, "to be inferred from all the facts and circumstances of the transaction in which the deed was executed, taken in connection with the conduct of the parties after its execution." *Jensen v. Friedman*, 79 Cal.App.2d 494, 498 (1947), quoting *Montgomery v. Spect*, 55 Cal.352, 353 (1880).

120. As alleged above, the Lease Transactions were not "leases" at all, but were made solely as security for the repayment of the purchase price paid by Dove's Landing. Plaintiffs and Dove's Landing mutually intended and understood that the Lease Transactions were not true leases, but rather were given to secure Dove's Landing's financing of the Property.

121. Several factors demonstrate dispositive indicia that the Lease Transactions at issue in this action were intended to reflect a true sale and financing, and not a lease as those documents have been previously characterized.

122. First, on information and belief, as part of his disclosures to the boards of trustees of both OroHealth and Oroville Hospital, Mr. Wentz stated that the Property would be beneficially owned by the Hospital, and that title to the entire Property would be given to the Property upon the end of two lease terms. The boards of both OroHealth and Oroville Hospital approved the Lease Transactions in reliance upon Mr. Wentz's representation that the Property would be beneficially owned by the Hospital with title to eventually vest in the Hospital, and incurred over $7 million in renovation charges in further reliance upon this representation.

123. Second, on information and belief, the Initial Lease requires OroHealth to make monthly payments of approximately $77,380, plus CAMs that totaled six figures each year of the existence of the Initial Lease. The Renewal Lease requires OroHealth to make monthly payments of $1.19 per square foot of leased area used by the Hospital, but also charges the Hospital for 5,000 square feet of space that is not used by the Hospital or OroHealth. The Renewal Lease also charges OroHealth for CAMs, and these payments amounted to over six figures for each year of the existence of the Lease. On information and belief, the "lease" charges paid each year by Plaintiffs mirrored those paid by Dove's Landing to the secured note-holders with security interests in the

Property, and also covered all other costs of ownership incurred by Dove's Landing (along with conferring additional profits to Dove's Landing), including any down payment made by Dove's Landing as part of the sale of the Property.

124. Third, the Renewal Lease, which dramatically increases the rent OroHealth must pay for the Property, does not align with the term of the Initial Lease, and instead, on information and belief, was done in anticipation of a refinancing of the Property by Dove's Landing which all parties knew would increase the monthly debt service associated with the acquisition costs of the Property. The Initial Lease term was set to begin, at the earliest, in January of 2012, and was to run for ten years at a lower monthly payment amount, or until January of 2022. Yet OroHealth and Dove's Landing entered into the Renewal Lease, which offers less advantageous terms to OroHealth, on January 1, 2018, four years ahead of schedule. Meanwhile, the Second Deed of Trust was recorded on July 5, 2018, and was executed on or about June 14, 2018. On information and belief, the only reason OroHealth would have to enter into the Renewal Lease which required it to pay substantially greater rent, is because the Renewal Lease is not a lease at all, but merely part of the disguised financing of the Property.

125. Fourth, all of the costs associated with the ownership and operation of the Property have been borne exclusively by Plaintiffs. Plaintiffs funded all improvements and renovations to the Property after it was acquired by Dove's Landing. Plaintiffs have further paid all property taxes, insurance, CAMs, maintenance costs, and other carrying costs that would normally be associated with ownership of the Property.

126. Fifth, the publicly disclosed documents in the Official Statement provided to bondholders by OroHealth and Oroville Hospital in 2019—whose final preparation and approval had been entirely delegated to Mr. Wentz by the boards of both entities—discloses that the "Note payable" to a third-party lender, which was at that time secured by the Property, is a liability of Oroville Hospital. It would not have been GAAP-compliant to classify a note payable as a liability of the Hospital unless the Hospital owned the Property which secured the note.

127. Sixth, the MOU signed by Mr. Wentz on behalf of the Sports Club (as a promoter for a "limited liability company [which] will be created to own the property") and by Dr. Bazzani on

behalf of OroHealth, contemplates a reversionary interest in the Property indicative of a grant of the Sports Club's promotee's entire interest in the Property, which requires OroHealth to part with no additional consideration.

128. Seventh, the aggregate combined term-of-years of the Lease Transactions spans the entire useful life of the Property. While the core and shell of the original building that had served as a department store was approximately 70 years old and nearing the end of its useful life, the Hospital's renovations to the building extended its useful life and altered its use. The specific improvements which allow the Property to function as a medical facility—all of which were paid for by Plaintiffs—have a useful life of approximately fifteen to twenty years before significant reinvestment and renovation in the Property is required. Much of the depreciation schedule of a medical facility is dependent upon the medical equipment inside of it, as well as the electrical and HVAC facilities, all of which require regular updates in order to comply with applicable medical standards as regulated by federal, state, and local government authorities.

129. Based on the foregoing, the Lease Transactions, constitute a grant deed in favor of Oroville Hospital and an equitable mortgage on the Property securing the purchase price paid by Dove's Landing, if any amount is due and owing to Dove's Landing. Plaintiff is entitled to a judicial declaration that the Lease Transactions are a grant deed and mortgage and not true leases, to a determination of the amount currently due and owing to repay the purchase money lien, and to an opportunity to assume the existing first-position deed of trust held by a third-party lender.

**FOURTH CLAIM FOR RELIEF**

**Breach of Fiduciary Duty [Common Law]**

**(Plaintiffs Against Dove's Landing, the Sports Club, and Robert J. Wentz)**

130. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 129 as if fully set forth herein.

131. To the extent that this claim seeks turnover of title to the Property to Plaintiffs and not disgorgement of other property, this claim is asserted in the alternative to the First, Second, and Third Claims asserted in this Complaint. Should the Court treat the Lease Transactions as a "true

sale," then this cause of action only seeks turnover of amounts in excess of what was a fair and reasonable sale price and fair and reasonable financing terms in connection with the Property.

132. At all times, Dove's Landing and the Sports Club were the agents, servants, employees, directors, subsidiaries, associates, aiders and abetters, and alter egos of Mr. Wentz, and were at all times acting within the purpose and scope of said agency and employment, and Dove's Landing, the Sports Club, and Mr. Wentz ratified and approved the acts of each other. Further, Dove's Landing, the Sports Club, and Mr. Wentz agreed to carry out the scheme described in this Complaint, and did so through the commission of one or more covert acts, conspiring with each other to accomplish its ends. As such, Dove's Landing, the Sports Club, and Mr. Wentz are legally responsible for the acts of each other.

133. Mr. Wentz had a material financial interest in each of the transactions between Plaintiffs and Dove's Landing, as well as the MOU between OroHealth and the Sports Club. The aforementioned transactions were not part of a plan to fix compensation for Mr. Wentz and were not part of a charitable program.

134. On information and belief, Mr. Wentz, aided and abetted by Dove's Landing and the Sports Club, usurped the opportunity to purchase the Property from Plaintiffs without first presenting it to the boards of trustees of either OroHealth or Oroville Hospital. Had Mr. Wentz presented either OroHealth or Oroville Hospital with the opportunity to purchase the Property, they would have been able to consummate the purchase on terms at least as favorable as those received by Dove's Landing, and they would have in fact consummated the purchase.

135. Mr. Wentz's conduct in usurping the opportunity to purchase the Property from himself and away from Plaintiffs is expressly forbidden under the Bylaws of both OroHealth or Oroville Hospital, which state:

> No Trustee or officer of this Corporation may appropriate or divert to others any opportunity for profit in connection with a transaction in which it is known or could be anticipated that this Corporation is or would be interested. Such opportunities include but are not limited to, acquisition of real or personal property, appointment of suppliers, or design or development of new products, service, or areas of business related to this Corporation's present or planned services or service areas.

OroHealth Bylaws, Art. X §5(a); Oroville Hospital Bylaws, Art. XIII §5(a).

136. On information and belief, the Lease Transactions which occurred after Dove's Landing acquired the Property were not fair and reasonable to either OroHealth or Oroville Hospital. After depriving Plaintiffs of the opportunity to purchase the Property, Mr. Wentz used his influence and control over the boards of both Plaintiffs to convince them to approve the Initial Lease. Under the Initial Lease, Plaintiffs were charged monthly rental rates which matched or exceeded the fair market value of the Property, as though the Property had already been completely improved and ready for use as a medical facility, even though the improvements were not completed until three-and-a-half years into the Initial Lease term. Plaintiffs were never given any sort of accommodation or value from Dove's Landing for improving what had been a dilapidated and out-of-use department store into a state-of-the-art medical facility, costing Plaintiffs over $7 million. Plaintiffs were simply charged rent for a building they paid to build.

137. On information and belief, the rent charges Plaintiffs paid under the Lease Transactions were applied to pay for all of the financing debt that Dove's Landing had incurred in purchasing the Property. Essentially, Plaintiffs paid for both the acquisition costs of the Property as well as its renovations, but received the equity benefits of neither. Instead, Dove's Landing, the Sports Club, and Mr. Wentz were handed ownership of the improved Property at virtually no cost to themselves, and all of their financing costs were completely subsidized by Plaintiffs, to whom Mr. Wentz owed a fiduciary duty. Mr. Wentz knew that Plaintiffs were captive tenants, in that they could not break the Initial Lease or otherwise choose not to renew the term without risking a total loss of their $7 million investment. Plaintiffs assumed all of the burdens of ownership and none of the benefits, leaving Dove's Landing, the Sports Club, and Mr. Wentz to knowingly reap the rewards of Mr. Wentz's self-dealing at the expense of Plaintiffs.

138. On information and belief, prior to consummating the Lease Transactions, the boards of OroHealth and Oroville Hospital did not authorize or approved the transaction in good faith because they were dominated by Mr. Wentz. Prior to consummating the Lease Transactions, the boards of OroHealth and Oroville Hospital did not possess knowledge of the material facts concerning the Lease transaction and Mr. Wentz's interest in the Lease transaction. Mr. Wentz

secreted material facts regarding his interest in Dove's Landing and the mechanics of the purchase of the Property from the boards of directors of both Plaintiffs, and inculcated a dysfunctional financial system whereby the other trustees of Plaintiffs could not objectively and neutrally evaluate any transactions involving self-dealing by Mr. Wentz without Mr. Wentz's undue influence tainting the boards' evaluation of said transaction. Effectively, any vote of the trustees of Plaintiffs concerning a self-dealing transaction of Mr. Wentz was a proverbial "rubber stamp" because a trustee's failure to approve such a transaction would lead to negative personal and professional consequences for the dissenting trustee, and any dissenting trustee would be further subject to personal and professional consequences because that trustee was deprived of the information necessary to make an informed decision on the basis of Mr. Wentz's efforts to obfuscate the facts surrounding any transactions involving the Property.

139. On information and belief, the boards of OroHealth and Oroville Hospital did not perform a reasonable investigation of the Lease Transactions, because OroHealth and Oroville Hospital could have easily obtained a more advantageous arrangement with reasonable effort had Mr. Wentz not usurped their opportunity to purchase the Property. Any reasonable investigation should have concluded that spending $7 million to improve a parcel of real property that did not belong to Plaintiffs and bore the risk of total loss was not an economically reasonable risk. Moreover, any reasonable investigation should have concluded that Plaintiffs would already be subsidizing the Property owners' purchase of the Property entirely by paying them rent under the Lease, essentially handing Dove's Landing, the Sports Club, and Mr. Wentz the purchase funds to owning the Property without them having to incur any costs to do so. Paying the same costs as purchasing a piece of real property without actually purchasing the property is a canonically unreasonable transaction under the circumstances. The payment of these costs is also *prima facie* evidence that the boards utterly failed to even attempt to assure that a reasonable information and reporting system was in existence at any time during the applicable period, because any reasonable board member not under the control of Mr. Wentz would have been able to determine that paying the purchase price for a trustee-owned entity to purchase the Property was unreasonable.

140. The dealings of a self-interested director with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.

141. Additionally, a director who knowingly approved another director's self-dealing transaction is not considered "disinterested" under California law, even if the approving director received no consideration. All of the votes of the boards of trustees at issue in this case were unanimous.

142. Under California law, all property and profits realized by Dove's Landing, the Sports Club, and Mr. Wentz in connection with the Lease Transactions, including title to the Property itself, should be disgorged and awarded to Plaintiffs. Plaintiffs are further entitled to compensatory damages for their out-of-pocket costs.

143. The conduct of Dove's Landing, the Sports Club, and Mr. Wentz that is alleged in this cause of action was undertaken for the purpose of defrauding Plaintiffs because Dove's Landing, the Sports Club, and Mr. Wentz knew or should have known of the facts at issue, and acted in conscious disregard of the rights of Plaintiffs. The acts of Dove's Landing, the Sports Club, and Mr. Wentz were oppressive, fraudulent, and malicious, such that Plaintiffs are entitled to a recovery of punitive damages.

## FIFTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty [Cal. Corp. Code § 5233(c)]**

**(Plaintiffs Against Dove's Landing, the Sports Club, and Mr. Wentz)**

144. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 143 as if fully set forth herein.

145. To the extent that this claim seeks turnover of title to the Property to Plaintiffs and not disgorgement of other property, this claim is asserted in the alternative to the First, Second, and Third Claims asserted in this Complaint. Should the Court treat the Lease Transactions as a "true

sale," then this cause of action only seeks turnover of amounts in excess of what was a fair and reasonable sale price and fair and reasonable financing terms in connection with the Property.

146. At all times, Dove's Landing and the Sports Club were the agents, servants, employees, directors, subsidiaries, associates, aiders and abetters, and alter egos of Mr. Wentz, and were at all times acting within the purpose and scope of said agency and employment, and Dove's Landing, the Sports Club, and Mr. Wentz ratified and approved the acts of each other. Further, Dove's Landing, the Sports Club, and Mr. Wentz agreed to carry out the scheme described in this Complaint, and did so through the commission of one or more covert acts, conspiring with each other to accomplish its ends. As such, Dove's Landing, the Sports Club, and Mr. Wentz are legally responsible for the acts of each other.

147. Under California Corporations Code § 5233(c)(1), a nonprofit public benefit corporation may bring an action against an officer or director of that corporation for engaging in a self-dealing transaction as long as the Attorney General of the State of California is joined as an indispensable party.

148. Under California Corporations Code § 5233(a), "a self-dealing transaction means a transaction to which the corporation is a party and in which one or more of its directors has a material financial interest[,]" and which is not exempted by satisfying <u>all</u> of the following exemption criteria promulgated by California Corporations Code § 5233(d)(2):

a. The corporation entered into the transaction for its own benefit;

b. The transaction was fair and reasonable as to the corporation at the time the corporation entered into the transaction;

c. Prior to consummating the transaction or any part thereof the board authorized or approved the transaction in good faith by a vote of a majority of the directors then in office without counting the vote of the interested director or directors, and with knowledge of the material facts concerning the transaction and the director's interest in the transaction; and

d. Either the board considered and in good faith determined after reasonable investigation under the circumstances that the corporation could not have

obtained a more advantageous arrangement with reasonable effort under the circumstances prior to authorizing or approving the transaction; or the corporation in fact could not have obtained a more advantageous arrangement with reasonable effort under the circumstances.

149. The dealings of a self-interested director with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.

150. Additionally, a director who knowingly approved another director's self-dealing transaction is not considered "disinterested" under California law, even if the approving director received no consideration. All of the votes of the boards of trustees at issue in this case were unanimous.

151. Mr. Wentz had a material financial interest in each of the transactions between Plaintiffs and Dove's Landing. The transactions between Plaintiffs and Dove's Landing were not part of a plan to fix compensation for Mr. Wentz and was not part of a charitable program.

152. On information and belief, the Lease transaction was not fair and reasonable to either OroHealth or Oroville Hospital.

153. On information and belief, prior to consummating the Lease Transactions, the boards of OroHealth and Oroville Hospital did not authorize or approved the transactions in good faith because they were dominated by Mr. Wentz. Prior to consummating the Lease Transactions, the boards of OroHealth and Oroville Hospital did not possess knowledge of the material facts concerning each Lease transaction and Mr. Wentz's interest in each Lease transaction. Mr. Wentz secreted material facts regarding his interest in Dove's Landing and the mechanics of the purchase of the Property from the boards of directors of both Plaintiffs, and inculcated a dysfunctional financial system whereby the other trustees of Plaintiffs could not objectively and neutrally evaluate any transactions involving self-dealing by Mr. Wentz without Mr. Wentz's undue influence tainting the

boards' evaluation of said transaction. Effectively, any vote of the trustees of Plaintiffs concerning a self-dealing transaction of Mr. Wentz was a proverbial "rubber stamp" because a trustee's failure to approve such a transaction would lead to negative personal and professional consequences for the dissenting trustee, and any dissenting trustee would be further subject to personal and professional consequences because that trustee was deprived of the information necessary to make an informed decision on the basis of Mr. Wentz's efforts to obfuscate the facts surrounding any transactions involving the Property.

154. On information and belief, the boards of OroHealth and Oroville Hospital did not perform a reasonable investigation of the Lease Transactions, because OroHealth and Oroville Hospital could have easily obtained a more advantageous arrangement with reasonable effort had Mr. Wentz not usurped their opportunity to purchase the Property. Any reasonable investigation should have concluded that spending $7 million to improve a parcel of real property that did not belong to Plaintiffs and bore the risk of total loss was not an economically reasonable risk. Moreover, any reasonable investigation should have concluded that Plaintiffs would already be subsidizing the Property owners' purchase of the Property entirely by paying them rent under the Lease, essentially handing Dove's Landing, the Sports Club, and Mr. Wentz the purchase funds to owning the Property without them having to incur any costs to do so. Paying the same costs as purchasing a piece of real property without actually purchasing the property is a canonically unreasonable transaction under the circumstances. The payment of these costs is also *prima facie* evidence that the boards utterly failed to even attempt to assure that a reasonable information and reporting system was in existence at any time during the applicable period, because any reasonable board member not under the control of Mr. Wentz would have been able to determine that paying the purchase price for a trustee-owned entity to purchase the Property was unreasonable.

155. Under California Corporations Code § 5233(h(3)), Mr. Wentz and his aiders and abetters, Dove's Landing and the Sports Club, must "[r]eturn or replace any property lost to the corporation as a result of such transaction, together with any income or appreciation lost to the corporation by reason of such transaction, or account for any proceeds of sale of such property, and pay the proceeds to the corporation together with interest at the legal rate." Under California

Corporations Code § 5233(h), Dove's Landing must turn the Property itself over to Plaintiffs, and any other benefits retained by Dove's Landing, the Sports Club, and Mr. Wentz must be disgorged.

156. The conduct of Dove's Landing, the Sports Club, and Mr. Wentz that is alleged in this cause of action was undertaken for the purpose of defrauding Plaintiffs because Dove's Landing, the Sports Club, and Mr. Wentz knew or should have known of the facts at issue, and acted in conscious disregard of the rights of Plaintiffs. The acts of Dove's Landing, the Sports Club, and Mr. Wentz were fraudulent and malicious, and Plaintiffs are therefore entitled to an award of exemplary damages under California Corporations Code § 5233(h)(3).

**SIXTH CLAIM FOR RELIEF**

**Fraudulent Conveyance [Cal. Civ. Code § 3439.04(a)(1) – Actual Fraud]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

157. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 156 as if fully set forth herein.

158. On information and belief, the CAMs charges incurred by Plaintiffs in the seven years preceding the filing of this adversary proceeding included CAMs charges that were improperly charged to Plaintiffs. On information and belief, these CAMs overcharges were incurred as obligations and/or transferred to Dove's Landing and/or Mr. Wentz with actual intent to hinder, delay, or defraud the creditors of Plaintiffs.

159. On information and belief, the rental charges incurred by Plaintiffs in the seven years preceding the filing of this adversary proceeding included but were not limited to overcharges for approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease, amounting to at least $721,329 in wrongfully transferred funds. On information and belief, these rental overcharges were incurred as obligations and/or transferred to Dove's Landing and/or Mr. Wentz with actual intent to hinder, delay, or defraud the creditors Plaintiffs.

160. Dove's Landing and Mr. Wentz have acted in violation of California's Uniform Voidable Transactions Act (the "UVTA"), specifically California Civil Code § 3439.04(a)(1), which states that, "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the

debtor made the transfer or incurred the obligation…[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." (*Id.*)

161. Plaintiffs, as Debtors in possession, were unable to discover the full extent of these wrongfully incurred obligations or transfers prior to the filing of the instant action.

162. Accordingly, Plaintiffs, as Debtors in possession and on behalf of the Estate, are entitled to judgment avoiding all transfers of the aforementioned property away from the Debtors, and/or the avoidance of the aforementioned obligations.

163. The conduct of Dove's Landing and Mr. Wentz that is alleged in this cause of action was undertaken for the purpose of defrauding the Estate and other creditors by intentionally preventing them from collecting on their obligations owed by the Debtors, and in conscious disregard of the rights of the creditors of the Debtors. The acts of Dove's Landing and Mr. Wentz were oppressive, fraudulent, and malicious, such that Plaintiffs are entitled to a recovery of punitive damages.

**SEVENTH CLAIM FOR RELIEF**

**Fraudulent Conveyance [Cal. Civ. Code § 3439.04(a)(2) – Constructive Fraud]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

164. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 163 as if fully set forth herein.

165. On information and belief, Plaintiffs were insolvent at all times starting with the date four years prior to the filing of this Complaint, due to the fact that their liabilities exceeded the value of their assets and they were unable to pay their debts as they became due.

166. On information and belief, the CAMs charges incurred by Plaintiffs in the four years preceding the filing of this adversary proceeding included CAMs charges that were improperly charged to Plaintiffs, and Plaintiffs incurred these obligations and/or paid these amounts without receiving a reasonably equivalent value in exchange for these transfers.

167. On information and belief, the rental charges incurred by Plaintiffs in the four years preceding the filing of this adversary proceeding included but were not limited to overcharges for approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease,

amounting to at least $721,329 in funds that were transferred without receiving a reasonably equivalent value in exchange for these transfers, as well as the incurrence of additional obligations and/or payments of additional amounts without receiving a reasonably equivalent value in exchange for these transfers.

168. Plaintiffs, as Debtors in possession, were unable to discover the full extent of these wrongfully incurred obligations or transfers prior to the filing of the instant action.

169. Accordingly, Plaintiffs, as Debtors in possession and on behalf of the Estate, are entitled to judgment avoiding all transfers of the aforementioned property away from the Debtors, and/or the avoidance of the aforementioned obligations.

## EIGHTH CLAIM FOR RELIEF

**Fraudulent Conveyance [Common Law]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

170. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 169 as if fully set forth herein.

171. On information and belief, Plaintiffs were insolvent at all times starting with the date four years prior to the filing of this Complaint, due to the fact that their liabilities exceeded the value of their assets and they were unable to pay their debts as they became due.

172. On information and belief, the CAMs charges incurred by Plaintiffs in the seven years preceding the filing of this adversary proceeding included CAMs charges that were improperly charged to Plaintiffs. On information and belief, these CAMs overcharges were incurred as obligations and/or transferred to Dove's Landing and/or Mr. Wentz with actual intent to hinder, delay, or defraud the creditors of Plaintiffs.

173. In the alternative, on information and belief, the CAMs charges incurred by Plaintiffs in the four years preceding the filing of this adversary proceeding included CAMs charges that were improperly charged to Plaintiffs, and Plaintiffs incurred these obligations and/or paid these amounts without receiving a reasonably equivalent value in exchange for these transfers.

174. On information and belief, the rental charges incurred by Plaintiffs in the seven years preceding the filing of this adversary proceeding included but were not limited to overcharges for

approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease, amounting to at least $721,329 in wrongfully transferred funds. On information and belief, these rental overcharges were incurred as obligations and/or transferred to Dove's Landing and/or Mr. Wentz with actual intent to hinder, delay, or defraud the creditors Plaintiffs.

175. In the alternative, on information and belief, the rental charges incurred by Plaintiffs in the four years preceding the filing of this adversary proceeding included but were not limited to overcharges for approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease, amounting to at least $721,329 in funds that were transferred without receiving a reasonably equivalent value in exchange for these transfers, as well as the incurrence of additional obligations and/or payments of additional amounts without receiving a reasonably equivalent value in exchange for these transfers.

176. Dove's Landing and Mr. Wentz have acted in violation of the UVTA, specifically California Civil Code § 3439.04(a)(2), which states that, "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation…[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either: [¶] (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction [or] [¶] (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." (*Id.*)

177. Plaintiffs, as Debtors in possession, were unable to discover the full extent of these wrongfully incurred obligations or transfers prior to the filing of the instant action.

178. Accordingly, Plaintiffs, as Debtors in possession and on behalf of the Estate, are entitled to judgment avoiding all transfers of the aforementioned property away from the Debtors, and/or the avoidance of the aforementioned obligations.

179. The conduct of Dove's Landing and Mr. Wentz that is alleged in this cause of action was undertaken for the purpose of defrauding the Estate and other creditors by intentionally preventing them from collecting on their obligations owed by the Debtors, and in conscious

disregard of the rights of the creditors of the Debtors. The acts of Dove's Landing and Mr. Wentz were oppressive, fraudulent, and malicious, such that Plaintiffs are entitled to a recovery of punitive damages.

**NINTH CLAIM FOR RELIEF**

**Fraudulent Transfer [11 U.S.C. § 548]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

180. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 179 as if fully set forth herein.

181. On information and belief, Plaintiffs were insolvent at all times starting with the date two years prior to the filing of the Chapter 11 Cases, due to the fact that their liabilities exceeded the value of their assets and they were unable to pay their debts as they became due.

182. On information and belief, the CAMs charges incurred by Plaintiffs in the two years preceding the filing of the Chapter 11 Cases included CAMs charges that were improperly charged to Plaintiffs. On information and belief, these CAMs overcharges were incurred as obligations and/or transferred to Dove's Landing and/or Mr. Wentz with actual intent to hinder, delay, or defraud the creditors of Plaintiffs.

183. In the alternative, on information and belief, the CAMs charges incurred by Plaintiffs in the two years preceding the filing of the Chapter 11 Cases included CAMs charges that were improperly charged to Plaintiffs, and Plaintiffs incurred these obligations and/or paid these amounts without receiving a reasonably equivalent value in exchange for these transfers.

184. On information and belief, the rental charges incurred by Plaintiffs in the two years preceding the filing of the Chapter 11 Cases included but were not limited to overcharges for approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease, amounting to at least $721,329 in wrongfully transferred funds. On information and belief, these rental overcharges were incurred as obligations and/or transferred to Dove's Landing and/or Mr. Wentz with actual intent to hinder, delay, or defraud the creditors Plaintiffs.

185. In the alternative, on information and belief, the rental charges incurred by Plaintiffs in the two years preceding the filing of the Chapter 11 Cases included but were not limited to

overcharges for approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease, amounting to at least $721,329 in funds that were transferred without receiving a reasonably equivalent value in exchange for these transfers, as well as the incurrence of additional obligations and/or payments of additional amounts without receiving a reasonably equivalent value in exchange for these transfers.

186. Dove's Landing and Mr. Wentz have acted in violation of 11 U.S.C. § 548(a), which states that, "The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— [¶] (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or [¶] (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and [¶] (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred[.]" (*Id.*)

187. Plaintiffs, as Debtors in possession, were unable to discover the full extent of these wrongfully incurred obligations or transfers prior to the filing of the Chapter 11 Cases.

188. Accordingly, Plaintiffs, as Debtors in possession and on behalf of the Estate, are entitled to judgment avoiding all transfers of the aforementioned property away from the Debtors, and/or the avoidance of the aforementioned obligations.

## <u>TENTH CLAIM FOR RELIEF</u>

### Avoidance of Fraudulent Transfer [11 U.S.C. § 544(b)]

### (Plaintiffs Against Dove's Landing and Robert J. Wentz)

189. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 188 as if fully set forth herein.

190. On information and belief, Plaintiffs were insolvent at all times starting with the date two years prior to the filing of the Chapter 11 Cases, due to the fact that their liabilities exceeded the value of their assets and they were unable to pay their debts as they became due.

191. On information and belief, the CAMs charges incurred by Plaintiffs in the seven years preceding the filing of the Chapter 11 Cases included CAMs charges that were improperly charged to Plaintiffs. On information and belief, these CAMs overcharges were actual fraudulent conveyances under California's UVTA, under California Civil Code § 3439.04(a)(1).

192. In the alternative, on information and belief, the CAMs charges incurred by Plaintiffs in the four years preceding the filing of the Chapter 11 Cases included CAMs charges that were improperly charged to Plaintiffs, and on information and belief, these CAMs overcharges were constructive fraudulent conveyances under California's UVTA, under California Civil Code § 3439.04(a)(2).

193. On information and belief, the rental charges incurred by Plaintiffs in the two years preceding the filing of the Chapter 11 Cases included but were not limited to overcharges for approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease, amounting to at least $721,329 in wrongfully transferred funds. On information and belief, these CAMs overcharges were actual fraudulent conveyances under California's UVTA, under California Civil Code § 3439.04(a)(1)

194. In the alternative, on information and belief, the rental charges incurred by Plaintiffs in the two years preceding the filing of the Chapter 11 Cases included but were not limited to overcharges for approximately 5,000 square feet which were not chargeable to Plaintiffs under the Renewal Lease, amounting to at least $721,329 in funds that were transferred without receiving a reasonably equivalent value in exchange for these transfers, as well as the incurrence of additional obligations and/or payments of additional amounts without receiving a reasonably equivalent value in exchange for these transfers. On information and belief, these rental overcharges were constructive fraudulent conveyances under California's UVTA, under California Civil Code § 3439.04(a)(2)

195. Pursuant to 11 U.S.C. § 544, Plaintiffs, as Debtors in possession, may avoid any transfer of property of the Debtors that may be avoided by an actual or hypothetical lien creditor under state law.

196. In accordance with 11 U.S.C. §§ 544 and 550, Plaintiffs may avoid and recover the value of the aforementioned property.

**ELEVENTH CLAIM FOR RELIEF**

**Avoidance and Recovery of Post-Petition Transfer of Estate Property**

**[11 U.S.C. §§ 549(b) and 550]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

197. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 196 as if fully set forth herein.

198. On information and belief, Plaintiffs' inadvertent transfer of $380,000 to Dove's Landing was a transfer of an interest in property of the Estate, as set forth herein, that was done after the commencement of the case.

199. On information and belief, the transfer of $380,000 to Dove's Landing was done without prior approval of this Court, and in unwitting fashion by Plaintiffs, without their true knowledge, consent or participation.

200. On information and belief, the transfer of $380,000 to Dove's Landing occurred without the receipt by the Estate of any value after the commencement of the Chapter 11 Case in exchange for or as consideration for such transfer.

201. The transfer of an interest in property of the Plaintiffs as Debtors, or the receipt of the proceeds therefrom by other transferees, were not authorized under the Bankruptcy Code, by the Plaintiffs, or by this Court.

202. On information and belief, as a result of the transfer described above, Dove's Landing, the Sports Club, and Mr. Wentz, and each of them, assert some right, title and/or interest in or to the Debtors' property, which interests are adverse to those of the Plaintiffs and the Estate.

203. Plaintiffs are entitled to avoid the post-petition transfer and any and all asserted interests by Dove's Landing and Mr. Wentz in or to property of the Debtors and the Estate, under 11

U.S.C. § 549, and to recover from Dove's Landing and Mr. Wentz, and either or both of them, any and all interests in and to the property of the Estate pursuant to 11 U.S.C. §550(a).

**TWELFTH CLAIM FOR RELIEF**

**Violation of the Automatic Stay [11 U.S.C. §§ 105(a) and 362(a)(3)]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

204. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 203 as if fully set forth herein.

205. On information and belief, the acts of Dove's Landing and Mr. Wentz, or either of them, to effectuate a transfer of property of the Estate, as described above in connection with the transfer of $380,000, constitutes a violation of the automatic stay as set forth under 11 U.S.C. §362(a)(3), since it was an act to obtain possession of property of the Estate or to exercise control over property of the Estate.

206. On information and belief, an actual controversy has arisen and now exists between Plaintiffs, on the one hand, and Dove's Landing and Mr. Wentz, on the other hand, as set forth herein. Plaintiffs desires a judicial determination of the Estate's rights with respect to the $380,000 that was transferred to Dove's Landing, and a declaration as to the respective rights and interests in those funds as between the Estate and Dove's Landing and Mr. Wentz, pursuant to 28 U.S.C. § 2202 and 11 U.S.C. §§ 105(a).

207. As a result of the actions described herein, including the actions taken by Dove's Landing and Mr. Wentz, the Estate has been damaged, in an amount that is presently unknown but which is subject to proof at trial, and included, at a minimum, the attorneys' fees and costs incurred by the Plaintiffs to avoid and set aside the $380,000 transfer.

**THIRTEENTH CLAIM FOR RELIEF**

**Accounting**

**(Plaintiffs Against Dove's Landing, Sports Club, and Robert J. Wentz)**

208. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 207 as if fully set forth herein.

209. As alleged herein, a fiduciary relationship existed between Plaintiffs and Mr. Wentz, and by extension Dove's Landing and Sports Club, that required Mr. Wentz, Dove's Landing, and Sports Club to account to Plaintiff for any and all transactions entered between them.

210. By reason of the aforementioned fiduciary relationship, Dove's Landing, Sports Club, and Mr. Wentz owed Plaintiffs a duty to maintain accurate records of all transactions involving the Property and to render a full and complete accounting thereof to Plaintiffs upon demand.

211. A balance is due from Dove's Landing, Sports Club, and Mr. Wentz, and/or any of them, to Plaintiffs, the exact amount of which is unknown to Plaintiffs and cannot be ascertained without a full and complete accounting by Dove's Landing, Sports Club, and Mr. Wentz, and/or any of them.

212. Plaintiffs have demanded that Dove's Landing, Sports Club, and Mr. Wentz, and/or any of them, render a full and complete accounting, and Dove's Landing, Sports Club, and Mr. Wentz have refused to do so.

213. As a result of the failure to account by Dove's Landing, Sports Club, and Mr. Wentz, and/or any of them, Plaintiffs have been unable to determine the true state of the accounts between the parties and the amount, if any, due to Plaintiffs.

214. Plaintiffs have no adequate remedy at law in that the accounts between the parties are so complicated that only a court of equity can satisfactorily unravel them, and/or the exact amount due to Plaintiffs cannot be determined without an accounting.

**FOURTEENTH CLAIM FOR RELIEF**

**Constructive Trust**

**(Plaintiffs Against Dove's Landing)**

215. Plaintiffs reincorporate and reallege each of the allegations in paragraphs 1 through 214 as if fully set forth herein.

216. California law recognizes a constructive trust as an equitable remedy imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that the holder would be unjustly enriched if permitted to retain the property. Cal. Civ. Code, §§ 2223, 2224; *Communist Party v. 522 Valencia, Inc.*, 35 Cal.App.4th 980, 990 (1995).

217. The elements of a constructive trust under California law are: (1) the existence of a *res* (specific, identifiable property); (2) the plaintiff's right to that property; and (3) the defendant's unjust acquisition or retention of the property. *Communist Party v. 522 Valencia, Inc., supra*, 35 Cal.App.4th at pp. 990-991.

218. The Property constitutes a specific, identifiable *res* over which a constructive trust may be imposed.

219. By reason of the facts alleged in this Complaint, including but not limited to the disguised financing nature of the Lease Transactions, Mr. Wentz's self-dealing, Dove's Landing's and Sports Club's aiding and abetting of Mr. Wentz's self-dealing, and the transfer of property of Plaintiffs away from them and to Dove's Landing, Sports Club, Mr. Wentz, and/or any of them, Plaintiffs have a right to, and equitable interest in, the Property that is superior to that of Dove's Landing.

220. Dove's Landing acquired and/or has retained title to and possession of the Property through breach of fiduciary duty and aiding and abetting breach of fiduciary duty, as alleged herein. It would be inequitable and unjust to permit Dove's Landing to retain the benefit of the Property under such circumstances. Civ. Code, § 2224 ("One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.").

221. By reason of the foregoing, equity requires that a constructive trust be imposed upon the Property, with Dove's Landing declared to be an involuntary trustee thereof for the benefit of Plaintiffs, and that Dove's Landing be ordered to convey all right, title, and interest in and to the Property to Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Dove's Landing, Sports Club, and Robert J. Wentz, inclusive, and each of them, as follows:

**As to the First Claim for Relief For Declaratory Relief/Recharacterization:**

1. For a declaration that the Lease Transactions do not create "leases" under the Bankruptcy Code, including 11 U.S.C. § 365, and instead should be recharacterized as a financing arrangement; and

2. For a declaration that the Property shall be vested in the name of Oroville Hospital;

**As to the Second Claim for Relief For Declaratory Relief/Recharacterization:**

3. For a declaration quieting title to the Property in fee simple in the name of Oroville Hospital against all or any right, title, estate, or interest in the Property outside of a possible lien interest, which Defendant Dove's Landing will claim if such lien interest exists pursuant to the Grant Deed attached hereto as Exhibit 3 whose priority relates back to December 28, 2012, the date on which the Grant Deed was recorded;

**As to the Third Claim for Relief For Imposition of Equitable Mortgage**

**[Cal. Civ. Code § 2925]:**

4. For a declaration that the Lease Transactions do not create "leases" under the Bankruptcy Code, including 11 U.S.C. § 365, and instead should be recharacterized as a financing arrangement;

5. For a declaration that the Property shall be vested in the name of Oroville Hospital; and

6. For a judicial declaration that the Lease Transactions are a grant deed and mortgage and not true leases, for a determination of the amount currently due and owing to repay the purchase money lien, and for an opportunity for Plaintiffs to assume the existing first-position deed of trust held by a third-party lender;

**As to the Fourth Claim for Relief For Breach of Fiduciary Duty [Common Law]:**

7. Disgorgement of all property and profits realized by Dove's Landing, the Sports Club, and Robert J. Wentz in connection with the Lease Transactions, including title to the Property itself, which should be awarded to Plaintiffs;

8. Compensatory damages for Plaintiffs' out-of-pocket costs; and

9. For punitive and exemplary damages sufficient to punish Dove's Landing and Robert J. Wentz and to discourage Dove's Landing and Robert J. Wentz from acting in a similar manner in the future;

**As to the Fifth Claim for Relief For Breach of Fiduciary Duty [Cal. Corp. Code § 5233(c)]:**

10. For all available remedies under Cal. Corp. Code § 5233(h), including the return or replacement any property lost to Plaintiffs as a result of such transaction, together with any income or appreciation lost to Plaintiffs by reason of such transaction, or account for any proceeds of sale of such property, and payment the proceeds to the corporation together with interest at the legal rate;

11. For a declaration that the Property shall be vested in the name of Oroville Hospital;

12. For disgorgement of any other benefits retained by Dove's Landing, the Sports Club, and Robert J. Wentz, with such benefits being awarded to Plaintiffs;

13. For exemplary damages sufficient to punish Dove's Landing and Robert J. Wentz and to discourage Dove's Landing and Robert J. Wentz from acting in a similar manner in the future;

**As to the Sixth Claim for Relief For Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(1) – Actual Fraud:**

14. Avoiding the transfers of property referenced in this Complaint and vesting title to that property solely in the name of the Debtors;

15. For punitive and exemplary damages sufficient to punish Dove's Landing and Robert J. Wentz and to discourage Dove's Landing and Robert J. Wentz from acting in a similar manner in the future;

**As to the Seventh Claim for Relief For Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(2) – Constructive Fraud:**

16. Avoiding the transfers of property referenced in this Complaint and vesting title to that property solely in the name of the Debtors;

**As to the Eighth Claim for Relief For Common Law Fraudulent Conveyance:**

17. Avoiding the transfers of property referenced in this Complaint and vesting title to that property solely in the name of the Debtors;

18. For punitive and exemplary damages sufficient to punish Dove's Landing and Robert J. Wentz and to discourage Dove's Landing and Robert J. Wentz from acting in a similar manner in the future;

**As to the Ninth Claim for Relief For Fraudulent Transfer [11 U.S.C. § 548]:**

19. Avoiding the transfers of property referenced in this Complaint and vesting title to that property solely in the name of the Debtors;

20. For punitive and exemplary damages sufficient to punish Dove's Landing and Robert J. Wentz and to discourage Dove's Landing and Robert J. Wentz from acting in a similar manner in the future;

**As to the Tenth Claim for Relief For Avoidance of Fraudulent Transfer [11 U.S.C. § 544(b)]:**

21. Avoiding the transfers of property referenced in this Complaint and vesting title to that property solely in the name of the Debtors;

22. For punitive and exemplary damages sufficient to punish Dove's Landing and Robert J. Wentz and to discourage Dove's Landing and Robert J. Wentz from acting in a similar manner in the future;

**As to the Tenth Claim for Relief For Avoidance of Fraudulent Transfer [11 U.S.C. § 544(b)]:**

23. Avoiding the transfers of property referenced in this Complaint and vesting title to that property solely in the name of the Debtors;

24. For punitive and exemplary damages sufficient to punish Dove's Landing and Robert J. Wentz and to discourage Dove's Landing and Robert J. Wentz from acting in a similar manner in the future;

**As to the Eleventh Claim for Relief For Avoidance and Recovery of Post-Petition Transfer of Estate Property [11 U.S.C. §§ 549(b) and 550]:**

25. Avoiding the post-petition transfer of $380,000 referenced in this Complaint and vesting title to that property solely in the name of the Debtors; and

26. Avoiding any and all asserted interests by Dove's Landing and Robert J. Wentz in or to property of the Debtors and the Estate;

**As to the Twelfth Claim for Relief For Violation of the Automatic Stay**

**[11 U.S.C. §§ 105(a) and 362(a)(3)]:**

27. Avoiding the post-petition transfer of $380,000 as a violation of the automatic stay and declaring the transfer void pursuant to 11 U.S.C. §§ 105(a) and 362(a)(3); and

28. For reasonable costs and attorneys' fees;

**As to the Thirteenth Claim for Accounting:**

29. For an accounting of the exact amount due to Plaintiffs from by Dove's Landing, the Sports Club, and Robert J. Wentz;

**As to the Fourteenth Claim for Relief for Constructive Trust:**

30. For imposition of a constructive trust upon the Property in favor of Plaintiffs and against Dove's Landing;

31. For an order directing Dove's Landing to convey all right, title, and interest in and to the Property to Oroville Hospital;

32. For a preliminary and permanent injunction restraining and enjoining Dove's Landing, Sports Club, and Robert J. Wentz, and all persons acting in concert or participation with Dove's Landing, Sports Club, and Robert J. Wentz, from transferring, encumbering, hypothecating, concealing, or otherwise disposing of the Property during the pendency of this action;

**As to All Claims:**

33. For Plaintiffs' costs incurred herein;

34. For such other and further relief as the Court may deem reasonable under the circumstances.

Dated: August 4, 2026

**FOX ROTHSCHILD LLP**

*/s/ Nicholas A. Koffroth*
Keith C. Owens
Nicholas A. Koffroth

*Counsel to Oroville Hospital, et al., Plaintiffs and the Debtors and Debtors-in-Possession*

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF BUTTE**

I have read the foregoing VERIFIED COMPLAINT FOR: (1) Declaratory Relief/Recharacterization; (2) Quiet Title; (3) Imposition of Equitable Mortgage [Cal. Civ. Code § 2925]; (4) Breach of Fiduciary Duty [Common Law]; (5) Breach of Fiduciary Duty [Cal. Corp. Code § 5233(c)]; (6) Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(1) – Actual Fraud; (7) Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(2) – Constructive Fraud; (8) Common Law Fraudulent Conveyance; (9) Fraudulent Transfer [11 U.S.C. § 548]; (10) Avoidance of Fraudulent Transfer [11 U.S.C. § 544(b)]; (11) Avoidance and Recovery of Post-Petition Transfer of Estate Property [11 U.S.C. §§ 549(b) and 550]; (12) Violation of the Automatic Stay [11 U.S.C. §§ 105(a) and 362(a)(3)]; (13) Accounting; and (14) Constructive Trust and know its contents.

I am the Chief Restructuring Officer of Oroville Hospital, and OroHealth Corporation: A Nonprofit Healthcare System, Plaintiffs in this adversary proceeding and the Debtors and Debtors-in-Possession in the chapter 11 cases upon which this adversary proceeding is based. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

Executed on August 4, 2026 at Oroville, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| | |
|---|---|
| Michael Lane | */s/ Michael Lane* |
| Print Name of Signatory | Signature |

# EXHIBIT 1

Filed 08/04/26 Case 26-02092 Doc 1

# MEMORANDUM OF UNDERSTANDING

THIS MEMORANDUM OF UNDERSTANDING by and between OROHEALTH CORPORATION, which operates OROVILLE HOSPITAL, a locally owned, operated and independent hospital, hereinafter referred to as "Hospital", and OROVILLE SPORTS CLUB, a Limited Liability Company, hereinafter referred to as "LLC", provides as follows:

## RECITALS

WHEREAS, LLC maintains the OROVILLE SPORTS CLUB and has the opportunity to acquire property in the same complex in which it is located, which will provide additional space for the use by Hospital and/or related entities; and

WHEREAS, Hospital is interested in a long term rental agreement if LLC acquires said property;

NOW, THEREFORE, it is mutually agreed as follows:

1. LLC will exercise its best efforts to acquire a 51 percent interest in the real property currently owned by GOLD TOWN PLAZA, LLC. It is anticipated that a new limited liability company will be created to own the property, with LLC as a 51 percent owner and GOLD TOWN PLAZA, LLC as a 49 percent owner.

2. In consideration for the acquisition and availability of said property, Hospital is prepared to lease a portion of said property for its use for a term of no less than ten years with an option to renew. The lease will provide that Hospital will make all tenant improvements and be responsible for its portion of taxes, maintenance and insurance. The term of the lease will be subject to the approval by OroHealth Board of Trustees.

3. At the end of a period not to exceed 20 years, the parties agree that LLC will transfer its 51 percent interest to Hospital as a gift, provided the Hospital retains its independent nonprofit status and has remained an occupant of the space. OroHealth reserves the right to reject the gift in its sole discretion.

4. The parties agree that the rent on the lease between Hospital and LLC will be market rent to be set by the parties and subject to approval by OroHealth Board of Trustees. LLC will be responsible for any major replacement or construction.

5. The parties further acknowledge that a portion of the building will be used by commercial enterprises, including but not limited to restaurants and markets.

6. The parties further agree that upon acquisition of the property by LLC, they will formalize the lease and the Conditions, Covenants and Restrictions for the entire development to conform with this Memorandum of Understanding.

IN WITNESS WHEREOF, the parties have executed this Memorandum of Understanding as of the date set opposite their names.

DATED: May 31,, 2011

OROHEALTH CORPORATION

By: ______________________
Matthew J. Bazzani, M.D., Secretary
HOSPITAL

DATED: May 31,, 2011

OROVILLE SPORTS CLUB, LLC

By: ______________________
Robert J. Wentz, Owner
LLC

# EXHIBIT 2

# LEASE AGREEMENT

THIS LEASE made and entered into this 15th day of December 2011 between DOVE'S LANDING, LLC, a limited liability company (hereinafter called "Lessor") and OROHEALTH CORPORATION, a California corporation operating Oroville Hospital (hereinafter called "Lessee" without regard to number or gender). WITNESSETH:

1) USE AND PREMISES. Lessor hereby leases to Lessee, and Lessee hires from Lessor, for the purpose of conducting therein health and medical activities, and for no other purpose, the premises delineated by diagonal lines on the plat attached hereto as Exhibit "A" with an area of approximately 32,690 square feet of the currently unleased space in Building 1 located 2450 Oro Dam Boulevard, in the City of Oroville, in the County of Butte, State of California. Final size and configuration to be determined and made a part of this agreement when agreed upon by Lessee and Lessor. See the specific building configuration plan attached hereto and made a part hereof as Exhibit B.

The term "shopping center" means the entire area within the outer property limits as shown in Exhibit A and all other pieces or parcels of land at any time and from time to time designated by Lessor for use as part of the shopping center. Any portion of the shopping center that may be taken by eminent domain, private purchase in lieu of eminent domain, or dedicated for public use, upon such taking, purchase, or dedication, shall be excluded. Any additional property designated by Lessor for use as part of the shopping center shall be included until such designation shall be revoked by Lessor.

The term "accommodation areas" means all areas and facilities outside the premises, other than parking areas which are provided for in this Lease Agreement, that are provided and designated by Lessor for general use and convenience, among others, of Lessee and other lessees of all or any invitees. Accommodation areas include, but are not limited to, pedestrian sidewalks, landscaped areas, exterior stairways, comfort stations, corridors, arcades, sidewalks, incinerators, interior stairs and balconies and similar areas and improvements, truck ways, loading docks, loading areas, and delivery yards. The site plan of the shopping center is tentative notwithstanding Exhibit A, and Lessor reserves the right from time to time to make changes in the shape, size, location, number and extent of improvements, buildings, truck ways, accommodation areas, loading docks, loading areas, parking layout or areas, and other improvements and to eliminate or add any improvements or buildings to any portion of the shopping center.

During the term of this lease, Lessor shall operate, manage, and maintain all parking areas, access roads, and accommodation areas within the shopping center. The manner in which such areas and facilities shall be maintained, and the expenditures for maintenance, shall be at the sole discretion of Lessor, and the use of such areas and facilities shall be subject to such reasonable regulations and changes as Lessor shall make from time to time, including, without limitation, the right to close, if necessary, all or

any portion of such areas, roads, or facilities, to such extent as may be legally sufficient in the opinion of Lessor's counsel, to prevent a dedication thereof or the accrual of rights of any person or of the public therein, or to close temporarily all or any portion of such areas and facilities.

Lessor hereby grants to Lessee, during the term of the lease, the right to use, for the benefit of Lessee and Lessee's officers, employees, agents, customers, and invitees, in common with other entitled to such use, all accommodation areas, parking areas, and roads, subject to any rights, powers, and privileges reserved to Lessor. Subject to the provisions of this Lease Agreement, Lessee shall continuously during the entire term conduct and carry on Lessee's business in the demised premises, and shall keep the premises open for business and cause Lessee's business to be conducted therein during the usual business hours of each and every business day as customary for business of like character in the area in which the premises are located provided, however, that this provision shall not apply if Lessee's business shall be temporarily shut down on account of strikes, lockouts, or causes beyond the control of Lessee. Lessee shall keep the demised premises adequately stocked with merchandise, and with sufficient sales personnel to care for the patronage and conduct said business in accordance with good business practices.

2) TERM. The term of this Lease shall commence on the first to occur of occupancy or four (4) months from the date of Lessor's acquisition of the property and shall continue of a term of one hundred twenty (120)months.

Provided that this Lease shall be in good standing and in full force and effect and shall not theretofore have been terminated and that Lessee shall not be in default under any of the terms or conditions hereof, Lessee shall have the option to extend the term of this Lease, upon the same terms and conditions, except as to rental, extension or renewal, as are herein set forth, for two (2) additional terms of five (5) years each. Said option shall be exercised by Lessee delivering to Lessor notice in writing of Lessee's election to exercise such option, at least one hundred twenty (120) days prior to the expiration of the then current term. In the event the Lessee shall remain in possession of the demised premises beyond the term of this Lease or any extension or renewal hereof, without executing a new written Lease with Lessor, such holding over shall not constitute a renewal or extension of the Lease, but Lessee shall be a tenant at will.

3) RENT. The monthly rental for the first full lease year shall commence on the first to occur of open for business or four (4) months from the date of Lessor's acquisition of the property. Rental shall be at the rate of One Dollar and Ten Cents ($1.10) per square foot of leasable space with final size and configuration to be determined, with rentals payable monthly in advance. Lessor and Lessee do hereby agree that on each yearly anniversary date from the commencement of this Lease, and at regular yearly intervals thereafter, during the term of this Lease and during any renewals or extensions thereof, the rental for each subsequent year period shall be determined and fixed by dividing the monthly rental for the then current monthly rental by the index number of the revised Consumer's Price Index U. S. City Average, All Items, 1982-84=100 for All Urban Consumers (CPI-U) published monthly in the "Monthly Labor Review" of the Bureau of Labor Statistics of the U. S. Department of Labor for the month preceding the commencement date of this Lease, and then multiplying the resulting amount by the index number for said Consumer's Price Index for the month preceding each said yearly adjustment date. The rent so fixed and adjusted shall be the rent for the next one (1) year period commencing with the date on which said rent is to be adjusted as herein provided.

If for any reason whatsoever there is a change of any kind in the method of calculation or formulation of such Consumer's Price Index, U. S. City Average, All Items, 1982-84=100 for All Urban Consumers (CPI-U) or if said index is no longer continued or published, then the Lessor and Lessee shall mutually select such other commodity index which is satisfactory to Lessor and Lessee. If the parties cannot agree upon such other index, then such index shall be selected by a board of three arbitrators in accordance with the Arbitration article as herein contained in this Lease Agreement.

ALL RENTALS shall be paid without deductions or offsets, each month in advance, on the first day of each calendar month during said term. If the Lease commences other than on the first day of a calendar month, the first and last month's rental shall be prorated accordingly.

4) LEASE DEPOSIT. Simultaneous with the execution of this Lease, Lessee shall deposit with Lessor the sum of $20,000 to be applied toward the payment of the first month's rent. Lessor may commingle said deposit with Lessor's other monies and may deliver said deposit to any transferee of the reversion and, upon giving written notice of such delivery to Lessee personally or by certified mail, Lessor shall be discharged from further liability relating thereto.

5) TAXES AND ASSESSMENTS. Lessee shall be liable for all taxes levied against personal property, trade fixtures, and other property placed by Lessee in or on or about the demised premises including without prejudice to the generality of the foregoing, shelves, counters, vaults, vault doors, wall safes, partitions, fixtures, plant equipment, machinery, and other articles and if any such taxes on Lessee's personal property, trade fixtures or property placed in the demised premises by Lessee are levied against Lessor and if Lessor pays the same (which Lessor shall have the right to do regardless of validity of such levy) or if the assessed value of Lessor's property is increased by the inclusion of the value placed on such property or trade fixtures of Lessee or placed in the demised premises by Lessee and if Lessor pays the taxes based on such increased assessment (which Lessor shall have the right to do, regardless of the validity thereof), Lessee shall upon demand, as the case may be, pay to the Lessor the taxes so levied against Lessor or the proportion of such taxes resulting from such increase in the assessment. Lessee shall reimburse Lessor for Lessee's proportionate share of all real property taxes and assessments levied or assessed against the land on which the shopping center of which the demised premises form a part is located, including the entire parking area and accommodation areas serving the shopping center and the improvements and buildings on said land. Proration to be based on the number of square feet occupied by Lessee in the said shopping center bears to the total number of square feet of leasable area in the entire shopping center. Lessee shall pay to Lessor an amount equal to any and all excise, privilege, transaction and other taxes levied or assessed by any federal, state, or local authority upon the leasing of the demised premises or the payment or receipt of rent therefore, and any business tax imposed upon Lessor by any governmental authority which is based on or measured in whole or in part by amounts charged or received by Lessor from Lessee under this lease, provided Lessee shall pay only the amount of such business tax that would be payable by Lessor if the demised premises were the only property of Lessor.

If any such taxes are assessed against or relate to an area constituting less than all of the shopping center, Lessee's proportionate share of such taxes shall be determined by the ratio of the number of square feet occupied by Lessee to the total number of square feet of leasable area in the portion of the shopping center against which such taxes are assessed or to which they relate.



Initials

6) <u>IMPROVEMENTS AND MAINTENANCE OF PREMISES.</u>

(a) Lessee shall, at his sole cost, keep and maintain the premises and appurtenances (excepting exterior walls and roof which Lessor agrees to repair, subject to reimbursement as provided below), including glazing, any store front and the interior of the premises, in clean, good and sanitary order, condition and repair, hereby waiving all right to make repairs or replacements at the expense of Lessor. Additionally, on an "as needed basis," Lessee shall clean the walkway and pick up litter on the parking lot directly in front of Lessee's premises. By entry hereunder, Lessee accepts the premises as being in good and sanitary order, condition, and repair, and agrees on the last day of said term, or sooner termination of this Lease, to surrender unto Lessor said premises and appurtenances in the same condition as when received, reasonable use and wear thereof and damage by fire, Act of God, or by the elements excepted, and to remove all of Lessee's signs from said premises.

Lessor shall, subject to Lessee's reimbursement as herein provided, maintain in good repair the exterior walls and roof of the building in which the demised premises are located. Lessor shall not be required to make any repairs to the exterior walls or roof unless and until Lessee has notified Lessor in writing of the need for such repairs and Lessor shall have had a reasonable period of time thereafter to commence and complete said repairs. Lessee shall reimburse Lessor for its pro rata share of the cost of said repairs and maintenance incurred by Lessor in the proportion that the number of square feet leased by Lessee bears to the total number of square feet of leasable area in the building which contains the demised premises.

Lessee shall pay his pro rata share of the maintenance of the accommodation areas and parking areas in the proportion that the number of square feet leased by Lessee bears to the total number of square feet of leasable area in the shopping center. Cost of maintenance shall include upkeep, repairs and replacements to and of improvements in such common areas and any and all other expenses related to the existence of said common areas.

(b) All improvements to the interior of the leased premises shall be constructed by Lessee. Lessee agrees to provide Lessor with the plans and specifications for such improvements prior to construction.

7) <u>INSURANCE.</u> Lessee agrees that Lessee will at Lessee's own cost and expense at all times during the term hereof provide and keep in force for the benefit of Lessor and Lessee a liability insurance policy or an endorsement on a blanket liability insurance policy insuring Lessor and Lessee against any and all damages and liability on account of or arising out of injuries to or the death of any person in or about the demised premises in the minimum amount of One Million Dollars ($2,000,000.00) limit per occurrence and Two Million Dollars ($4,000,000.00) aggregate limit (bodily injury and property damage). Additionally, Lessee agrees to acquire and maintain adequate plate glass insurance. Said policies or endorsements shall be affected with insurance companies, approved by Lessor, authorized to write liability insurance in the State of California. Said policies shall designate specifically that Lessor is an additional named insured there under; such policies or certified copies thereof, shall be delivered to Lessor together with written obligations from the companies issuing said policies waiving all subrogation rights against Lessor and agrees to notify Lessor in writing if such policies are about to lapse or be canceled. Insurance coverage limits to be adjusted at the commencement of each five (5) years from the



Initials

commencement of the Lease and at each five (5) year interval to limits which are normal for the industry. If Lessor and Lessee cannot agree upon "normal coverage, "then Lessor and Lessee shall promptly proceed to have the matter arbitrated in accordance with Arbitration article as herein contained in this Lease Agreement.

8) LEASE CONTINGENCIES AND POSSESSION. This Lease is contingent upon Lessor's ability to close escrow for the acquisition of the referenced property within four (4) months from the date of this Lease Agreement. If Lessor, for any reason whatsoever, cannot deliver possession of the said premises to Lessee at the commencement of the said term, as hereinbefore specified, this Lease shall not be void or voidable, nor shall Lessor be liable to Lessee for any loss or damage resulting there from; but there shall be proportionate deduction of rent covering the period between the commencement of the said term and the time when Lessor can deliver possession. If possession of said premises is not delivered to Lessee within six(6) months from the date of execution of this Lease, either party may cancel this Lease by giving written notice of cancellation to the other.

9) USES PROHIBITED. Lessee shall not use, or permit said premises, or any part thereof, to be used, for any purpose or purposes other than the purpose or purposes for which said premises are hereby leased; and no use shall be made or permitted to be made on the said premises, nor acts done, which will increase the existing rate of insurance upon the building in which said premises may be located, or cause a cancellation of any insurance policy covering said building, or any part thereof, nor shall Lessee sell, or permit to be kept, used, or sold, in or about said premises, any article which may be prohibited by the standard form of fire insurance policies. Lessee shall, at his sole cost and expense, comply with any and all requirements, pertaining to said premises, of any insurance organization or company, necessary for the maintenance of reasonable fire and public liability insurance, covering said building and appurtenances.

10) WASTE--ALTERATIONS. Lessee shall not commit or suffer to be committed any waste upon the said premises, or any nuisance, or other acts or thing which may disturb the quiet enjoyment of any other tenant in the building, or center, in which the demised premises may be located.

Lessee shall not make, or suffer to be made, any alterations of said premises or any part thereof, without the written consent of Lessor first had and obtained, said approval not to be unreasonably withheld. Any additions to, or alterations of, the said premises, except movable furniture and trade fixtures, shall become at once a part of the realty and belong to Lessor. The Lessee shall have the right to remove its trade fixtures and equipment placed upon the leased premises provided that Lessee restores said premises as indicated below.

Lessee shall ascertain from Lessor at least thirty (30) days prior to the termination of Lease whether Lessor desires the premises, or any part thereof, restored to their condition prior to the making of any additions, alterations, installations and improvements, and if Lessor shall so desire, then Lessee shall forthwith restore said premises or such part or parts thereof and repair any damage caused by Lessee or necessary to restore said premises to their original condition, entirely at his own expense, excepting normal wear and tear.

11) ABANDONMENT. Lessee shall not vacate or abandon the premises at any time during the term; and if Lessee shall abandon, vacate, or surrender said premises, or be dispossessed by process of law, or

otherwise, any personal property belonging to Lessee and left on the premises shall be deemed to be abandoned, at the option of Lessor, except such property as may be mortgaged to Lessor.

12) FREE FROM LIENS. Lessee shall keep the demised premises and the property in which the demised premises are situated, free from any liens arising out of any work performed, materials furnished, or obligations incurred by Lessee. Prior to commencement of any work by outside contractors, Lessee shall provide Lessor with a minimum of ten (10) days notice so that Lessor may have the opportunity to install, if appropriate, a "Notice of Non-Responsibility."

13) COMPLIANCE WITH GOVERNMENTAL REGULATIONS. Lessee shall, at his sole cost and expense, comply with all of the requirements of all municipal, state, federal, and other authorities now in force, or which may hereafter be in force, pertaining to the said premises, and shall faithfully observe in the use of the premises all Municipal ordinances and State and Federal statutes now in force or which may hereafter be in force. The judgment of any court of competent jurisdiction, or the admission of Lessee in any action or proceeding against Lessee, whether Lessor be a party thereto or not, that Lessee has violated any such ordinance or statute in the use of the premises, shall be conclusive of that fact as between Lessor and Lessee.

14) INDEMNIFICATION OF LESSOR. Lessee, as a material part of the consideration to be rendered to Lessor, hereby waives all claims against Lessor for damage to goods, wares and merchandise, and all other personal property in, upon or about said premises, for injury to Lessee's business, and for injuries to persons in or about said premises, from any cause arising at any time, and Lessee will hold Lessor exempt and harmless from any damage or injury to any person, or to the goods, wares, and merchandise and all other personal property of any person, arising from the use of the premises by Lessee, or from the failure to Lessee to keep the premises in good condition and repair, as herein provided.

15) ADVERTISEMENTS AND SIGNS. Lessee shall not place or permit to be placed any sign, decoration, marquee or awning on the premises, including the exterior of the building, without first submitting a written description thereof to Lessor and obtaining the written consent of Lessor; Lessee, upon request of Lessor, shall immediately remove any sign, decoration, marquee or awning which Lessee has placed or permitted to be placed in, on or about the premises and which, in the opinion of Lessor, is objectionable or offensive, and if Lessee fails so to do, Lessor may enter upon said premises and remove the same. At the termination of Lease, or any extension thereof, Lessee shall remove all of his signs, and any damage caused by removal shall be repaired at Lessee's expense. All signs shall be maintained by Lessee at his own expense. The provisions of any sign criteria attached to this Lease are incorporated herein attached hereto as Exhibit C. Lessee shall not conduct or permit to be conducted any auction sale on said premises. All signs to be approved by Lessor, Lessee, and appropriate governmental authorities. Costs for sign construction, installation, and maintenance to be Lessee's expense except in the event of a common sign, in which case, all costs to be prorated in accordance with Lessee's prorated share of signage area.

16) UTILITIES. Lessee, from the time it first enters the premises for the purpose of setting fixtures, or from the commencement of this Lease, whichever date shall first occur, and throughout the term of this Lease shall pay for water, gas, heat, power, telephone service, sewer service and all other utility service supplied to or consumed in or on the leased premises. If there is no separate utility meters for the

premises, Lessee agrees to pay Lessor a monthly amount equal to the utility company's estimated monthly charge for service to the premises if it had a separate meter. Lessee shall not allow refuse, garbage, or trash to accumulate outside of the demised premises except on the day of scheduled scavenger pickup service, and then only in areas designated for that purpose by Lessor. Refuse collection charges shall be shared on a proportionate usage basis to be agreed upon between Lessor and Lessee and Lessee's other tenants. If no agreement can be reached, then either separate refuse boxes to be installed, or if that is not feasible, to have the matter arbitrated in accordance with the Arbitration article as herein contained inthisLease.

17) ENTRY BY LESSOR. Lessee shall permit Lessor and his agents to enter into and upon said demised premises at all reasonable times for the purpose of inspecting the same or for the purpose of maintaining the building in which said premises are situated, or for the purpose of making repairs, alterations or additions to any other portion of said building, including the erection and maintenance of such scaffolding, canopies, fences and props as may be required, or for the purpose of posting notices of nonresponsibility for alterations, additions, or repairs, or for the purpose of placing upon the property in which the said premises are located any usual or ordinary "for sale" signs, without any rebate of rent and without any liability to Lessee for any loss of occupation or quiet enjoyment of the premises thereby occasioned and shall permit Lessor and his agents, at any time within forty-five (45) days prior to the expiration of this Lease, to place upon said premises any usual or ordinary "to let" or "to lease" signs and exhibit the premises to prospective tenants at reasonable hours.

18) DESTRUCTION OF PREMISES. In the event of a partial destruction of said premises during the term of this Lease, from any cause, Lessor shall forthwith repair the same, provided such repairs can be made within one hundred twenty (120) days under the laws and regulations of state, federal, county, or municipal authorities, but such partial destruction shall in no way annul or void this Lease, except that Lessee shall be entitled to a proportionate deduction of rental while such repairs are being made, such proportionate deduction to be based upon the extent to which the making of such repairs shall interfere with the business carried on by Lessee in the said premises. If such repairs cannot be made in one hundred twenty (120) days, Lessor may, at his option, make same within a reasonable time, this Lease continuing in full force and effect and the rent to be proportionately rebated as aforesaid in this paragraph provided. In the event that Lessor does not so elect to make such repairs which cannot be made within one hundred twenty (120) days, or such repairs cannot be made under such laws and regulations, this Lease may be terminated at the option of either party.

In respect to any partial destruction which Lessor is obligated to repair or may elect to repair under the terms of this paragraph, the provisions of Section 1932, subdivision 2, and of Section 1933, subdivision 4, of the Civil Code of the State of California, are waived by Lessee. In the event that the building in which the demised premises may be situated be destroyed to the extent of not less than thirty percent (30%) of the replacement cost thereof, Lessor may elect to terminate this Lease whether the demised premises be injured or not. A total destruction of the building in which the said premises may be situated shall terminate this Lease. In the event of any dispute between Lessor and Lessee relative to the provisions of this paragraph, they shall each select an arbitrator, the two arbitrators so selected shall select a third arbitrator and the three arbitrators so selected shall hear and determine the controversy and their decision thereon shall be final and binding upon both Lessor and Lessee, who shall bear the costs of such arbitration equally between them.

19) ASSIGNMENT AND SUBLETTING. Lessee shall not assign this Lease nor any interest therein, and shall not sublet the said premises or any part thereof, or any right or privilege appurtenant thereto, or suffer any other person (the agents and servants of Lessee excepted) to occupy or use the said premises, or any portion thereof, without the written consent of Lessor first had and obtained; provided, however, that such consent shall not unreasonably be withheld. A consent to one assignment, subletting, occupation or use by any other person, shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Any such assignment or subletting without such consent shall be void, and shall, at the option of Lessor, terminate this Lease. This Lease shall not, nor shall any interest therein, be assignable, as to the interest of Lessee, by operation of law, without the written consent of Lessor. In no case will the Lessor ever consent to an assignment or sublease to a use which will require any greater parking demands during "peak shopping center hours." . In the event of assignment or sublease, rental to be increased by ten percent (10%) over the then current rental, and further adjustments made in accordance with the Rent article as herein contained in this Lease Agreement. In the event of an assignment or sublease, Lessee shall remain primarily liable for rental payment and fulfilling all other terms and conditions of the Lease Agreement.

20) INSOLVENCY OR BANKRUPTCY. Either (a) the appointment of a receiver (except a receiver appointed at the instance or request of Lessor) to take possession of all or substantially all of the assets of Lessee; or (b) a general assignment by Lessee for the benefit of creditors; or (c) any action taken or suffered by Lessee under any insolvency or bankruptcy act, shall constitute a breach of this Lease by Lessee. In such event, Lessor may at his option, declare this Lease terminated and forfeited by Lessee, and Lessor shall be entitled to immediate possession of such premises.

21) LATE CHARGES. Lessee hereby acknowledges that late payment by Lessee to Lessor of rent or other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed upon Lessor by terms of any mortgage or Trust Deed covering the Premises. All rental payments shall be due on the 1st of the month. Accordingly, if not received by the Lessor by the fifth day of the month (or by the next business day following the fifth, if the fifth is a weekend day or holiday), then the Lessee shall pay a late payment charge of ten percent (10%) of the rental due. In addition, any sum payable hereunder by Lessee that is not paid within twenty (20) days of when due (or five (5) days in the case of rental) shall thereafter accrue interest at the rate of one and one-half percent (1-1/2%) per month until paid unless such rates exceed the maximum rate that the parties may agree upon, as permitted by law, in which case the maximum permitted rate shall apply. Acceptance of such late charges by Lessor shall in no event constitute a waiver of Lessee's default with respect to such remedies granted hereunder.

22) LESSEE'S DEFAULT. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Lessee.

(a) The vacating or abandonment of the Premises by Lessee.



Initials

(b) The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of ten (10) days after written notice thereof by Lessor to Lessee.

(c) The failure by Lessee to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by the Lessee, other than described in (b) above, where such failure shall continue for a period of thirty (30) days after written notice thereof by Lessor to Lessee; provided, however, that if the nature of Lessee's default is such that more than thirty (30) days is required to effect its cure, then lessee shall not be deemed to be in default if Lessee commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

(d) The making by Lessee of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Lessee of a petition to have Lessee adjudged a bankrupt, or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); or the appointment of a trustee or a receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days.

(e) The purpose of the Notice Requirement in this article is to extend the Notice Requirements of the Unlawful Detainer Statutes of California.

23) <u>REMEDIES IN DEFAULT.</u> In the event of any such default or breach by Lessee, Lessor may at any time thereafter, in his sole discretion, with or without notice or demand and without limiting Lessor in the exercise of a right or remedy which Lessor may have by reason of such default or breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession of the premises to Lessor. In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises; reasonable attorney's fees; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent and other charges and adjustments called for herein for the balance of the term after the time of such award exceeds the amount of such loss for the same period that Lessee proves could be reasonably avoided; and that portion of any leasing commission paid by Lessor and applicable to the unexpired term of this Lease. Unpaid installments of rent or other sums shall bear interest from the date due at the maximum legal rate.

(b) Maintain Lessee's right to possession, in which case this Lease shall continue in effect whether or not Lessee shall have abandoned the Premises. In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent and any other charges and adjustment as may become due hereunder; or

(c) Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the State in which the Premises are located.

24) SURRENDER OF LEASE. The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subleases or subtenancies; or may, at the option of Lessor, operate as an assignment to him or any or all such subleases or subtenancies.

25) CONDEMNATION. In the event any condemnation proceeding shall be commenced affecting the demised premises, Lessee shall have no right to claim any valuation for his leasehold interest or otherwise by reason of his occupancy of or improvements to the premises, and any condemnation award adjudicated or by way of settlement shall belong in its entirety to Lessor. Lessee shall, however, be entitled to any award made to him for depreciation to and cost of removal of stock and fixtures placed in the demised premises by Lessee, provided that said award does not otherwise diminish the amount to be received by Lessor.

26) SUBORDINATION. This lease is and shall always be subordinate to any mortgage or deed of trust which is now or shall at any time be placed upon the demised premises or any part thereof or the building of which the demised premises are a portion and Lessee agrees to execute and deliver any instrument without cost, which may be deemed necessary to further affect the subordination of this Lease to any such mortgage or deed of trust, provided, however, that in the event of transfer of title to the demised premises by a Trustee to a Purchaser at a Trustee Sale under a Deed of Trust or mortgage, or by Lessor to a mortgagee, trustee, or beneficiary under said Deed of Trust or mortgage, or to any purchaser therefrom or successor thereto, this Lease shall not terminate if Lessee is not in default but Lessee shall attorn to said new owner as if a party hereto regardless of any rule of law to the contrary or absence of privity of contract.

27) TRANSFER OF SECURITY. If any security be given by Lessee to secure the faithful performance of all or any of the covenants of this Lease on the part of Lessee, Lessor may transfer and/or deliver the security, as such, to the purchaser of the reversion, in the event that the reversion be sold, and thereupon Lessor shall be discharged from any further liability in reference thereto.

28) WAIVER. The waiver by Lessor of any breach of any Lease provision shall not be deemed to be a waiver of such lease provision or any subsequent breach of the same or any other term, covenant or condition therein contained. The subsequent acceptance of rent hereunder by Lessor shall not be deemed to be a waiver of any preceding breach by Lessee of any provision of this Lease, other than the failure of Lessee to pay the particular rental so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

29) HOLDING OVER. Any holding over after the expiration of the said term of this Lease, with the consent of Lessor, shall be construed to be a tenancy from month to month at a rental equal to one hundred twenty-five percent (125%) of the rental for the month just prior to Lease expiration, and shall otherwise be on the terms and conditions herein specified, insofar as is applicable.

30) <u>SUCCESSORS AND ASSIGNS.</u> The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

31) <u>TIME.</u> Time is of the essence of this Lease.

32) <u>CAPTIONS.</u> The captions of this Lease are for convenience only, and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

33) <u>PARKING AREAS.</u>

(a) Throughout the term of this Lease, Lessor shall provide a parking area or areas for the use of Lessee and Lessee's customers, employees and invitees in common with other lessees and occupant of other portions of the shopping center and their customers, employees and invitees. Lessor reserves the right to change the parking areas and parking layout from time to time, provided that the parking provided meets the requirements imposed by the planning agency having jurisdiction.

(b) Lessee and Lessee's employees shall park their personal vehicles in areas designated by Lessor from to time which could include requiring employees to park personal autos off the premises. Upon request of Lessor, Lessee shall provide the automobile license numbers of the personal vehicles of Lessee and Lessee's employees.

(c) All expenses relating to the maintenance or operation of the parking areas shall be paid by Lessee and the other lessees in the shopping center in the proportion that the number of square feet occupied by each of them bears to the total number of square feet of leasable area in the shopping center. For the purpose of this Lease Agreement, the expenses payable by Lessee and the other lessees in the shopping center shall include (without limiting the generality of any provision of this lease) any assessment, charge, surcharge, tariff or penalty imposed by any governmental agency for the purpose, in whole or in part, of limiting the use of motor vehicles or otherwise protecting the environment.

(d) Lessor reserves the right to promulgate such reasonable rules and regulations relating to the use of the parking areas, roads, and accommodation areas, and any part or parts thereof, as Lessor may deem appropriate and for the best interests of the lessees. Lessee shall abide by such rules and cooperate in their observance. The rules and regulations shall be binding upon Lessee upon delivery of a copy of them to Lessee. The rules and regulations may be amended by Lessor from time to time, with or without advance notice, and all amendments shall be effective upon delivery of a copy of them to Lessee.

34) <u>EFFECT OF LESSOR'S CONVEYANCE.</u> If during the term of this Lease, Lessor shall sell his interest in the shopping center, or the premises, then from and after the effective date of sale, Lessor shall be released and discharged from any and all obligations and responsibilities under this Lease except those already accrued.



Initials

35) SALE OF PREMISES. Lessor reserves the right to sell any part of the shopping center, provided that the rights of Lessee and the other lessee's rights to use the accommodation areas and parking areas are protected.

36) LIABILITY AND FIRE INSURANCE PREMIUMS. Lessee, upon demand, shall pay to Lessor his proportionate share of (a) the premium for liability insurance maintained by Lessor in connection with the operation of the shopping center, accommodation areas and parking areas, and (b) the premium for fire and extended coverage insurance on the building in which the demised premises are located. If any such insurance covers less than all of the shopping center, Lessee's proportionate share of the premium shall be determined by the ratio of the number of square feet occupied by Lessee to the total number of square feet of leasable area in the portion of the shopping center covered by such insurance. In addition, Lessee shall pay an amount equal to any increase in the premium for fire and extended coverage insurance allocable to the remainder of said building because of any special conditions relating to lessee's operation which requires a higher premium.

37) WAIVER OF SUBROGATION. To the extent that such waiver does not invalidate any fire insurance coverage, Lessor hereby agrees to waive or release his right of recovery or right of subrogation against Lessee and Lessee hereby agrees to waive or release his right of recovery or right of subrogation against Lessor for damage to or destruction of the demised premises caused by perils insured against in the standard fire insurance policy including the extended coverage endorsement.

38) APPORTIONMENT AND PAYMENT OF TAXES, COSTS, AND PREMIUMS.

(a) If any tax, insurance premium or other expense relates to a building which is only partially complete, Lessor shall equitably apportion such tax, premium or expense between the completed portion of the building and that portion which is not complete.

(b) Lessee's share of taxes, maintenance costs, insurance premiums, reserve for replacements, administrative fees, and other expenses as hereinabove provided shall be payable to Lessor upon demand, but not more often than once each calendar month. Lessee's share of such taxes, costs, premiums and other expenses may be estimated by Lessor subject to adjustment in future billings to Lessee. Such taxes, costs, premiums and other expenses shall be computed on an accrual basis under generally accepted accounting principles. On or before March 31st of each year, Lessor shall determine such taxes, costs, premiums and other expenses during the preceding year ending December 31st and shall furnish Lessee a statement showing said items in reasonable detail. To the extent Lessee's share of such taxes, costs, premiums and other expenses is greater or less than the sum actually billed to and paid by Lessee during the year, the difference shall be billed to and paid by Lessee or refunded to Lessee, as the case may be.

39) FRESH AND EASY LEASE. Both Lessor and Lessee understand that Fresh and Easy Market has a contingent Lease in place for the leasehold acquisition of a portion of Building 1 consisting of approximately 16,024 square feet. In the event said lease with Fresh and Easy does not go into effect, the Lessee shall have a period of thirty (30) days, from date of notification to the Lessee by Lessor of the availability of the Fresh and Easy space, to notify the Lessor of Lessee's desire to lease said space under the same terms and conditions as herein contained in this Lease Agreement. Lessee's occupancy and commencement of rental shall begin 30 days from the date of Lessee's notification to Lessor of their

interest in the leasehold acquisition of the Fresh and Easy Space but in no case shall rental commence sooner than the date as memorialized in Article 3 RENT.

40) VACANT SPACE LEASE. Both Lessor and Lessee understand that a portion of Building 1 consisting of approximately 10,000 square feet is currently vacant without a contingent Lease in place. The Lessee shall have the right of first refusal for such space.

41) ARBITRATION. In addition to those provisions specifically subject to arbitration, any question, dispute or controversy arising under the provisions of this Lease Agreement, at the option of Lessor, shall be determined by arbitration. Such arbitration shall be conducted pursuant to the provisions of the Laws of the State of California, with the rules of procedure to be those of the American Arbitration Association or its successor insofar as said rules or procedure do not conflict with the Laws of the State of California. Any award entered as a result of arbitration shall be entered as a judgment with the cost of arbitration to be paid as ordered by the arbitrator.

42) LEGAL FEES. In case suit shall be brought because of the breach of any covenant herein contained, the losing party shall pay the prevailing party a reasonable attorney's fee which shall be fixed by the court.

43) NOTICES. All demands and notices of any kind which are permitted or required to be given hereunder shall be deemed duly given when deposited in the United States mail, postage prepaid, properly addressed and certified (with return receipt requested) in the case of notices by Lessee, to Lessor at 2600 Oro Dam Boulevard, Oroville, California, 95966, and in the case of notices by Lessor, to Lessee at 2767 Olive Highway, Oroville, California 95965.

Either party may at any time and from time to time designate a different address by advising the other party thereof in writing, following which the address so designated shall be deemed to be the address of the party giving such advice, for the purpose hereof.

44) COUNTERPART. This Lease Agreement and any Addenda may be signed in counterpart and each part to be considered an original.

45) APPLICABLE LAW. The invalidity or unenforceability of any provision of this Agreement shall not affect or impair any other provision. If any provision of this Agreement is capable of two constructions, one of which would render the provision invalid and the other of which would make the provision valid, then the provision shall have the meaning which renders it valid. The Laws of California shall govern the validity, performance, and enforcement of this Agreement. The submission of this document for examination does not constitute an offer to lease and becomes effective only upon execution and delivery thereof by Lessor and Lessee.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the day and year shown opposite their respective signatures below.



Initials

Executed by Lessor this 15th
day of December, 2011

LESSOR:
DOVE'S LANDING, LLC

By: ______________________
Robert J. Wentz
Managing Partner

Executed by Lessee this 15th
day of December, 2011

LESSEE:
OROHEALTH CORPORATION, a
California Corporation

By: ______________________
Scott Chapple
Chief Operating Officer

# EXHIBIT 3

Filed 08/04/26 Case 26-02092 Doc 1

2012-0050716

Recorded Official Records County of Butte CANDACE J. GRUBBS County Clerk-Recorder | REC FEE 19.00 | TAX 6270.00 | KL
09:00AM 28-Dec-2012 | Page 1 of 2

**RECORDING REQUESTED BY**
Mid Valley Title & Escrow Company

**AND WHEN RECORDED MAIL DOCUMENT TO:**
Dove's Landing, LLC
2600 Oro Dam Blvd.
Oroville, CA 95966

**Space Above This Line for Recorder's Use Only**

A.P.N.: 013-170-051 (PORTION) File No.: 0403-3781273 (AM)

# GRANT DEED

The Undersigned Grantor(s) Declare(s): DOCUMENTARY TRANSFER TAX **$6,270.00**; CITY TRANSFER TAX $;
SURVEY MONUMENT FEE $

[ ] computed on the consideration or full value of property conveyed, OR
[ ] computed on the consideration or full value less value of liens and/or encumbrances remaining at time of sale,
[ ] unincorporated area; [ x ] City of **Oroville**, and

2 KL

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, **Gold Town Plaza, LLC, a California limited liability company**

hereby GRANTS to **Dove's Landing, LLC, a California limited liablity company**

the following described property in the City of **Oroville**, County of **Butte**, State of **California**:

**PARCEL I:**

**PARCEL 1, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON OCTOBER 25, 2012, IN BOOK 183 OF MAPS, AT PAGE(S) 29, 30 AND 31.**

**EXCEPTING THEREFROM ONE HALF OF ALL MINERAL, OIL OR OTHER HYDROCARBON SUBSTANCES. SAID EXCEPTION AFFECTS ALL THAT PORTION OF THE HEREIN DESCRIBED PROPERTY LYING WITHIN THE BOUNDARIES OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN DEED FROM ANTHONY C. MORICI, AN UNMARRIED MAN TO SAFEWAY STORES, INC., A MARYLAND CORPORATION, DATED SEPTEMBER 27, 1971 AND RECORDED FEBRUARY 3, 1972, IN BOOK 1733, PAGE 296, OFFICIAL RECORDS.**

**PARCEL II:**

**AN UNDIVIDED 50% INTEREST IN THE FOLLOWING DESCRIBED PROPERTY:**

**PARCELS 3 AND 4, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON OCTOBER 25, 2012, IN BOOK 183 OF MAPS, AT PAGE(S) 29, 30 AND 31.**

Mail Tax Statements To: **SAME AS ABOVE**

Grant Deed - continued

Date: **12/24/2012**

A.P.N.: 013-170-051 (PORTION)

File No.: 0403-3781273 (AM)

Dated: **12/24/2012**

Gold Town Plaza, LLC, a California limited liability company

By: Kent Woodell, Manager

STATE OF Ca )SS
COUNTY OF Butte )

On 12/26/12, before me, Angela D. Mastelotto, Notary Public, personally appeared Kent Woodell, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

ANGELA D. MASTELOTTO
Commission #1907073
Notary Public - California
Butte County
My Comm. Exp. OCT. 22, 2014
CPS1 CPS1

Signature

My Commission Expires: ____________

*This area for official notarial seal*

Notary Name: ____________

Notary Phone: ____________

Notary Registration Number: ____________

County of Principal Place of Business: ____________

# EXHIBIT 4

20B

2012-0050717

Recorded Official Records County of Butte CANDACE J. GRUBBS County Clerk-Recorder | REC FEE 119.00

KL

09:00AM 28-Dec-2012 | Page 1 of 17

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

RABOBANK, N.A.
915 Highland Pointe Drive, Suite 350
Roseville, CA 95678
Attn: Commercial Real Estate Finance Closing Department

A.P.#013-170-051

Space above this line for Recorder's Use

Dove's Landing_New RE Term_2012

Real Estate Term Loan: 360708-01

# DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING

(Butte County, California)

THIS DOCUMENT SERVES AS A FINANCING STATEMENT FILED AS A FIXTURE FILING UNDER SECTION 9-502 OF THE CALIFORNIA UNIFORM COMMERCIAL CODE

17XXX
KL

This deed of trust is dated as of December 13, 2012. It is by DOVE'S LANDING, LLC, a California limited liability company ("Grantor"), as trustor and debtor, to and in favor of RABOBANK, N.A., a national banking association, as trustee ("Trustee"), whose address for purposes of this deed of trust is 915 Highland Pointe Drive, Suite 350, Roseville, CA 95678, for the benefit of RABOBANK, N.A., a national banking association ("Beneficiary"), as beneficiary and secured party.

Beneficiary has agreed to make a loan in the original principal sum of $5,080,000.00 to Grantor under the terms and conditions of the Credit Agreement between Grantor and Beneficiary dated as of the date of this deed of trust (the "Credit Agreement"). Each capitalized term used in this deed of trust that is defined in the Credit Agreement and not defined in this deed of trust will have the meaning specified in the Credit Agreement. This deed of trust will be interpreted in accordance with the Drafting Conventions.

## ARTICLE 1 – GRANT

To secure repayment of the indebtedness evidenced by the Note (defined herein) and payment and performance of all other Secured Obligations (defined herein), Grantor irrevocably and unconditionally grants, bargains, sells, and conveys to Trustee, in trust, for the benefit of Beneficiary, WITH POWER OF SALE and right of entry and possession, all of Grantor's estate, right, title and interest in and to the following, wherever located, whether now owned or hereafter acquired or arising, and, except as indicated, whether constituting real estate or personal property (collectively, the "Property"):

(a) the real estate and any interest in the real estate located in Butte County, California, and described in EXHIBIT A (the "Land"). The Land or its address is commonly known as 2450 Oro Dam Boulevard East, Oroville, CA 95966. The assessor's parcel number for the Land is 013-170-051 (Portion);

(b) all buildings, structures, improvements, fixtures, attachments, appliances, equipment, machinery and other articles now or hereafter erected on, affixed or attached to, or located in or on the Land, including all watering and irrigation apparatus, pumps, motors, generators, pipes, center pivot irrigators and sprinklers, windmills, and fences (the "Improvements");

(c) all easements, rights-of-way and rights appurtenant to the Land or used in connection with the Land or as a means of access thereto ("Easements");

(d) the ground water on, under, pumped from or otherwise available to the Property or any drainage, retention, ditch, canal, reservoir, or other water rights, whether as a result of overlying groundwater rights, contractual rights, or otherwise and whether riparian, appropriative, or otherwise; the right to remove or extract any such ground water including any permits, rights or licenses granted by any Governmental Authority and any rights granted or created by any easement, covenant, agreement or contract with any Person; and any rights to which the Property or Grantor is entitled with respect to surface water, whether such rights are appropriative, riparian, prescriptive or otherwise and whether or not pursuant to historical use,

contractual agreement, permit or other governmental authorization; any water right, water allocation for water not yet delivered, distribution right, delivery right, any proscriptive, contractual, easement or other rights necessary or convenient to convey any water to the Property, water storage right, or other water-related entitlement appurtenant to or otherwise applicable to the Property by virtue of the Property being situated within the boundaries of any governmental water district irrigation district or other local agency or within the boundaries of any private water company, mutual water company, or other non-governmental entity and any shares, or any rights under such shares, of any private water company, mutual water company, or other non-governmental entity pursuant to which Grantor or the Property may receive water (collectively, "Water Rights");

(e) all other tenements, hereditaments and appurtenances to the Land;

(f) minerals, oil, gas, and other hydrocarbon substances, minerals, mineral interests, royalties, overriding royalties, production payments, net profit interests and other interests and other interests and estates in, under and on the Land and other oil, gas and mineral interests with which any of the foregoing interests or estates are pooled or unitized (the "Mineral Rights");

(g) timber now or hereafter standing or cut;

(h) leases, subleases, licenses, occupancy agreements, concessions and other agreements, granting a possessory interest in and to, or the right to extract, mine, reside in, sell, or use the Property (collectively, the "Leases");

(i) all utility contracts, maintenance agreements, management agreements, service contracts and other agreements directly related to the operation and maintenance of the Property;

(j) any certificated and uncertificated securities, securities entitlements, securities accounts and commodities accounts;

(k) working drawings, instructional manuals, and rights in processes directly related to the operation of the Property;

(l) building materials, equipment, work in process or other personal property of any kind, including but not limited to all software embedded therein, whether stored on the Land or elsewhere, which have been or later will be acquired for the purpose of being delivered to, incorporated into or installed on or about the Land or Improvements;

(m) goods, materials, supplies, chattels, furniture, fixtures, equipment and machinery now or later to be attached to, placed in or on, or used in connection with the use, enjoyment, occupancy or operation of all or any part of the Land and Improvements, whether stored on the Land or elsewhere, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment, including any and all software embedded therein, all of which shall be considered to the fullest extent of the law to be real property for purposes of this deed of trust;

(n) other tangible personal property of every kind and description, whether stored on the Land or elsewhere, including all goods, materials, supplies, tools, books, records, chattels, furniture, machinery and equipment or which is in all cases (i) directly related to the operation of the Property or acquired in connection with any construction or maintenance of the Land or the Improvements or (ii) affixed or installed, or to be affixed or installed, in any manner on the Land or the Improvements;

(o) development and use rights, governmental permits, approvals and licenses, applications, and all permits and licenses relating or pertaining to the use or enjoyment of the Property;

(p) general intangibles, accounts and other rights to the payment of money, reserves, deferred payments, refunds, cost savings, payments and deposits, whether now or later to be received from third parties (including earnest money sales deposits) or deposited by Grantor with third parties, including all utility deposits;

(q) proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property (the "Insurance Claims");

(r) all awards made for the taking by condemnation or the power of eminent domain, or by any proceeding or purchase in lieu thereof, of the whole or any part of the Real Estate (the "Condemnation Awards");

(s) all deposit accounts at Beneficiary and all other deposit accounts from which Grantor may from time to time authorize Beneficiary to debit payments due on the Secured Obligations, and all money or other personal property of Grantor in addition to the foregoing deposited with or otherwise in Beneficiary's or Trustee's possession;

(t) the right, in the name and on behalf of Grantor, upon notice to Grantor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Trustee or Beneficiary in the Property;

(u) letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) that Grantor may now have or hereafter acquire relating to the properties, rights, titles and interests referred to herein;

(v) books and records pertaining to any and all of the property described herein, including computer-readable memory and any computer hardware or software necessary to access and process such memory; and

(w) substitutions, replacements, additions, accessions and proceeds for or to any of the foregoing, and all books, records and files relating to any of the foregoing, including, without limitation, computer readable memory and data and any computer software or hardware reasonably necessary to access and process such memory and data.

## ARTICLE 2 - ASSIGNMENT OF RENTS

2.01 **Assignment**. Grantor irrevocably and unconditionally assigns Beneficiary all rents and other benefits derived from the Leases, and all other issues, profits, royalties, bonuses, income and other proceeds of the Property, whether now due, past due or to become due, including all prepaid rents, security deposits and other supporting obligations (the "Rents"). Beneficiary may collect Rents with or without taking possession of the Property. Beneficiary, by its acceptance of this deed of trust does not assume any duty or obligation under the Leases.

2.02 **Grant of License**. Notwithstanding the provisions of Section 2.01, Beneficiary confers upon Grantor a license to collect and retain the Rents as they become due and payable, so long as there is no Event of Default (the "License"). If an Event of Default has occurred, Beneficiary may terminate the License without notice to or demand upon Grantor.

2.03 **Collection and Application of Rents**. Subject to the License granted to Grantor under Section 2.02, Beneficiary has the right, power and authority to collect any and all Rents. Grantor hereby appoints Beneficiary its attorney-in-fact to perform any and all of the following acts, if and at the times when Beneficiary in its sole discretion may so choose: (a) demand, receive and enforce payment of any and all Rents; (b) give receipts, releases and satisfactions for any and all Rents; and (c) sue either in the name of Grantor or in the name of Beneficiary for any and all Rents. Beneficiary's right to the Rents does not depend on whether or not Beneficiary takes possession of the Property as permitted under Section 8.02(c). In Beneficiary's sole discretion, it may choose to collect Rents either with or without taking possession of the Property. If an Event of Default occurs while Beneficiary is in possession of all or part of the Property and is collecting and applying Rents as permitted under this deed of trust, Beneficiary, Trustee and any receiver shall nevertheless be entitled to exercise and invoke every right and remedy afforded any of them under this deed of trust and at law or in equity, including the right to exercise the Power of Sale (defined herein).

2.04 **Notice**. All lessees under any and all Leases are hereby irrevocably authorized and notified by Grantor to rely upon and to comply with (and are fully protected in so doing) any notice or demand by Beneficiary for the payment to Beneficiary of Rents, or for the performance of any of lessees' undertakings under the Leases, and lessees shall have no right or duty to inquire as to whether any Event of Default has actually occurred or is then existing hereunder.

2.05 **Proceeds**. Beneficiary may apply all amounts received by it pursuant to this assignment to pay any of the following in such amounts and in such order as Beneficiary deems appropriate: (a) any and all Secured Obligations; (b) all expenses of leasing, operating, maintaining and managing the Property, including without limitation, the salaries, fees, commissions and wages of a managing agent and such other employees, agents or independent contractors as Beneficiary deems necessary or desirable; (c) all taxes, charges, claims, assessments, any other liens, and premiums for all insurance

Filed 08/04/26 Case 26-02092 Doc 1

Beneficiary deems necessary or desirable; (d) the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Property.

**2.06** <u>Beneficiary Not Responsible</u>. Under no circumstances shall Beneficiary have any duty to produce Rents from the Property. Regardless of whether or not Beneficiary, in person or by agent, takes actual possession of the Land and Improvements, Beneficiary is not and shall not be deemed to be: (a) a "mortgagee in possession" for any purpose; (b) responsible for performing any of the obligations of the lessor under any Lease or performing any obligation under any construction document; (c) responsible for any waste committed by lessees or any other parties, any dangerous or defective condition of the Property, or any negligence in the management, upkeep, repair or control of the Property; or (d) liable in any manner for the Property or the use, occupancy, enjoyment or operation of all or any part of it (except to the extent of its reckless or intentional misconduct).

**2.07** <u>Leasing.</u> Except as may be expressly provided in the Credit Agreement; (a) Grantor shall not accept any prepayment of Rents for any rental period exceeding one month without Beneficiary's prior written consent, and (b) Grantor shall not lease or enter into an agreement to lease the Property or any part of it except with Beneficiary's prior written consent, which consent may be conditioned on, among other things, the execution, delivery and recordation of a subordination, non-disturbance and attornment agreement, in form and substance acceptable to Beneficiary. Grantor shall apply all Rents in a manner approved by Beneficiary.

## ARTICLE 3 – SECURITY AGREEMENT

**3.01** <u>Grant of Security Interest</u>. Grantor grants to Beneficiary a security interest in and pledges and assigns to Beneficiary all of Grantor's right, title and interest in and to the Property, to the extent characterized as personal property (the "<u>Personalty</u>").

**3.02** <u>Addresses of Debtor and Secured Party</u>. The address of Grantor adjacent to its signature below is the mailing address of Grantor as debtor under the UCC. The address for Trustee specified in the first paragraph of this deed of trust is the address for Trustee as secured party under the UCC; and the address for Beneficiary specified in <u>Article 9</u> is the address for Beneficiary as secured party under the UCC.

**3.03** <u>Fixture Filing</u>. This deed of trust constitutes a financing statement filed as a fixture filing under the UCC, covering any Property which now is or later may become a fixture attached to the Land or any Improvement.

## ARTICLE 4 – SECURED OBLIGATIONS

**4.01** <u>Secured Obligations</u>. Grantor makes the grant, conveyance, transfer and assignment above, makes the irrevocable and absolute assignment in <u>Section 2.01</u>, and grants the security interest under <u>Section 3.01</u>, to secure payment and performance of the following obligations (the "<u>Secured Obligations</u>") in any order of priority that Beneficiary may choose:

(a) all Obligations (defined in the Credit Agreement), including the Real Estate Term Loan Note dated as of the date of this deed of trust, from Grantor to Beneficiary in the original principal amount of $5,080,000.00 (the "<u>Note</u>") all other indebtedness, liabilities and obligations of Grantor to Beneficiary arising pursuant to any of the Loan Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several;

(b) all obligations of Grantor under this deed of trust;

(c) all future advances and other obligations that Grantor may agree to pay or perform (whether as principal, surety or guarantor) for the benefit of Beneficiary, when a writing evidences the parties' agreement that the advance or obligation be secured by this deed of trust; and

(d) any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding.

4.02 Future Secured Obligations. The Secured Obligations include future advances made by Beneficiary, and for any purpose, and all other future Secured Obligations. Those future advances and other future Secured Obligations are secured to the same extent as if made or incurred on the date of the execution of this deed of trust, and have priority as to third persons with or without actual notice from the time this deed of trust is filed for record as provided by law. If this deed of trust secures a line of credit or there is a future advance, the total amount of indebtedness secured by this deed of trust may decrease or increase from time to time. Grantor shall not file for record any notice limiting the maximum amount secured by this deed of trust (a "Maximum Amount Notice"). A Maximum Amount Notice will be an Event of Default (defined herein). Nothing in this Section 4.02 will constitute a commitment to make additional or future advances in any amount.

4.03 Notice of terms of Secured Obligation Documents. All persons who have or acquire an interest in the Property will be deemed to have received notice of, and will be bound by, the terms of the Credit Agreement, the other Loan Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (the Loan Documents and those other agreements or instruments, the "Secured Obligation Documents"). These terms include any provisions in the Secured Obligation Documents which permit borrowing, repayment and reborrowing, or which provide that the rate of interest on one or more of the Secured Obligations may vary from time to time.

4.04 Unsecured Obligations. This deed of trust does not secure any obligation which is unsecured pursuant to the express terms of the Credit Agreement or any other document, agreement or instrument.

## ARTICLE 5 – WARRANTY OF TITLE

5.01 Warranty of Title. Grantor represents and warrants that Grantor lawfully possesses and holds fee simple title to all of the Land and the Improvements; that Grantor has the right, power and authority to grant, convey and assign the Property; and that the Property is unencumbered. Grantor especially agrees and declares that the separate estate of each of them, whether vested, contingent or in expectancy, is hereby conveyed and shall be bound for the payment and performance of the Secured Obligations.

5.02 Defense and Notice of Claims and Actions. At Grantor's sole expense, Grantor shall protect, preserve and defend the Property and title to and right of possession of the Property, and the security of this deed of trust and the rights and powers of Beneficiary and Trustee created under it, against all adverse claims. Grantor must give Beneficiary and Trustee prompt notice in writing if any claim is asserted which does or could affect any of these matters, or if any action or proceeding is commenced which alleges or relates to any such claim.

5.03 Liens, Charges and Encumbrances. Grantor shall immediately discharge any lien on the Property other than Permitted Encumbrances, which Beneficiary has not consented to in writing. Grantor must pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now does or later may encumber or appear to encumber all or part of the Property or any interest in it, whether the lien, charge or encumbrance is or would be senior or subordinate to this deed of trust. "Permitted Encumbrances" shall mean those exceptions to Lender's policy of title insurance covering this deed of trust that Lender deems acceptable in its sole discretion.

## ARTICLE 6 - REPRESENTATIONS

6.01 Representations. Grantor represents to Beneficiary that:

(a) the Property does not represent the proceeds of unlawful activity under any state, federal or foreign law;

(b) the Property includes all property and rights which may be reasonably necessary or desirable to enable Grantor to use, enjoy and operate the Land and the Improvements for the present uses thereof;

(c) none of the Land or Improvements is subject to any Lien, offset or claim except any easements and restrictions expressly listed on a schedule of exceptions to coverage in the final commitment for title insurance or pro forma policy of title insurance received by Beneficiary prior to the Closing and not objected to by Beneficiary that are shown in the policy of title insurance insuring the validity and priority of this deed of trust (those Liens, offsets or claims, if any, the "Permitted Exceptions");

(d) Grantor owns the Personalty free and clear of any security interests, reservations of title or conditional sales contracts, and there is no presently valid financing statement affecting the Personalty on file in any public office;

(e) Grantor has title to, or (in the case of leased property) valid leasehold interests in, all of their properties and assets, real and personal, including the properties and assets and leasehold interests reflected in the Financial Information (other than any properties or assets disposed of in the ordinary course of business);

(f) the legal name of Grantor is as appears in the first paragraph of this agreement;

(g) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this agreement;

(h) if Grantor is anything other than a natural Person, it has complied with all applicable laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business;

(i) the execution, delivery and performance by Grantor of this deed of trust is within the powers and authority of Grantor and has been duly authorized;

(j) to Grantor's knowledge, this deed of trust does not conflict with any Applicable Law;

(k) this deed of trust is a legal, valid and binding agreement of Grantor, enforceable against Grantor in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable ;

(l) there has been no Material Adverse Effect as to Grantor since the effective date the Financial Information was provided to Beneficiary;

(m) there is no lawsuit, tax claim or other dispute pending or to Grantor's knowledge threatened against Grantor or the Property that, if determined adverse to Grantor, is reasonably likely to have a Material Adverse Effect;

(n) Grantor is not the subject of any Judgment;

(o) this deed of trust does not conflict with, nor is Grantor in default on any credit agreement, indenture, purchase agreement, guaranty, capital lease, or other investment, agreement, or arrangement presently in effect providing for or relating to extensions of credit in respect of which Grantor is in any manner directly or contingently obligated;

(p) Grantor has filed all tax returns (federal, state, and local) required to be filed and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(q) Grantor has complied with all current and future laws, regulations and ordinances or other requirements of any governmental authority relating to or imposing liability or standards of conduct concerning protection of health or the environment or hazardous substances ("Environmental Laws");

(r) Grantor has not received any notices of violations of any Applicable Laws; and Grantor is in compliance with all Applicable Laws;

(s) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or effecting the Property with respect to any violations of Applicable Laws;

(t) Grantor's place of business, or its chief executive office, if it has more than one place of business, is located at the address specified below; and

(u) unless otherwise disclosed to Beneficiary, Grantor is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

## ARTICLE 7 – COVENANTS

**7.01** **Performance of Secured Obligations**. Grantor shall promptly pay and perform each Secured Obligation in accordance with its terms.

**7.02** **Maintenance and Preservation of Property**. Grantor shall:

(a) immediately discharge any lien on the Property which Beneficiary has not consented to in writing, and shall also pay when due each obligation secured by or reducible to a lien, charge or encumbrance which now or hereafter encumbers or appears to encumber all or part of the Property, whether the lien, charge or encumbrance is or would be senior or subordinate to this deed of trust;

(b) not alter, remove or demolish any portion of the Improvements, except as permitted or required by the Credit Agreement;

(c) maintain (or cause to be maintained) all policies of insurance required under the Credit Agreement and pay (or cause payment of) all premiums for that insurance on or prior to the date when due;

(d) promptly and completely repair and/or restore any portion of the Property which becomes damaged or destroyed, in a good and workmanlike manner in accordance with sound building practices, whether or not Grantor has received the proceeds of any Insurance Claim;

(e) not commit or allow any waste of the Property, nor do or suffer to be done any act whereby the value of any part of the Property may be lessened;

(f) not initiate or allow any change in any zoning or other land use classification which affects the Property or any part of it, except as permitted or required by the Credit Agreement;

(g) not bring or keep any article on the Property or cause or allow any condition to exist on it, if that could invalidate or would be prohibited by any insurance coverage required to be maintained by Grantor on the Property or any part of it under this deed of trust;

(h) if the Property is a condominium, Grantor shall observe and perform all obligations of Grantor under the recorded covenants, conditions, and restrictions applicable to the Property, and under the bylaws of the condominium association and any rules or regulations thereunder; and

(i) perform all other acts which from the character or use of the Property may be reasonably necessary to maintain and preserve its value and utility.

**7.03** **Compliance with Applicable Law** Grantor shall not commit or allow any act upon or use of the Property which would violate any Applicable Law, whether now existing or later to be enacted and whether foreseen or unforeseen, or any public or private covenant, condition, restriction or equitable servitude affecting the Property.

**7.04** **Taxes and Assessments**. Grantor shall pay (a) prior to delinquency all taxes, levies, charges and assessments imposed by Applicable Law or any public or quasi-public authority or utility company which are (or if not paid, may become) a lien on all or part of the Property or any interest in it, or which may cause any decrease in the value of the Property or any part of it (individually and collectively "Impositions"); (b) any and all intangible taxes and documentary stamp taxes determined at any time to be due on or as a result of the Secured Obligations, this deed of trust or any other Loan Documents, together with any and all interest and penalties thereon; and (c) taxes, levies, charges and assessments on Beneficiary's or Secured Parties' interest therein or upon this mortgage or the Secured Obligations (collectively, "Mortgage Taxes"); except that if the amount of Mortgage Taxes exceeds the Maximum Rate, Grantor will not be required to pay any such excess. If after the date of this deed of trust, the State of California passes any law deducting from the value of Land for the purpose of taxation any lien thereon, or changing in any way the laws for the taxation of mortgages or debts secured by mortgage for state or local purposes, or the manner of the collection of any such taxes, so as to affect this deed of trust, then within 180 days after notice by Beneficiary to Grantor, Grantor shall pay all Secured Obligations. Notwithstanding the foregoing provisions of this Section 7.04, Grantor may, at its expense, contest the validity or application of any Imposition by appropriate legal proceedings promptly initiated and conducted in good faith and with due diligence, provided that (a) Beneficiary is satisfied that neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, or lost as a result of such contest, and (b) Grantor shall have posted a bond or furnished such other security required from time to time by Beneficiary.

**7.05 Damages and Insurance and Condemnation Proceeds.**

(a) If Beneficiary chooses to do so, it may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of the Property, and it may make any compromise or settlement of the action or proceeding. Beneficiary, if it so chooses, may participate in any action or proceeding relating to any Condemnation Award and may join Grantor in adjusting any Insurance Claim.

(b) All Insurance Proceeds, Condemnation Awards, and proceeds of any other claim based on warranty, or for damage, injury or loss to the Property which Grantor may receive or be entitled to must be paid to Beneficiary. In each instance, Beneficiary may apply those proceeds first toward reimbursement of all of Beneficiary's costs and expenses of recovering the proceeds, including attorneys' fees. If, in any instance, each and all of the following conditions are satisfied in Beneficiary's reasonable judgment, Beneficiary shall permit Grantor to use the balance of the proceeds ("Net Claims Proceeds") to pay costs of repairing or reconstructing the Property in the manner described below: (i) The plans and specifications, cost breakdown, construction contract, construction schedule, contractor and payment and performance bond for the work of repair or reconstruction must all be acceptable to Beneficiary; (ii) Beneficiary must receive evidence satisfactory to it that after repair or reconstruction, the Property would be at least as valuable as it was immediately before the damage or condemnation occurred; (iii) the Net Claims Proceeds must be sufficient in Beneficiary's determination to pay for the total cost of repair or reconstruction, including all associated development costs and interest projected to be payable on the Secured Obligations until the repair or reconstruction is complete; or Grantor must provide its own funds in an amount equal to the difference between the Net Claims Proceeds and a reasonable estimate, made by Grantor and found acceptable by Beneficiary, of the total cost of repair or reconstruction; (iv) Beneficiary must receive evidence satisfactory to it that all leases which it may find acceptable will continue after the repair or reconstruction is complete; and (v) there has occurred no Event of Default.

(c) If Beneficiary finds that the foregoing conditions are met, Beneficiary shall hold the Net Claims Proceeds and any funds which Grantor is required to provide in a noninterest-bearing account and must disburse them to Grantor to pay costs of repair or reconstruction upon presentation of evidence satisfactory to Beneficiary that repair or reconstruction has been completed satisfactorily and lien-free. However, if Beneficiary finds that one or more of the conditions are not satisfied, it may apply the Net Claims Proceeds to pay or prepay (without premium) some or all of the Secured Obligations in such order and proportions as it may choose.

(d) GRANTOR HEREBY SPECIFICALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ALL RIGHTS OF A PROPERTY OWNER GRANTED UNDER CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1265.225(A), WHICH PROVIDES FOR ALLOCATION OF CONDEMNATION PROCEEDS BETWEEN A PROPERTY OWNER AND A LIENHOLDER, AND ANY OTHER LAW OR SUCCESSOR STATUTE OF SIMILAR IMPORT.

**7.06 Site Visits, Observation and Testing.** Beneficiary and its agents and representatives may enter and visit the Property at any reasonable time for the purposes of observing it, performing appraisals or inspections, taking and removing soil or groundwater samples, and conducting tests on any part of it, as provided in the Credit Agreement, and otherwise to determine Grantor's compliance with this deed of trust.

**7.07 Prohibited Transfers.** Grantor agrees that a material factor in Beneficiary's decision to enter into the Secured Obligation Documents is the expertise, financial status and other characteristics of Grantor. Grantor shall not make or permit any Prohibited Transfer. Upon any Prohibited Transfer Beneficiary may declare all Secured Obligations to be due and payable immediately. "Prohibited Transfer" means: (a) any sale, contract to sell, conveyance, encumbrance, pledge, mortgage, lease of the Property not expressly permitted under this instrument or the other Secured Obligation Documents, or other transfer of all or any material part of the Property or any interest in it, whether voluntary, involuntary, by operation of law or otherwise; (b) if Grantor is a corporation, any transfer or transfers of shares of the voting power or the direct or indirect beneficial ownership of Grantor; (c) if Grantor is a partnership, withdrawal or removal of any general partner, dissolution of the partnership under Applicable Law, or any transfer or transfers of the partnership interests; (d) if Grantor is a limited liability company, withdrawal or removal of any managing member, termination of the limited liability company or any transfer or transfers of the voting power or the ownership of the economic interest in the Grantor; or (e) if Grantor is a trust, withdrawal or removal of any trustee or revocation of the trust.

7.08 Compensation and Reimbursement of Costs and Expenses. Grantor shall pay (a) fees in the maximum amounts legally permitted, or reasonable fees as may be charged by Beneficiary or Trustee when the law provides no maximum limit, for any services that Beneficiary or Trustee may render in connection with this deed of trust, including Beneficiary's providing a statement or Trustee's rendering of services in connection with a reconveyance; (b) all of Beneficiary's or Trustee's costs and expenses which may be incurred in rendering any such services; and (c) all costs, expenses and other advances which may be incurred or made by Beneficiary or Trustee in any efforts to enforce any terms of this deed of trust or protect the Property, including any rights or remedies afforded to Beneficiary or Trustee under Section 8.02, whether any lawsuit is filed or not, including any bankruptcy or other voluntary or involuntary proceeding, in or out of court, for the adjustment of debtor-creditor relationships, or in defending any action or proceeding arising under or relating to this deed of trust, including attorneys' fees and other legal costs, costs of any Foreclosure Sale (defined herein) and any cost of evidence of title. If Beneficiary chooses to dispose of Property through more than one Foreclosure Sale, Grantor must pay all costs, expenses or other advances that may be incurred or made by Beneficiary or Trustee in each of those Foreclosure Sales.

7.09 Indemnification. GRANTOR SHALL INDEMNIFY TRUSTEE AND BENEFICIARY AGAINST AND SHALL HOLD THEM HARMLESS FROM ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, CAUSES OF ACTION, JUDGMENTS, COURT COSTS, ATTORNEYS' FEES AND OTHER LEGAL EXPENSES, COST OF EVIDENCE OF TITLE, COST OF EVIDENCE OF VALUE, AND OTHER COSTS AND EXPENSES WHICH EITHER MAY SUFFER OR INCUR: (A) IN PERFORMING ANY ACT REQUIRED OR PERMITTED BY THIS DEED OF TRUST OR ANY OF THE OTHER SECURED OBLIGATION DOCUMENTS OR BY LAW; (B) BECAUSE OF ANY FAILURE OF GRANTOR TO PAY OR PERFORM ANY OF THE SECURED OBLIGATIONS; OR (C) BECAUSE OF ANY ALLEGED OBLIGATION OF OR UNDERTAKING BY BENEFICIARY TO PERFORM OR DISCHARGE ANY OF THE REPRESENTATIONS, WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN ANY DOCUMENT RELATING TO THE PROPERTY (OTHER THAN SUCH WARRANTIES, CONDITIONS, COVENANTS OR OTHER OBLIGATIONS IN THE SECURED OBLIGATION DOCUMENTS). THIS AGREEMENT BY GRANTOR TO INDEMNIFY TRUSTEE AND BENEFICIARY SURVIVES THE RELEASE AND CANCELLATION OF ANY OR ALL OF THE SECURED OBLIGATIONS AND THE FULL OR PARTIAL RELEASE AND/OR RECONVEYANCE OF THIS DEED OF TRUST

7.10 Payments Due Under This Deed Of Trust. Grantor must pay all obligations to pay money arising under this deed of trust immediately upon demand by Trustee or Beneficiary. Each such obligation shall bear interest from the date the obligation arises at the Default Rate.

7.11 Impounds. Any time after the occurrence of an Event of Default, Beneficiary may require Grantor to maintain reserves for payment of taxes (including special assessments and other charges against the Property by governmental or quasi governmental bodies) or premiums on property insurance or both. The reserves shall be created by payment each month to Beneficiary of an amount determined by Beneficiary to be sufficient to produce by the date they are due amounts equal to the estimated taxes and insurance premiums to be paid. If at the time that payments are to be made the reserve for either taxes or insurance premiums is insufficient, Grantor shall upon demand pay such additional sum as Beneficiary shall determine to be necessary to cover the required payment. Beneficiary shall not charge a service charge for collecting reserves and paying taxes and insurance premiums. The reserves shall not constitute a trust. Grantor agrees that Beneficiary may commingle reserve funds with other funds of Beneficiary and need not invest them for the benefit of Grantor. Grantor agrees that Beneficiary need not pay Grantor interest on reserves, unless applicable statutes require payment of interest notwithstanding any contrary agreement.

## ARTICLE 8 – EVENTS OF DEFAULT AND REMEDIES

8.01 Events of Default. The following each shall be an event of default under this deed of trust (an "Event of Default"):

(a) an Event of Default under the Credit Agreement;

(b) a Prohibited Transfer;

(c) the Financial Information or any representation in this deed of trust is materially substantially incorrect or materially misleading;

(d) the filing of any notice limiting the maximum amount secured by this deed of trust to a sum less than the maximum amount secured as specified herein, or if no such amount is specified, to any amount;

(e) for more than 10 days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this deed of trust not previously described in this Section 8.01, which can be cured by the payment of a sum of money; or

(f) for 30 days after notice from Beneficiary, Grantor is in default under any term, covenant or condition of this deed of trust not previously described in this Section 8.01; provided that if (i) it is reasonably certain that the default can be cured by Grantor within that 30 day period and (ii) Grantor has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period shall be extended for so long as reasonably required by Grantor in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Grantor of the Event of Default.

8.02 Remedies. At any time after an Event of Default:

(a) Acceleration. Beneficiary may declare any or all of the Secured Obligations to be due and payable immediately.

(b) Receiver. Beneficiary may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for the Property.

(c) Entry. Beneficiary, in person, by agent or by court- appointed receiver, may enter, take possession of, manage and operate all or any part of the Property, and may also do any and all other things in connection with those actions that Beneficiary may consider necessary and appropriate to protect the security of this deed of trust. Such other things may include: taking and possessing all of Grantor's or the then owner's books and records; entering into, enforcing, modifying, or canceling leases on such terms and conditions as Beneficiary may consider proper; obtaining and evicting tenants; fixing or modifying rents; collecting and receiving any payment of money owing to Grantor; completing any unfinished construction; and/or contracting for and making repairs and alterations. If Beneficiary so requests, Grantor will assemble all of the Property that has been removed from the Land and make all of it available to Beneficiary at the site of the Land. GRANTOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS BENEFICIARY AS GRANTOR'S ATTORNEY-IN-FACT TO PERFORM SUCH ACTS AND EXECUTE SUCH DOCUMENTS AS BENEFICIARY CONSIDERS APPROPRIATE IN CONNECTION WITH TAKING THESE MEASURES, INCLUDING ENDORSEMENT OF GRANTOR'S NAME ON ANY INSTRUMENTS. Regardless of any provision of this deed of trust or the other Secured Obligation Documents, Beneficiary shall not be considered to have accepted any property other than cash or immediately available funds in satisfaction of any obligation of Grantor to Beneficiary, unless Beneficiary has given express written notice of its election of that remedy in accordance with the UCC.

(d) Cure; Protection of Security. Trustee or Beneficiary may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Trustee or Beneficiary may also enter the Property and/or do any and all other things which it considers necessary or appropriate to protect the security of this deed of trust. Such other things may include: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Trustee or Beneficiary under, this deed of trust; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Trustee's or Beneficiary's judgment is or may be senior in priority to this deed of trust, such judgment of Trustee or Beneficiary to be conclusive as among the parties to this deed of trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Credit Agreement; otherwise caring for and protecting any and all of the Property; and/or employing counsel, accountants, contractors and other appropriate persons to assist Trustee or Beneficiary. Trustee and Beneficiary may take any of the actions permitted under this Section 8.02 either with or without giving notice to any person. Notwithstanding the foregoing, in no event will Trustee or Beneficiary have any obligation to take any of the actions set forth in this clause (d).

(e) Uniform Commercial Code Remedies. Beneficiary may exercise any or all of the remedies granted to a secured party under the UCC.

(f) Judicial Action. Beneficiary may bring an action in any court of competent jurisdiction to foreclose this deed of trust or to obtain specific enforcement of any of the covenants or agreements of this deed of trust.

(g) Power of Sale. Under the power of sale granted under this deed of trust (the "Power of Sale"), Beneficiary has the discretionary right to cause some or all of the Property, including the Personalty, to be sold or otherwise disposed of in any combination and in any manner permitted by Applicable Law.

(i) Sales of Personal Property. For purposes of the Power of Sale, Beneficiary may elect to treat as Personalty any Property which is intangible or which can be severed from the Land or Improvements without causing structural damage. If it chooses to do so, Beneficiary may dispose of any Personalty separately from the sale of real property, in any manner permitted by Division 9 of the UCC, including any public or private sale, or in any manner permitted by any other applicable law. Any proceeds of any such disposition shall not cure any Event of Default or reinstate any Secured Obligation for purposes of Section 2924c of the California Civil Code.

(ii) Non-Judicial Foreclosure Sales of Real Property or Mixed Collateral. Beneficiary may choose to dispose of some or all of the Property which consists solely of real property in any manner then permitted by applicable law. In its discretion, Beneficiary may also or alternatively choose to dispose of some or all of the Property, in any combination consisting of both real and personal property, together in one sale to be held in accordance with the law and procedures applicable to real property, as permitted by the UCC. Grantor agrees that such a sale of Personalty together with real property constitutes a commercially reasonable sale of the personal property. For purposes of the Power of Sale, either a sale of real property alone, or a sale of both real and personal property together in accordance with the UCC, will sometimes be referred to as a "Non-Judicial Foreclosure Sale." Before any Non-Judicial Foreclosure Sale, Beneficiary or Trustee must give such notice of default and election to sell as may then be required by law. When all time periods then legally mandated have expired, and after such notice of sale as may then be legally required has been given, Trustee must sell the property being sold at a public auction to be held at the time and place specified in the notice of sale. Neither Trustee nor Beneficiary have any obligation to make demand on Grantor before any Non-Judicial Foreclosure Sale. From time to time in accordance with then applicable law, Trustee may, and in any event at Beneficiary's request must, postpone any Non-Judicial Foreclosure Sale by public announcement at the time and place noticed for that sale. At any Non-Judicial Foreclosure Sale, Trustee must sell to the highest bidder at public auction for cash in lawful money of the United States. , Trustee must execute and deliver to the purchaser(s) a deed or deeds conveying the property being sold without any covenant or warranty whatsoever, express or implied. The recitals in any such deed of any matters or facts, including any facts bearing upon the regularity or validity of any Non-Judicial Foreclosure Sale, are conclusive proof of their truthfulness. Any such deed shall be conclusive against all persons as to the facts recited in it.

(h) Single or Multiple Foreclosure Sales. If the Property consists of more than one lot, parcel or item of property, Beneficiary may: (i) Designate the order in which the lots, parcels and/or items shall be sold or disposed of or offered for sale or disposition; and (ii) elect to dispose of the lots, parcels and/or items through a single consolidated sale or disposition to be held or made under the Power of Sale, or in connection with judicial proceedings, or by virtue of a judgment and decree of foreclosure and sale; or through two or more such sales or dispositions; or in any other manner Beneficiary may deem to be in its best interests (any such sale or disposition, a "Foreclosure Sale;" any two or more, "Foreclosure Sales"). If it chooses to have more than one Foreclosure Sale, Beneficiary at its option may cause the Foreclosure Sales to be held simultaneously or successively, on the same day, or on such different days and at such different times and in such order as it may deem to be in its best interests. No Non-Judicial Foreclosure Sale will terminate or affect the liens of this deed of trust on any part of the Property which has not been sold, until all of the Secured Obligations have been paid in full.

**8.03** **Credit Bids**. At any Foreclosure Sale, any person, including Grantor, Trustee or Beneficiary, may bid for and acquire the Property or any part of it to the extent permitted by then applicable law. Instead of paying cash for that property, Beneficiary may settle for the purchase price by crediting the sales price of the property against the following obligations:

(a) First, the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Grantor is obligated to reimburse Trustee or Beneficiary; and

(b) Second, all other Secured Obligations in any order and proportions as Beneficiary may choose.

**8.04** **Application of Foreclosure Sale Proceeds**. Trustee and Beneficiary shall apply the proceeds of any Foreclosure Sale in the following manner:

(a) First, to pay the portion of the Secured Obligations attributable to the expenses of sale, costs of any action and any other sums for which Grantor is obligated to reimburse Trustee or Beneficiary;

(b) Second, to pay the portion of the Secured Obligations attributable to any sums expended or advanced by Trustee or Beneficiary under the terms of this deed of trust which then remain unpaid;

(c) Third, to pay all other Secured Obligations in any order and proportions as Beneficiary may choose; and

(d) Fourth, to remit the remainder, if any, to the person or persons entitled to it.

**8.05** Application of Rents and Other Sums. Beneficiary must apply any and all Rents collected by it pursuant to the assignment provided in Article 2 of this deed of trust, and any and all other sums, other than the proceeds of a Foreclosure Sale, received or collected by Beneficiary, in the following manner:

(a) First, to pay the portion of the Secured Obligations attributable to the costs and expenses of collection of such sums incurred by Trustee, Beneficiary or any receiver appointed in accordance with this deed of trust;

(b) Second, to pay any and all Secured Obligations in any order and proportions as Beneficiary in its sole discretion may choose, and any and all expenses incident to the Property as provided in Section 2.05, and in such order and proportions as Beneficiary in its sole discretion may choose; and

(c) Third, to remit the remainder, if any, to the person or persons entitled thereto.

**8.06** No Liability for Funds Not Received. Trustee and Beneficiary have no liability for any funds which it does not actually receive.

## ARTICLE 9 – NOTICES

All notices, approvals, consents, and other communications, under this deed of trust ("Notices") must be given in accordance with and will be subject to the terms and provisions of the Credit Agreement. Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Trustee, to the address in the first paragraph of this deed of trust; if to Beneficiary, to 915 Highland Pointe Drive, Suite 350, Roseville, CA 95678, Attention: Commercial Real Estate Finance Closing Department; and in the case of any other Person, to the address designated by that Person in a notice to Grantor and Beneficiary.

## ARTICLE 10 –REQUEST FOR NOTICE

Grantor requests that a copy of any notice of default and any notice of sale be mailed to it at the address specified adjacent to its signature below.

## ARTICLE 11 –TRUSTEE AND BENEFICIARY

**11.01** Authority of Beneficiary. Without affecting the personal liability of any Person, including Grantor, for the payment of the Secured Obligations or the lien of this deed of trust on the remainder of the Property for the unpaid amount of the Secured Obligations, Trustee may perform any of the following acts when requested to do so by Beneficiary in writing: (a) consent to the making of any plat or map of the Property or any part of it; (b) join in granting any easement or creating any restriction affecting the Property; (c) join in any subordination or other agreement affecting this deed of trust or the lien of it; or (d) reconvey the Property or any part of it without any warranty.

**11.02** Exculpation of Trustee and Beneficiary. None of Beneficiary, Trustee will be directly or indirectly liable to Grantor or any other person as a consequence of any of the following: (a) the exercise of or failure to exercise any rights, remedies or powers granted to it in this deed of trust; (b) any failure or refusal to perform or discharge any obligation or liability of Grantor under any agreement related to the Property or under this deed of trust; or (c) any loss sustained by Grantor or any third party resulting from any failure to lease the Property or from any other act or omission in managing the Property after an Event of Default, unless the loss is caused by the willful misconduct and bad faith of Beneficiary, Trustee, respectively. GRANTOR HEREBY EXPRESSLY WAIVES AND RELEASES ALL LIABILITY OF THE TYPES DESCRIBED ABOVE, AND AGREES THAT NO SUCH LIABILITY BE ASSERTED AGAINST OR IMPOSED UPON TRUSTEE or BENEFICIARY.

11.03 **Substitution of Trustee**. Beneficiary may substitute a successor to any Trustee named in or acting under this deed of trust in any manner now or later to be provided at Applicable Law.

## ARTICLE 12 – RECONVEYANCE

When all Secured Obligations have been paid in full and there are no further obligations under the Loan Documents, Trustee shall execute and deliver an instrument reconveying the Property, or so much of it as is then held under this deed of trust, without warranty to the person or persons legally entitled to it. In the reconveyance, the grantee may be described as "the person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness. Trustee and Beneficiary will have no duty to determine the rights of persons claiming to be rightful grantees of any reconveyance of the Property.

## ARTICLE 13– MISCELLANEOUS

13.01 **Additional Provisions**. The Secured Obligation Documents state all of the terms and conditions of the parties' agreement regarding the matters mentioned in or incidental to this deed of trust. The Secured Obligation Documents also grant further rights to Beneficiary and contain further agreements and affirmative and negative covenants by Grantor which apply to this deed of trust and to the Property.

13.02 **Entire Agreement**. This deed of trust and the other Secured Obligation Documents collectively: (i) represent the sum of the understandings and agreements between Beneficiary and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Beneficiary and Grantor concerning this credit; and (iii) are intended by Beneficiary and Grantor as the final, complete and exclusive statement of the terms agreed to by them. In the event of any conflict between this deed of trust and any other agreements required by this deed of trust, this deed of trust will prevail.

13.03 **Other Acts**. Grantor shall cooperate with Beneficiary for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this deed of trust or to carry out the intent of this agreement. Promptly (but in no event more than ten days) after request by Beneficiary, Grantor will execute, acknowledge and deliver any document which Beneficiary deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Beneficiary in the preparation, execution and filing of any such documents.

13.04 **No Waiver or Cure**. Each waiver by Trustee or Beneficiary must be in writing, and no waiver is to be construed as a continuing waiver. No waiver is to be implied from any delay or failure by Trustee or Beneficiary to take action on account of any default of Grantor. Consent by Trustee or Beneficiary to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Trustee's or Beneficiary's consent to be obtained in any future or other instence. The exercise by Trustee or Beneficiary of any right or remedy under this deed of trust or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or notice of default under this deed of trust or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, have been cured); or impair the security of this deed of trust; or prejudice Trustee, Beneficiary or any receiver appointed in accordance with this deed of trust, in the exercise of any right or remedy afforded any of them under this deed of trust; or be construed as an affirmation by Beneficiary of any tenancy, lease or option, or a subordination of the lien of this deed of trust.

13.05 **Merger**. No merger shall occur as a result of Beneficiary's acquiring any other estate in or any other lien on the Property.

13.06 **Waiver of Marshalling**. Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshalling of assets or to require upon foreclosure sales of assets in a particular order, including any rights provided by California Civil Code Sections 2899 and 3433, as those sections may be amended from time to time. Each successor and assign of Grantor, including any holder of a lien subordinate to this deed of trust, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

13.07 Waiver of Certain Other Laws. To the full extent Grantor may do so, Grantor agrees that Grantor will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for appraisement, valuation, stay, extension or redemption, and Grantor, for Grantor, and its representatives, successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution, or notice of election to mature or declare due the whole of the Secured Obligations in the event of foreclosure of the lien created by this deed of trust.

13.08 Joint and Several Obligations. If Grantor consists of more than one Person, each Grantor (a) acknowledges and undertakes, together with the other Grantors, joint and several liability for the indebtedness, liabilities and obligations of Grantor under this deed of trust; (b) acknowledges that this deed of trust is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (c) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable. GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT BENEFICIARY EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS DEED OF TRUST, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

13.09 Authority to Bind Grantor. If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all parties comprising Grantor. Beneficiary may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

13.10 Binding Effect; Successors and Assigns. The Secured Obligation Documents shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided, that Grantor shall not assign its rights or obligations hereunder without Beneficiary's consent. However, this section does not waive the provisions of Section 7.07; and Grantor shall not assign its rights or obligations hereunder without Beneficiary's consent. Beneficiary may transfer all or any portion of their rights under the Secured Obligation Documents to any other Person. Beneficiary may disclose to any actual or proposed transferee any information that Grantor has delivered to Beneficiary in connection with the negotiation of this deed of trust or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Beneficiary in providing that information to any actual or proposed transferee.

13.11 Rights and Remedies Cumulative. All rights and remedies under this deed of trust and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

13.12 Severability. Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Beneficiary may, at its option, declare all Secured Obligations immediately due and payable.

13.13 Amendments in Writing. This deed of trust may not be amended, changed, modified, altered or terminated without the prior written consent of Beneficiary.

13.14 Governing Law. This deed of trust shall be governed and interpreted by applying the laws of the State of California (the "Governing Law State") without regard or reference to its conflict of laws principles.

13.15 JURISDICTION AND VENUE. GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF BENEFICIARY, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS DEED OF TRUST OR ANY OTHER LOAN DOCUMENT WILL BE LITIGATED IN THE SUPERIOR COURT OF CALIFORNIA, PLACER COUNTY, CALIFORNIA OR THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA. GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

13.16 Counterpart Execution. This deed of trust may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument.

13.17 Necessary Action. Beneficiary is authorized to execute any other documents or take any other actions necessary to effectuate this deed of trust and the consummation of the transactions contemplated herein.

13.18 Credit Report. Beneficiary is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Grantor. Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Beneficiary shall authorize third Persons to provide the information requested from time to time.

13.19 Time of the Essence. Time is of the essence of this deed of trust.

13.20 No Construction Against Drafter. Each Party has participated in negotiating and drafting this deed of trust, so if an ambiguity or a question of intent or interpretation arises, this deed of trust is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this deed of trust.

13.21 INDEMNIFICATION. GRANTOR SHALL DEFEND, INDEMNIFY AND HOLD TRUSTEE AND BENEFICIARY ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (I) INCURRED AS A RESULT OF THE FAILURE BY GRANTOR TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF DEPOSITS OR OTHER FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY GRANTOR OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY GRANTOR OF ANY ENVIRONMENTAL LAW; (IV) RESULTING FROM THE RELIANCE BY TRUSTEE OR BENEFICIARY ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF GRANTOR; AND (V) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF TRUSTEE OR BENEFICIARY BEING PARTY TO THIS DEED OF TRUST OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS DEED OF TRUST; except that Grantor shall have no obligation to an Indemnified Person under this section with respect to Losses resulting from the gross negligence or willful misconduct of that Indemnified Person as determined by a court of competent jurisdiction. If and to the extent that an indemnity is unenforceable for any reason, Grantor shall to make the maximum contribution to the payment and satisfaction thereof which is permissible under Applicable Law. The provisions of all Indemnities shall survive the reconveyance of this deed of trust.

13.22 WAIVER OF TRIAL BY JURY. **GRANTOR (A) COVENANTS AND AGREES NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS DEED OF TRUST; OR (II) ANY LOAN DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY; AND ARE A MATERIAL INDUCEMENT FOR THE BENEFICIARY ENTERING INTO THE CREDIT AGREEMENT AND OTHER LOAN DOCUMENTS.**

Grantor is signing and delivering this deed of trust effective as of the day and year first written above.

**GRANTOR**

DOVE'S LANDING, LLC, a California limited liability company

Address for notices:

2600 Oro Dam Boulevard
Oroville, CA 95966
Attention: Robert J. Wentz

By: ____________________
ROBERT J. WENTZ
Managing Member

STATE OF CALIFORNIA )
) ss
COUNTY OF BUTTE )

On 17th DEC., 2012 before me, JANET G. FIORE TENNANT, a notary public, personally appeared — ROBERT J. WENTZ —, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/~~she~~ executed the same in his/~~her~~ authorized capacity, and that by his/~~her~~ signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Janet G. Fiore Tennant

JANET G. FIORE TENNANT
Commission # 1888300
Notary Public - California
Butte County
My Comm. Expires Jun 1, 2014

**LEGAL DESCRIPTION**

Real property in the City of Oroville, County of Butte, State of California, described as follows:

PARCEL I:

PARCEL 1, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON OCTOBER 25, 2012, IN BOOK 183 OF MAPS, AT PAGE(S) 29, 30 AND 31.

EXCEPTING THEREFROM ONE HALF OF ALL MINERAL, OIL OR OTHER HYDROCARBON SUBSTANCES. SAID EXCEPTION AFFECTS ALL THAT PORTION OF THE HEREIN DESCRIBED PROPERTY LYING WITHIN THE BOUNDARIES OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN DEED FROM ANTHONY C. MORICI, AN UNMARRIED MAN TO SAFEWAY STORES, INC., A MARYLAND CORPORATION, DATED SEPTEMBER 27, 1971 AND RECORDED FEBRUARY 3, 1972, IN BOOK 1733, PAGE 296, OFFICIAL RECORDS.

PARCEL II:
AN UNDIVIDED 50% INTEREST IN THE FOLLOWING DESCRIBED PROPERTY:
PARCELS 3 AND 4, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON OCTOBER 25, 2012, IN BOOK 183 OF MAPS, AT PAGE(S) 29, 30 AND 31.

APN: 013-170-051 (PORTION)

# EXHIBIT 5

DocuSign Envelope ID: E593FBE2-660B-4E26-969A-7CAB04F64F25

LEASE AGREEMENT

THIS LEASE made and entered into this 1st day of January 2018 between DOVE'S LANDING, LLC, a limited liability company (hereinafter called "Lessor") and OROHEALTH CORPORATION, a California corporation operating Oroville Hospital (hereinafter called "Lessee" without regard to number or gender). WITNESSETH:

1) USE AND PREMISES. Lessor hereby leases to Lessee, and Lessee hires from Lessor, for the purpose of conducting therein health and medical activities, and for no other purpose, the premises delineated by diagonal lines on the plat attached hereto as Exhibit "A" with an area of approximately 60,000 square feet of the currently leased space in Building I located at 2450 Oro Dam Boulevard, in the City of Oroville, in the County of Butte, State of California. Final size and configuration to be determined and made a part of this agreement when agreed upon by Lessee and Lessor. See the specific building configuration plan attached hereto and made a part hereof as Exhibit B.

The term "medical center" means the entire area within the outer property limits as shown in Exhibit A and all other pieces or parcels of land at any time and from time to time designated by Lessor for use as part of the medical center. Any portion of the medical center that may be taken by eminent domain, private purchase in lieu of eminent domain, or dedicated for public use, upon such taking, purchase, or dedication, shall be excluded. Any additional property designated by Lessor for use as part of the medical center shall be included until such designation shall be revoked by Lessor.

The term "accommodation areas" means all areas and facilities outside the premises, other than parking areas which are provided for in this Lease Agreement, that are provided and designated by Lessor for general use and convenience, among others, of Lessee and other lessees of all or any invitees. Accommodation areas include, but are not limited to, pedestrian sidewalks, landscaped areas, exterior stairways, comfort stations, corridors, arcades, sidewalks, incinerators, interior stairs and balconies and similar areas and improvements, truck ways, loading docks, loading areas, and delivery yards. The site plan of the medical center is tentative notwithstanding Exhibit A, and Lessor reserves the right from time to time to make changes in the shape, size, location, number and extent of improvements, buildings, truck ways, accommodation areas, loading docks, loading areas, parking layout or areas, and other improvements and to eliminate or add any improvements or buildings to any portion of the medical center.

During the term of this lease, Lessor shall operate, manage, and maintain all parking areas, access roads, and accommodation areas within the medical center. The manner in which such areas and facilities shall be maintained, and the expenditures for maintenance, shall be at the sole discretion of Lessor, and the use of such areas and facilities shall be subject to such reasonable regulations and changes as Lessor shall make from time to time, including, without limitation, the right to close, if necessary, all or

DS TR DS SC

any portion of such areas, roads, or facilities, to such extent as may be legally sufficient in the opinion of Lessor's counsel, to prevent a dedication thereof or the accrual of rights of any person or of the public therein, or to close temporarily all or any portion of such areas and facilities.

Lessor hereby grants to Lessee, during the term of the lease, the right to use, for the benefit of Lessee and Lessee's officers, employees, agents, customers, and invitees, in common with other entitled to such use, all accommodation areas, parking areas, and roads, subject to any rights, powers, and privileges reserved to Lessor. Subject to the provisions of this Lease Agreement, Lessee shall continuously during the entire term conduct and carry on Lessee's business in the demised premises, and shall keep the premises open for business and cause Lessee's business to be conducted therein during the usual business hours of each and every business day as customary for business of like character in the area in which the premises are located provided, however, that this provision shall not apply if Lessee's business shall be temporarily shut down on account of strikes, lockouts, or causes beyond the control of Lessee. Lessee shall keep the demised premises adequately stocked with merchandise, and with sufficient sales personnel to care for the patronage and conduct said business in accordance with good business practices.

2) TERM. The term of this Lease shall commence on the first of January, 2018 and shall continue of a term of one hundred twenty (120) months.

Provided that this Lease shall be in good standing and in full force and effect and shall not theretofore have been terminated and that Lessee shall not be in default under any of the terms or conditions hereof, Lessee shall have the option to extend the term of this Lease, upon the same terms and conditions, except as to rental, extension or renewal, as are herein set forth, for two (2) additional terms of five (5) years each. Said option shall be exercised by Lessee delivering to Lessor notice in writing of Lessee's election to exercise such option, at least one hundred twenty (120) days prior to the expiration of the then current term. In the event the Lessee shall remain in possession of the demised premises beyond the term of this Lease or any extension or renewal hereof, without executing a new written Lease with Lessor, such holding over shall not constitute a renewal or extension of the Lease, but Lessee shall be a tenant at will.

3) RENT. The monthly rental for the first full lease year shall commence on the first of January 2018. Rental shall be at the rate of One Dollar and Ten Cents ($1.19) per square foot of leasable space with final size and configuration to be determined, with rentals payable monthly in advance. Lessor and Lessee do hereby agree that on each yearly anniversary date from the commencement of this Lease, and at regular yearly intervals thereafter, during the term of this Lease and during any renewals or extensions thereof, the rental for each subsequent year period shall be increased and fixed by dividing the monthly rental for the then current monthly rental by the index number of the revised Consumer's Price Index U. S. City Average, All Items, 1982-84=100 for All Urban Consumers (CPI-U) published monthly in the "Monthly Labor Review" of the Bureau of Labor Statistics of the U.S. Department of Labor for the month preceding the commencement date of this Lease, and then multiplying the resulting amount by the index number for said Consumer's Price Index for the month preceding each said yearly adjustment date. The rent so fixed and adjusted shall be the rent for the next one (1) year period commencing with the date on which said rent is to be adjusted as herein provided.

DS TZ DS SC

DocuSign Envelope ID: E593FBE2-660B-4E26-969A-7CAB04F64F25

If for any reason whatsoever there is a change of any kind in the method of calculation or formulation of such Consumer's Price Index, U. S. City Average, All Items, 1982-84=100 for All Urban Consumers (CPI-U) or if said index is no longer continued or published, then the Lessor and Lessee shall mutually select such other commodity index which is satisfactory to Lessor and Lessee. If the parties cannot agree upon such other index, then such index shall be selected by a board of three arbitrators in accordance with the Arbitration article as herein contained in this Lease Agreement.

ALL RENTALS shall be paid without deductions or offsets, each month in advance, on the first day of each calendar month during said term. If the Lease commences other than on the first day of a calendar month, the first and last month's rental shall be prorated accordingly.

4.) LEASE DEPOSIT. Lessee has previously deposited with Lessor the sum of $20,000 which was applied toward the payment of the first month's rent of the original lease. Lessor may commingle said deposit with Lessor's other monies and may deliver said deposit to any transferee of the reversion and, upon giving written notice of such delivery to Lessee personally or by certified mail, Lessor shall be discharged from further liability relating thereto.

5.) TAXES AND ASSESSMENTS. Lessee shall be liable for all taxes levied against personal property, trade fixtures, and other property placed by Lessee in or on or about the demised premises including without prejudice to the generality of the foregoing, shelves, counters, vaults, vault doors, wall safes, partitions, fixtures, plant equipment, machinery, and other articles and if any such taxes on Lessee' personal property, trade fixtures or property placed in the demised premises by Lessee are levied against Lessor and if Lessor pays the same (which Lessor shall have the right to do regardless of validity of such levy) or if the assessed value of Lessor's property is increased by the inclusion of the value placed on such property or trade fixtures of Lessee or placed in the demised premises by Lessee and if Lessor pays the taxes based on such increased assessment (which Lessor shall have the right to do, regardless of the validity thereof), Lessee shall upon demand, as the case may be, pay to the Lessor the taxes so levied against Lessor or the proportion of such taxes resulting from such increase in the assessment. Lessee shall reimburse Lessor for Lessee's proportionate share of all real property taxes and assessments levied or assessed against the land on which the medical center of which the demised premises form a part is located, including the entire parking area and accommodation areas serving the medical center and the improvements and buildings on said land. Proration to be based on the number of square feet occupied by Lessee in the said medical center bears to the total number of square feet of leasable area in the entire medical center. Lessee shall pay to Lessor an amount equal to any and all excise, privilege, transaction and other taxes levied or assessed by any federal, state, or local authority upon the leasing of the demised premises or the payment or receipt of rent therefore, and any business tax imposed upon Lessor by any governmental authority which is based on or measured in whole or in part by amounts charged or received by Lessor from Lessee under this lease, provided Lessee shall pay only the amount of such business tax that would be payable by Lessor if the demised premises were the only property of Lessor.

If any such taxes are assessed against or relate to an area constituting less than all of the medical center, Lessee's proportionate share of such taxes shall be determined by the ratio of the number of square feet occupied by Lessee to the total number of square feet of leasable area in the portion of the medical center against which such taxes are assessed or to which they relate.

DS RK DS SC

6.) IMPROVEMENTS AND MAINTENANCE OF PREMISES.

(a) Lessee shall, at his sole cost, keep and maintain the premises and appurtenances (excepting exterior walls and roof which Lessor agrees to repair, subject to reimbursement as provided below), including glazing, any store front and the interior of the premises, in clean, good and sanitary order, condition and repair, hereby waiving all right to make repairs or replacements at the expense of Lessor. Additionally, on an "as needed basis," Lessee shall clean the walkway and pick up litter on the parking lot directly in front of Lessee's premises. By entry hereunder, Lessee accepts the premises as being in good and sanitary order, condition, and repair, and agrees on the last day of said term, or sooner termination of this Lease, to surrender unto Lessor said premises and appurtenances in the same condition as when received, reasonable use and wear thereof and damage by fire, Act of God, or by the elements excepted, and to remove all of Lessee's signs from said premises.

Lessor shall, subject to Lessee's reimbursement as herein provided, maintain in good repair the exterior walls and roof of the building in which the demised premises are located. Lessor shall not be required to make any repairs to the exterior walls or roof unless and until Lessee has notified Lessor in writing of the need for such repairs and Lessor shall have had a reasonable period of time thereafter to commence and complete said repairs. Lessee shall reimburse Lessor for its pro rata share of the cost of said repairs and maintenance incurred by Lessor in the proportion that the number of square feet leased by Lessee bears to the total number of square feet of leasable area in the building which contains the demised premises.

Lessee shall pay his pro rata share of the maintenance of the accommodation areas and parking areas in the proportion that the number of square feet leased by Lessee bears to the total number of square feet of leasable area in the medical center. Cost of maintenance shall include upkeep, repairs and replacements to and of improvements in such common areas and any and all other expenses related to the existence of said common areas.

(b) All improvements to the interior of the leased premises shall be constructed by Lessee. Lessee agrees to provide Lessor with the plans and specifications for such improvements prior to construction.

7) INSURANCE. Lessee agrees that Lessee will at Lessee's own cost and expense at all times during the term hereof provide and keep in force for the benefit of Lessor and Lessee a liability insurance policy or an endorsement on a blanket liability insurance policy insuring Lessor and Lessee against any and all damages and liability on account of or arising out of injuries to or the death of any person in or about the demised premises in the minimum amount of One Million Dollars ($1,000,000.00) limit per occurrence and Two Million Dollars ($2,000,000.00) aggregate limit (bodily injury and property damage). Additionally, Lessee agrees to acquire and maintain adequate plate glass insurance. Said policies or endorsements shall be affected with insurance companies, approved by Lessor, authorized to write liability insurance in the State of California. Said policies shall designate specifically that Lessor is an additional named insured there under; such policies or certified copies thereof, shall be delivered to Lessor together with written obligations from the companies issuing said policies waiving all subrogation rights against Lessor and agrees to notify Lessor in writing if such policies are about to lapse or be canceled. Insurance coverage limits to be adjusted at the commencement of each five (5) years from the commencement of the Lease and at each five (5) year interval to limits which are normal for the industry. If Lessor and Lessee cannot agree upon "normal coverage, "then Lessor and Lessee shall promptly proceed to have the matter

DS SC
DS

arbitrated in accordance with Arbitration article as herein contained in this Lease Agreement.

8) LEASE CONTINGENCIES AND POSSESSION. If Lessor, for any reason whatsoever, cannot deliver possession of the said premises to Lessee at the commencement of the said term, as hereinbefore specified, this Lease shall not be void or voidable, nor shall Lessor be liable to Lessee for any loss or damage resulting there from; but there shall be proportionate deduction of rent covering the period between the commencement of the said term and the time when Lessor can deliver possession. If possession of said premises is not delivered to Lessee within six (6) months from the date of execution of this Lease, either party may cancel this Lease by giving written notice of cancellation to the other.

9) USES PROHIBITED. Lessee shall not use, or permit said premises, or any part thereof, to be used, for any purpose or purposes other than the purpose or purposes for which said premises are hereby leased; and no use shall be made or permitted to be made on the said premises, nor acts done, which will increase the existing rate of insurance upon the building in which said premises may be located, or cause a cancellation of any insurance policy covering said building, or any part thereof, nor shall Lessee sell, or permit to be kept, used, or sold, in or about said premises, any article which may be prohibited by the standard form of fire insurance policies. Lessee shall, at his sole cost and expense, comply with any and all requirements, pertaining to said premises, of any insurance organization or company, necessary for the maintenance of reasonable fire and public liability insurance, covering said building and appurtenances.

10) WASTE-ALTERATIONS. Lessee shall not commit or suffer to be committed any waste upon the said premises, or any nuisance, or other acts or thing which may disturb the quiet enjoyment of any other tenant in the building, or center, in which the demised premises may be located.

Lessee shall not make, or suffer to be made, any alterations of said premises or any part thereof, without the written consent of Lessor first had and obtained, said approval not to be unreasonably withheld. Any additions to, or alterations of, the said premises, except movable furniture and trade fixtures, shall become at once a part of the realty and belong to Lessor. The Lessee shall have the right to remove its trade fixtures and equipment placed upon the leased premises provided that Lessee restores said premises as indicated below.

Lessee shall ascertain from Lessor at least thirty (30) days prior to the termination of Lease whether Lessor desires the premises, or any part thereof, restored to their condition prior to the making of any additions, alterations, installations and improvements, and if Lessor shall so desire, then Lessee shall forthwith restore said premises or such part or parts thereof and repair any damage caused by Lessee or necessary to restore said premises to their original condition, entirely at his own expense, excepting normal wear and tear.

11) ABANDONMENT. Lessee shall not vacate or abandon the premises at any time during the term; and if Lessee shall abandon, vacate, or surrender said premises, or be dispossessed by process of law, or _otherwise, any personal property belonging to Lessee and left on the premises shall be deemed to be abandoned, at the option of Lessor, except such property as may be mortgaged to Lessor.

12) FREE FROM LIENS. Lessee shall keep the demised premises and the property in which the demised premises are situated, free from any liens arising out of any work performed, materials furnished, or obligations incurred by Lessee. Prior to commencement of any work by outside contractors, Lessee shall provide Lessor with a minimum of ten (10) days' notice so

DS SC DS

that Lessor may have the opportunity to install, if appropriate, a "Notice of Non-Responsibility."

13) COMPLIANCE WITH GOVERNMENTAL REGULATIONS. Lessee shall, at his sole cost and expense, comply with all of the requirements of all municipal, state, federal, and other authorities now in force, or which may hereafter be in force, pertaining to the said premises, and shall faithfully observe in the use of the premises all Municipal ordinances and State and Federal statutes now in force or which may hereafter be in force. The judgment of any court of competent jurisdiction, or the admission of Lessee in any action or proceeding against Lessee, whether Lessor be a party thereto or not, that Lessee has violated any such ordinance or statute in the use of the premises, shall be conclusive of that fact as between Lessor and Lessee.

14) INDEMNIFICATION OF LESSOR. Lessee, as a material part of the consideration to be rendered to Lessor, hereby waives all claims against Lessor for damage to goods, wares and merchandise, and all other personal property in, upon or about said premises, for injury to Lessee's business, and for injuries to persons in or about said premises, from any cause arising at any time; and Lessee will hold Lessor exempt and harmless from any damage or injury to any person, or to the goods, wares, and merchandise and all other personal property of any person, arising from the use of the premises by Lessee, or from the failure to Lessee to keep the premises in good condition and repair, as herein provided.

15) ADVERTISEMENTS AND SIGNS. Lessee shall not place or permit to be placed any sign, decoration, marquee or awning on the premises, including the exterior of the building, without first submitting a written description thereof to Lessor and obtaining the written consent of Lessor; Lessee, upon request of Lessor, shall immediately remove any sign, decoration, marquee or awning which Lessee has placed or permitted to be placed in, on or about the premises and which, in the opinion of Lessor, is objectionable or offensive, and if Lessee fails so to do, Lessor may enter upon said premises and remove the same. At the termination of Lease, or any extension thereof, Lessee shall remove all of his signs, and any damage caused by removal shall be repaired at Lessee's expense. All signs shall be maintained by Lessee at his own expense. The provisions of any sign criteria attached to this Lease are incorporated herein attached hereto as Exhibit C. Lessee shall not conduct or permit to be conducted any auction sale on said premises. All signs to be approved by Lessor, Lessee, and appropriate governmental authorities. Costs for sign construction, installation, and maintenance to be Lessee's expense except in the event of a common sign, in which case, all costs to be prorated in accordance with Lessee's prorated share of signage area.

16) UTILITIES. Lessee, from the time it first enters the premises for the purpose of setting fixtures, or from the commencement of this Lease, whichever date shall first occur, and throughout the term of this Lease shall pay for water, gas, heat, power, telephone service, sewer service and all other utility service supplied to or consumed in or on the leased premises. If there is no separate utility meters for the premises, Lessee agrees to pay Lessor a monthly amount equal to the utility company's estimated monthly charge for service to the premises if it had a separate meter. Lessee shall not allow refuse, garbage, or trash to accumulate outside of the demised premises except on the day of scheduled scavenger pickup service, and then only in areas designated for that purpose by Lessor. Refuse collection charges shall be shared on a proportionate usage basis to be agreed upon between Lessor and Lessee and Lessee's other tenants.

DS SC

DS TR

If no agreement can be reached, then either separate refuse boxes to be installed, or if that is not feasible, to have the matter arbitrated in accordance with the Arbitration article as herein contained in this Lease.

17) ENTRY BY LESSOR. Lessee shall permit Lessor and his agents to enter into and upon said demised premises at all reasonable times for the purpose of inspecting the same or for the purpose of maintaining the building in which said premises are situated, or for the purpose of making repairs, alterations or additions to any other portion of said building, including the erection and maintenance of such scaffolding, canopies, fences and props as may be required, or for the purpose of posting notices of nonresponsibility for alterations, additions, or repairs, or for the purpose of placing upon the property in which the said premises are located any usual or ordinary "for sale" signs, without any rebate of rent and without any liability to Lessee for any loss of occupation or quiet enjoyment of the premises thereby occasioned and shall permit Lessor and his agents, at any time within forty-five (45) days prior to the expiration of this Lease, to place upon said premises any usual or ordinary "to let" or "to lease" signs and exhibit the premises to prospective tenants at reasonable hours.

18) DESTRUCTION OF PREMISES. In the event of a partial destruction of said premises during the term of this Lease, from any cause, Lessor shall forthwith repair the same, provided such repairs can be made within one hundred twenty (120) days under the laws and regulations of state, federal, county, or municipal authorities, but such partial destruction shall in no way annul or void this Lease, except that Lessee shall be entitled to a proportionate deduction of rental while such repairs are being made, such proportionate deduction to be based upon the extent to which the making of such repairs shall interfere with the business carried on by Lessee in the said premises. If such repairs cannot be made in one hundred twenty (120) days, Lessor may, at his option, make same within a reasonable time, this Lease continuing in full force and effect and the rent to be proportionately rebated as aforesaid in this paragraph provided. In the event that Lessor does not so elect to make such repairs which cannot be made within one hundred twenty (120) days, or such repairs cannot be made under such laws and regulations, this Lease may be terminated at the option of either party.

In respect to any partial destruction which Lessor is obligated to repair or may elect to repair under the terms of this paragraph, the provisions of Section 1932, subdivision 2, and of Section 1933, subdivision 4, of the Civil Code of the State of California, are waived by Lessee. In the event that the building in which the demised premises may be situated be destroyed to the extent of not less than thirty percent (30%) of the replacement cost thereof, Lessor may elect to terminate this Lease whether the demised premises be injured or not. A total destruction of the building in which the said premises may be situated shall terminate this Lease. In the event of any dispute between Lessor and Lessee relative to the provisions of this paragraph, they shall each select an arbitrator, the two arbitrators so selected shall select a third arbitrator and the three arbitrators so selected shall hear and determine the controversy and their decision thereon shall be final and binding upon both Lessor and Lessee, who shall bear the costs of such arbitration equally between them.

19) ASSIGNMENT AND SUBLETTING. Lessee shall not assign this Lease nor any interest therein, and shall not sublet the said premises or any part thereof, or any right or privilege appurtenant thereto, or suffer any other person (the agents and servants of Lessee excepted) to occupy or use the said premises, or any portion thereof, without the written consent of Lessor first had and obtained; provided, however, that such consent shall not unreasonably be withheld. A

DS SC
DS

consent to one assignment, subletting, occupation or use by any other person, shall not be deemed to be a consent to any subsequent assignment, subletting, occupation or use by another person. Any such assignment or subletting without such consent shall be void, and shall, at the option of Lessor, terminate this Lease. This Lease shall not, nor shall any interest therein, be assignable, as to the interest of Lessee, by operation of law, without the written consent of Lessor. In no case will the Lessor ever consent to an assignment or sublease to a use which will require any greater parking demands during "peak medical center hours." . In the event of assignment or sublease, rental to be increased by ten percent (10%) over the then current rental, and further adjustments made in accordance with the Rent article as herein contained in this Lease Agreement. In the event of an assignment or sublease, Lessee shall remain primarily liable for rental payment and fulfilling all other terms and conditions of the Lease Agreement.

20) INSOLVENCY OR BANKRUPTCY. Either (a) the appointment of a receiver (except a receiver appointed at the instance or request of Lessor) to take possession of all or substantially all of the assets of Lessee; or (b) a general assignment by Lessee for the benefit of creditors; or (c) any action taken or suffered by Lessee under any insolvency or bankruptcy act, shall constitute a breach of this Lease by Lessee. In such event, Lessor may at his option, declare this Lease terminated and forfeited by Lessee, and Lessor shall be entitled to immediate possession of such premises.

21) LATE CHARGES. Lessee hereby acknowledges that late payment by Lessee to Lessor of rent or other sums due hereunder will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges and late charges which may be imposed upon Lessor by terms of any mortgage or Trust Deed covering the Premises. All rental payments shall be due on the 1st of the month. Accordingly, if not received by the Lessor by the fifth day of the month (or by the next business day following the fifth, if the fifth is a weekend day or holiday), then the Lessee shall pay a late payment charge often percent (10%) of the rental due. In addition, any sum payable hereunder by Lessee that is not paid within twenty (20) days of when due (or five (5) days in the case of rental) shall thereafter accrue interest at the rate of one and one-half percent (1-1/2%) per month until paid unless such rates exceed the maximum rate that the parties may agree upon, as permitted by law, in which case the maximum permitted rate shall apply. Acceptance of such late charges by Lessor shall in no event constitute a waiver of Lessee's default with respect to such remedies granted hereunder.

22) LESSEE'S DEFAULT. The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Lessee.

a. The vacating or abandonment of the Premises by Lessee.

b. The failure by Lessee to make any payment of rent or any other payment required to be made by Lessee hereunder, as and when due, where such failure shall continue for a period of ten (10) days after written notice thereof by Lessor to Lessee.

c. The failure by Lessee to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by the Lessee, other than described in (b) above, where such failure shall continue for a period of thirty (30) days after written notice thereof by Lessor to Lessee; provided, however, that if the nature of Lessee's default is such that more than thirty (30) days is required to effect its cure, then lessee shall not be deemed to be in default if Lessee commences such cure within said thirty (30) day period and thereafter diligently prosecutes such cure to completion.

DS SC
DS TZr

d. The making by Lessee of any general assignment or general arrangement for the benefit of creditors; or the filing by or against Lessee of a petition to have Lessee adjudged a bankrupt, or a petition for reorganization or arrangement under any law relating to bankruptcy (unless, in the case of a petition filed against Tenant, the same is dismissed within sixty (60) days); or the appointment of a trustee or a receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within thirty (30) days; or the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within thirty (30) days.

e. The purpose of the Notice Requirement in this article is to extend the Notice Requirements of the Unlawful Detainer Statutes of California.

23) REMEDIES IN DEFAULT. In the event of any such default or breach by Lessee, Lessor may at any time thereafter, in his sole discretion, with or without notice or demand and without limiting Lessor in the exercise of a right or remedy which Lessor may have by reason of such default or breach:

a. Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession of the premises to Lessor. In such event Lessor shall be entitled to recover from Lessee all damages incurred by Lessor by reason of Lessee's default including, but not limited to, the cost of recovering possession of the Premises; expenses of reletting, including necessary renovation and alteration of the Premises; reasonable attorney's fees; the worth at the time of award by the court having jurisdiction thereof of the amount by which the unpaid rent and other charges and adjustments called for herein for the balance of the term after the time of such award exceeds the amount of such loss for the same period that Lessee proves could be reasonably avoided; and that portion of any leasing commission paid by Lessor and applicable to the unexpired term of this Lease. Unpaid installments of rent or other sums shall bear interest from the date due at the maximum legal rate.

b. Maintain Lessee's right to possession, in which case this Lease shall continue in effect whether or not Lessee shall have abandoned the Premises. In such event Lessor shall be entitled to enforce all of Lessor's rights and remedies under this Lease, including the right to recover the rent and any other charges and adjustment as may become due hereunder; or

(c) Pursue any other remedy now or hereafter available to Lessor under the laws or judicial decisions of the State in which the Premises are located.

24) SURRENDER OF LEASE. The voluntary or other surrender of this Lease by Lessee, or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subleases or subtenancies; or may, at the option of Lessor, operate as an assignment to him or any or all such subleases or subtenancies.

25) CONDEMNATION. In the event any condemnation proceeding shall be commenced affecting the demised premises, Lessee shall have no right to claim any valuation for his leasehold interest or otherwise by reason of his occupancy of or improvements to the premises, and any condemnation award adjudicated or by way of settlement shall belong in its entirety to Lessor. Lessee shall, however, be entitled to any award made to him for depreciation to and

DS SC
DS

cost of removal of stock and fixtures placed in the demised premises by Lessee, provided that said award does not otherwise diminish the amount to be received by Lessor.

26) SUBORDINATION. This lease is and shall always be subordinate to any mortgage or deed of trust which is now or shall at any time be placed upon the demised premises or any part thereof or the building of which the demised premises are a portion and Lessee agrees to execute and deliver any instrument without cost, which may be deemed necessary to further affect the subordination of this Lease to any such mortgage or deed of trust, provided, however, that in the event of transfer of title to the demised premises by a Trustee to a Purchaser at a Trustee Sale under a Deed of Trust or mortgage, or by Lessor to a mortgagee, trustee, or beneficiary under said Deed of Trust or mortgage, or to any purchaser therefrom or successor thereto, this Lease shall not terminate if Lessee is not in default but Lessee shall attorn to said new owner as if a party hereto regardless of any rule of law to the contrary or absence of privity of contract.

27) TRANSFER OF SECURITY. If any security be given by Lessee to secure the faithful performance of all or any of the covenants of this Lease on the part of Lessee, Lessor may transfer and/or deliver the security, as such, to the purchaser of the reversion, in the event that the reversion be sold, and thereupon Lessor shall be discharged from any further liability in reference thereto.

28) WAIVER. The waiver by Lessor of any breach of any Lease provision shall not be deemed to be a waiver of such lease provision or any subsequent breach of the same or any other term, covenant or condition therein contained. The subsequent acceptance of rent hereunder by Lessor shall not be deemed to be a waiver of any preceding breach by Lessee of any provision of this Lease, other than the failure of Lessee to pay the particular rental so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

29) HOLDING OVER. Any holding over after the expiration of the said term of this Lease, with the consent of Lessor, shall be construed to be a tenancy from month to month at a rental equal to one hundred twenty-five percent (125%) of the rental for the month just prior to Lease expiration, and shall otherwise be on the terms and conditions herein specified, insofar as is applicable.

30) SUCCESSORS AND ASSIGNS. The covenants and conditions herein contained shall, subject to the provisions as to assignment, apply to and bind the heirs, successors, executors, administrators and assigns of all of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

31) TIME. Time is of the essence of this Lease.

32) CAPTIONS. The captions of this Lease are for convenience only, and are not a part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease.

33) PARKING AREAS.

DS SC

a. Throughout the term of this Lease, Lessor shall provide a parking area or areas for the use of Lessee and Lessee's customers, employees and invitees in common with other lessees

DS

and occupant of other portions of the medical center and their customers, employees and invitees. Lessor reserves the right to change the parking areas and parking layout from time to time, provided that the parking provided meets the requirements imposed by the planning agency having jurisdiction.

b. Lessee and Lessee's employees shall park their personal vehicles in areas designated by Lessor from to time which could include requiring employees to park personal autos off the premises. Upon request of Lessor, Lessee shall provide the automobile license numbers of the personal vehicles of Lessee and Lessee's employees.

c. All expenses relating to the maintenance or operation of the parking areas shall be paid by Lessee and the other lessees in the medical center in the proportion that the number of square feet occupied by each of them bears to the total number of square feet of leasable area in the medical center. For the purpose of this Lease Agreement, the expenses payable by Lessee and the other lessees in the medical center shall include (without limiting the generality of any provision of this lease) any assessment, charge, surcharge, tariff or penalty imposed by any governmental agency for the purpose, in whole or in part, of limiting the use of motor vehicles or otherwise protecting the environment.

d. Lessor reserves the right to promulgate such reasonable rules and regulations relating to the use of the parking areas, roads, and accommodation areas, and any part or parts thereof, as Lessor may deem appropriate and for the best interests of the lessees. Lessee shall abide by such rules and cooperate in their observance. The rules and regulations shall be binding upon Lessee upon delivery of a copy of them to Lessee. The rules and regulations may be amended by Lessor from time to time, with or without advance notice, and all amendments shall be effective upon delivery of a copy of them to Lessee.

34) EFFECT OF LESSOR'S CONVEYANCE. If during the term of this Lease, Lessor shall sell his interest in the medical center, or the premises, then from and after the effective date of sale, Lessor shall be released and discharged from any and all obligations and responsibilities under this Lease except those already accrued.

35) SALE OF PREMISES. Lessor reserves the right to sell any part of the medical center, provided that the rights of Lessee and the other lessee's rights to use the accommodation areas and parking areas are protected.

36) LIABILITY AND FIRE INSURANCE PREMIUMS. Lessee, upon demand, shall pay to Lessor his proportionate share of (a) the premium for liability insurance maintained by Lessor in connection with the operation of the medical center, accommodation areas and parking areas, and (b) the premium for fire and extended coverage insurance on the building in which the demised premises are located. If any such insurance covers less than all of the medical center, Lessee's proportionate share of the premium shall be determined by the ratio of the number of square feet occupied by Lessee to the total number of square feet of leasable area in the portion of the medical center covered by such insurance. In addition, Lessee shall pay an amount equal to any increase in the premium for fire and extended coverage insurance allocable to the remainder of said building because of any special conditions relating to lessee's operation which requires a higher premium.

DS SC

37) WAIVER OF SUBROGATION. To the extent that such waiver does not invalidate any fire insurance coverage, Lessor hereby agrees to waive or release his right of recovery or right

DS

of subrogation against Lessee and Lessee hereby agrees to waive or release his right of recovery or right of subrogation against Lessor for damage to or destruction of the demised premises caused by perils insured against in the standard fire insurance policy including the extended coverage endorsement.

38) APPORTIONMENT AND PAYMENT OF TAXES, COSTS, AND PREMIUMS.

a. If any tax, insurance premium or other expense relates to a building which is only partially complete, Lessor shall equitably apportion such tax, premium or expense between the completed portion of the building and that portion which is not complete.

b. Lessee's share of taxes, maintenance costs, insurance premiums, reserve for replacements, administrative fees, and other expenses as hereinabove provided shall be payable to Lessor upon demand, but not more often than once each calendar month. Lessee's share of such taxes, costs, premiums and other expenses may be estimated by Lessor subject to adjustment in future billings to Lessee. Such taxes, costs, premiums and other expenses shall be computed on an accrual basis under generally accepted accounting principles. On or before March 31st of each year, Lessor shall determine such taxes, costs, premiums and other expenses during the preceding year ending December 31st and shall furnish Lessee a statement showing said items in reasonable detail. To the extent Lessee's share of such taxes, costs, premiums and other expenses is greater or less than the sum actually billed to and paid by Lessee during the year, the difference shall be billed to and paid by Lessee or refunded to Lessee, as the case may be.

39) ARBITRATION. In addition to those provisions specifically subject to arbitration, any question, dispute or controversy arising under the provisions of this Lease Agreement, at the option of Lessor, shall be determined by arbitration. Such arbitration shall be conducted pursuant to the provisions of the Laws of the State of California, with the rules of procedure to be those of the American Arbitration Association or its successor insofar as said rules or procedure do not conflict with the Laws of the State of California. Any award entered as a result of arbitration shall be entered as a judgment with the cost of arbitration to be paid as ordered by the arbitrator.

40) LEGAL FEES. In case suit shall be brought because of the breach of any covenant herein contained, the losing party shall pay the prevailing party a reasonable attorney's fee which shall be fixed by the court.

41) NOTICES. All demands and notices of any kind which are permitted or required to be given hereunder shall be deemed duly given when deposited in the United States mail, postage prepaid, properly addressed and certified (with return receipt requested) in the case of notices by Lessee, to Lessor at 2600 Oro Dam Boulevard, Oroville, California, 95966, and in the case of notices by Lessor, to Lessee at 2767 Olive Highway, Oroville, California 95965.

Either party may at any time and from time to time designate a different address by advising the other party thereof in writing, following which the address so designated shall be deemed to be the address of the party giving such advice, for the purpose hereof.

DS SC

DS

42) COUNTERPART. This Lease Agreement and any Addenda may be signed in counterpart and

each part to be considered an original.

43) APPLICABLE LAW. The invalidity or unenforceability of any provision of this Agreement shall not affect or impair any other provision. If any provision of this Agreement is capable of two constructions, one of which would render the provision invalid and the other of which would make the provision valid, then the provision shall have the meaning which renders it valid. The Laws of California shall govern the validity, performance, and enforcement of this Agreement. The submission of this document for examination does not constitute an offer to lease and becomes effective only upon execution and delivery thereof by Lessor and Lessee.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed as of the day and year shown opposite their respective signatures below.

DS DS

DocuSign Envelope ID: E593FBE2-660B-4E26-969A-7CAB04F64F25

LESSOR:
DOVE'S LANDING, LLC

By: DocuSigned by:
241FFC7A5EAE499...
Robert J. Wentz
Managing Partners

Date Signed: 1/2/2018

LESSEE:
OROHEALTH CORPORATION, a California Corporation

By: DocuSigned by:
Scott Chapple
6490F24DA2E645C...
Scott Chapple
Chief Operating Officer

Date Signed: 12/11/2017

# EXHIBIT B

6

Richard M. Pachulski (CA Bar No. 90073)
Alan J. Kornfeld (CA Bar No. 130063)
Teddy M. Kapur (CA Bar No. 242486)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067-4003
Telephone: 310-277-6910
Facsimile: 310-201-0760
E-mail: rpachulski@pszjlaw.com
akornfeld@pszjlaw.com
tkapur@pszjlaw.com

*Counsel to Defendants Dove's Landing, LLC, Robert J. Wentz, and Oroville Sports Club*, LLC

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

In re

OROVILLE HOSPITAL, *et al.,*

Debtors and Debtors in Possession.

☒ Affects All Debtors
☐ Affects Oroville Hospital
☐ Affects ProHealth Corporation: A Nonprofit Healthcare System

Debtors and Debtors in Possession

OROHEALTH CORPORATION: A NONPROFIT HEALTHCARE SYSTEM, and OROVILLE HOSPITAL,

Plaintiffs,

v.

DOVE'S LANDING, LLC; ROBERT J. WENTZ; OROVILLE SPORTS CLUB, LLC; and ROB BONTA, as Attorney General of California (nominal defendant),

Defendants.

Lead Case No. 25-26876

Jointly Administered With:
Case No. 25-26877

Adv. Proc. No.: 26-02092
DCN TMK-1

Chapter 11

**MOTION OF DEFENDANTS DOVE'S LANDING, LLC, ROBERT J. WENTZ, AND OROVILLE SPORTS CLUB, LLC TO: (1) COMPEL ARBITRATION; (2) STAY DEFENDANTS' TIME TO RESPOND TO THE COMPLAINT; AND (3) STAY THIS ADVERSARY PROCEEDING**

Date: October 20, 2026
Time: 11:00 a.m.
Crtrm.: Courtroom 32
501 I Street, Suite 3-200
Sacramento, California 95814
Judge: Hon. Christopher D. Jaime

Dove's Landing, LLC ("**Dove's Landing**"), Robert J. Wentz ("**Wentz**") and Oroville Sports Club LLC ("**Sports Club**" and, together, the "**Defendants**") file this *Motion to (1) Compel Arbitration; (2) Stay Defendants' Time to Respond to the Complaint; and (3) Stay This Adversary*

*Proceeding* (the "**Motion**"), and the supporting *Memorandum of Points and Authorities*, the *Declaration of Robert J. Wentz* (the "**Wentz Decl.**"), and the exhibits in support of the Motion, with respect to the Complaint filed against them on August 4, 2026 by OroHealth Corporation: A Nonprofit Healthcare System ("**OroHealth**") and Oroville Hospital (the "**Hospital**" and, together the "**Debtors**" or "**Plaintiffs**").

Stripped of its baseless rhetoric and scurrilous and unfounded allegations, the Debtors' fourteen-count Complaint is a dispute that is governed by the arbitration provision in the leases at issue. As set forth in the Complaint itself: "This is an adversary proceeding … to recharacterize the two written lease agreements" … "between Plaintiff OroHealth Corporation and Defendant Dove's Landing, LLC" (which leases the Debtors define as the "**Initial Lease**" and the "**Renewal Lease**" and, together, the "**Lease Transactions**"). The Complaint's allegations of misconduct on the part of the Defendants with respect to the Lease Transactions are not only specious and contrary to reality but are wholly devoid of evidentiary support. The allegations are based solely on "information and belief," innuendo and rank conjecture in an attempt to rewrite history in order to fabricate claims that would otherwise be barred – not only by the facts themselves but also on statute of limitations grounds. The Defendants intend to vigorously defend against these meritless claims in the proper forum – which, as provided by both the Initial Lease and the Renewal Lease, is arbitration. Arbitration will provide an efficient, expeditious and cost-effective way for the parties to obtain a determination as to whether the claims have merit. The Defendants do not believe the claims have any merit and arbitration will preserve the resources of all parties in reaching a streamlined, comprehensive and efficacious resolution of these disputes.

The Defendants have therefore filed this Motion so that the matter may be heard and the Defendants' rights vindicated in accordance with the parties' agreed-to process and procedure. This is the proper course because, putting aside the Complaint's groundless and misleading attempts to recharacterize commercially reasonable conduct and transactions, boiled down to its essence, the relief requested by the Complaint is to hold that the two commercial leases were not leases at all; to declare the resulting instrument a mortgage; to quiet title on that theory; to impose a constructive trust as the remedy for that theory; and to compel an accounting of rent and CAM charges assessed

under those same leases. Every one of these claims requires the trier of fact to construe the Initial Lease and the Renewal Lease.

The Debtors say so themselves – describing the Complaint as "assert[ing] claims under §§ 544, 548, 549, and 550, among others, ***arising from the Lease*** among other related transactions."[1] That is not Defendants' characterization. It is Debtors'. And it maps precisely onto the operative contractual language, which commits to arbitration "any question, dispute or controversy ***arising under the provisions of this Lease Agreement***."[2]

The parties agreed how such disputes would be resolved – twice, in identical terms. Section 39 of the Renewal Lease provides that "any question, dispute or controversy arising under the provisions of this Lease Agreement, at the option of Lessor, shall be determined by arbitration," conducted under California law and the rules of the American Arbitration Association.[3] Section 41 of the Initial Lease is identical.[4] Dove's Landing, as Lessor, has exercised that option under both Leases by written election served on Debtors' counsel on August 27, 2026. In the written election, Dove's Landing has set forth its agreement to be bound by the resulting arbitration to the same extent as the Debtors. Wentz and Sports Club, non-signatories to the Leases, have also agreed to be so bound. Hospital, a Plaintiff and non-signatory to the Leases, is also appropriately bound to the arbitration provisions of the Leases upon which it brings suit.[5] Following service of the written election, by letter dated September 1, 2026, counsel for the Debtors advised that the Debtors refused to consent to arbitration.

Where a valid agreement to arbitrate exists, and the agreement encompasses the dispute at issue, an order compelling arbitration is mandatory. *See* Cal. Code Civ. Proc. § 1281.2; *Omar v. Ralphs Grocery Co.*, 118 Cal. App. 4th 955, 960-61 (2004). Under Ninth Circuit law, a bankruptcy

[1] *Debtors' Omnibus Reply in Support of Motion for Entry of an Order Authorizing the Assumption of Lease Agreement, Etc.* [Docket No. 1081] at 5 (emphasis added) ("**Omnibus Reply**").

[2] Renewal Lease § 39 (Complaint Ex. 5 at 12) (emphasis added). *See also* Initial Lease § 41 (Complaint Ex. 2 at 13).

[3] Renewal Lease § 39 at 12 (Compl. Ex. 5).

[4] Initial Lease § 41 at 13 (Compl. Ex. 2).

[5] A true and correct copy of the written election is attached to the exhibits filed in support of the Motion as **Exhibit B**; Wentz Decl. ¶¶ 5-7.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

court generally lacks discretion to deny arbitration of "non-core" matters and possesses discretion to deny arbitration of a "core" matter only where it finds that arbitration would "inherently conflict" with the underlying purposes of the Bankruptcy Code. *See Continental Insurance Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011 (9th Cir. 2012).

The dependency among the fourteen Claims for Relief of the Complaint here is total:

- The declaratory and title claims ask what the Leases are.
- The fiduciary claims ask whether the Leases' terms were fair.
- The accounting claim asks what the Leases required the Debtors to pay.
- The fraudulent-transfer claims ask whether payments made under the Leases exchanged reasonably equivalent value – a question that cannot be reached, let alone answered, without first construing contractual provisions of the Leases.

Compl. ¶¶ 158-159, 166-167, 182-185, 191-194.

These claims are pure contractual disputes, including the Sixth through Eleventh Claims[6] for Relief nominally styled as "core" fraudulent transfer claims. The fraudulent transfer claims rooted in the underlying contractual disputes should therefore also be treated as "non-core" and non-discretionary arbitration is properly compelled as to these claims. Even if determined to be "core," there is no conflict with the underlying purposes of the Bankruptcy Code as required under Ninth Circuit law and arbitration is properly compelled.

All of the causes of action in the Complaint arise out of the Leases. The Defendants therefore request the following relief:[7]

***Primarily***, an order compelling arbitration of the First, Second, Third, Thirteenth, and Fourteenth Claims for Relief;[8] and of the Fourth Claim for Relief, including to the extent it seeks

---

[6] The Debtors state that the Eighth Claim for Relief arises under "common law." Compl. ¶¶ 170-179. As such, the Eighth Claim for Relief should be regarded as a "non-core" claim. The Defendants do not concede that the Eighth Claim for Relief is core even though they group, out of convenience, the Eighth Claim for Relief among the Sixth through Eleventh Claims for Relief that are facially styled as "core."

[7] A proposed form of order is attached to the exhibits filed in support of the Motion as **Exhibit A**.

[8] First Claim for Relief (Declaratory Relief/Recharacterization); Second Claim for Relief (Quiet Title); Third Claim for Relief (Imposition of Equitable Mortgage); Thirteenth Claim for Relief (Accounting); Fourteenth Claim for Relief (Constructive Trust).



PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

turnover of the Property or damages measured by the Lease terms (Compl. ¶ 131).[9] Further, under *Thorpe*, arbitration of the Sixth through Eleventh Claims for Relief,[10] all of which are breach of contract claims that are predicated on payments made under the Leases that require the Leases to be construed. Defendants request that the Court exercise its discretion under *Thorpe* to compel arbitration of the Sixth through Eleventh Claims for Relief, to the extent considered "core," on the grounds that there is no inherent conflict with the underlying purposes of the Bankruptcy Code. This is a two-party commercial dispute, over one parcel of real property, and one stream of lease payments, turning on the construction of contracts the parties twice agreed to arbitrate, brought against defendants who have consistently maintained that these very questions belong in a plenary forum. The alternative is duplicative litigation of a single set of facts in two forums, with a live risk of inconsistent rulings on the controlling lease issues.

***Alternatively***, if the Court declines to refer the Sixth through Eleventh Claims for Relief to arbitration, an order staying those Claims for Relief under Cal. Code Civ. Proc. § 1281.4 and the Court's inherent authority pending completion of the arbitration on the underlying lease disputes.

***In either event***, a stay of the Fifth Claim for Relief, which includes the Attorney General (as a nominal defendant), who is not a party to either Lease;[11] a stay of the Twelfth Claim for Relief, which asks this Court to enforce its own automatic stay and which Defendants do not ask to be arbitrated;[12] and a stay of this adversary proceeding in all other respects.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

---

[9] Fourth Claim for Relief (Breach of Fiduciary Duty – Common Law).

[10] Sixth Claim for Relief (Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(1) Actual Fraud); Seventh Claim for Relief (Fraudulent Conveyance in Violation of California Civil Code § 3439.04(a)(2) Constructive Fraud); Eighth Claim for Relief (Common Law Fraudulent Conveyance); Ninth Claim for Relief (Fraudulent Transfer 11 U.S.C. § 548); Tenth Claim for Relief (Avoidance of Fraudulent Transfer 11 U.S.C. § 544(b)); Eleventh Claim for Relief (Avoidance and Recovery of Post-Petition Transfer of Estate Property 11 U.S.C. §§ 549(b) and 550).

[11] Fifth Claim for Relief (Breach of Fiduciary Duty Cal. Corp. Code § 5233(c)).

[12] Twelfth Claim for Relief (Violation of the Automatic Stay 11 U.S.C. §§ 105(a) and 362(a)(3)).

Filed 09/04/26 Case 26-02092 Doc 7

***Last***, Defendants request an order staying the requirement to respond to the Complaint, pursuant to Rule 12 of the Federal Rules of Civil Procedure and Bankruptcy Rule 7012, for a period of twenty-eight days after completion of the arbitration.[13]

Dated: September 4, 2026

PACHULSKI STANG ZIEHL & JONES LLP

By: */s/ Teddy M. Kapur*
Richard M. Pachulski
Alan J. Kornfeld
Teddy M. Kapur

*Counsel to Defendants Dove's Landing, LLC, Robert J. Wentz, and Oroville Sports Club, LLC*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

[13] *Ellison Framing, Inc. v. Zurich American Ins. Co.*, 805 F. Supp. 2d 1006, 1012 (E.D. Cal. 2011) (approving defendant's request to stay the requirement to file an answer that when such request was filed as part of a motion to compel arbitration), citing, *Ritza v. Int'l Longshoremen's and Warehousemen's Union*, 837 F.2d 365, 369 (9th Cir. 1988) (holding that federal courts have the inherent authority to hear pre-answer motions that are not expressly enumerated in Rule 12(b) of the Federal Rules because courts have the power to regulate actions that are closely related to the management of the lawsuit that involve matters of judicial administration).

# EXHIBIT C

45

THOMAS G. MOUZES (SBN 099446)
IAN K. MCGLONE (SBN 315201)
**BOUTIN JONES INC.**
Attorneys at Law
555 Capitol Mall, Suite 1500
Sacramento, CA 95814
Phone: 916.321.4444
Fax: 916.441.7597
Email: tmouzes@boutinjones.com
imcglone@boutinjones.com

Attorneys for Defendant-Intervenor TRI COUNTIES BANK

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO DIVISION)

| | |
|---|---|
| In re<br><br>OROVILLE HOSPITAL, *et al.*,[1]<br><br>Debtor. | **Case No. 2025-26876**<br><br>Jointly Administered with:<br>**Case No. 2025-26877**<br><br>Chapter 11 |
| ☒ Affects All Debtors<br>☐ Affects Oroville Hospital<br>☐ Affects OroHealth Corporation: A Nonprofit Healthcare System | |
| OROHEALTH CORPORATION: A NONPROFIT HEALTHCARE SYSTEM, chapter 11 Debtor and Debtor in Possession, and OROVILLE HOSPITAL, chapter 11 Debtor and Debtor in Possession,<br><br>Plaintiffs,<br><br>DOVE'S LANDING, LLC, a California limited liability company; ROBERT J. WENTZ, an individual; OROVILLE SPORTS CLUB, LLC, | **Adv. Proc. No. 2026-02092**<br><br>**TRI COUNTIES BANK'S PROPOSED VERIFIED ANSWER TO OROHEALTH CORPORATION AND OROVILLE HOSPITAL'S VERIFIED COMPLAINT**<br><br>Date: N/A<br>Time: N/A<br>Department: B, Crtrm 32<br>501 I Street, Suite 3-200<br>Sacramento, California 95814<br>Judge: Honorable Christopher D. Jaime |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the debtors is 2767 Olive Highway, Oroville, California, 95966.

| | |
|---|---|
| a California limited liability company; and ROB BONTA, as Attorney General of California, a nominal defendant, Defendants. | ) ) ) ) ) ) |

Defendant-Intervenor Tri Counties Bank ("TCB") hereby responds and answers the Verified Complaint ("Complaint") filed by Plaintiffs OroHealth Corporation and Oroville Hospital (collectively, "Plaintiffs") by admitting, denying and/or alleging, as follows:

**I.**

**NATURE OF THE ACTION**

1. TCB admits the existence of the real property commonly known as 2450 Oro Dam Boulevard, Oroville, California (the "Property"). Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 1 of the Complaint and therefore denies the same. TCB further alleges that it holds a valid and enforceable Deed of Trust, recorded on July 5, 2018, in the Official Records of Butte County, California, Document No. 2018-0022898 ("Deed of Trust"), a copy of which is attached hereto as **Exhibit 1** and incorporated herein, encumbering the Property, as security for the obligations and indebtedness described therein, and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

2. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 2 of the Complaint and therefore denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

3. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 3 of the Complaint and therefore denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

4. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 4 of the Complaint and therefore denies the same. TCB further alleges that it

holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

## II.

## JURISDICTION

5. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 5 of the Complaint and therefore denies the same.

6. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 6 of the Complaint and therefore denies the same.

7. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 7 of the Complaint and therefore denies the same.

8. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 8 of the Complaint and therefore denies the same.

9. TCB consents to the entry of final orders or judgment by the Court. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 9 of the Complaint and therefore denies the same.

10. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 10 of the Complaint and therefore denies the same.

## III.

## PARTIES

11. TCB admits that Debtors filed the above-entitled cases. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 11 and denies the same.

12. TCB admits that OroHealth is an entity. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 12 and denies the same.

13. TCB admits that Oroville Hospital is an entity. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 13 and denies the same.

14. TCB admits that Dove's Landing, LLC is an entity. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 14 and denies the same.

15. TCB admits that Oroville Sports Club, LLC is an entity. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 15 and denies the same.

16. TCB admits that Defendant Robert J. Wentz is an individual. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 16 and denies the same.

17. TCB admits Defendant Rob Bonta is the Attorney General of the State of California. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 17 of the Complaint and therefore denies the same.

## IV.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

18. TCB admits that OroHealth and Oroville Hospital each operate in the County of Butte, California. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 18 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

### A. The Bylaws of OroHealth and Oroville Hospital

19. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 19 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

20. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 20 and denies the same.

21. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 21 and denies the same.

22. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 22 and denies the same.

23. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 23 and denies the same.

24. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 24 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**B. Mr. Wentz's Domination and Control of the Boards of Trustees of Both OroHealth and Oroville Hospital, and the Sustained or Systematic Failure of the Boards to Exercise Oversight**

25. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 25 and denies the same.

26. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 26 and denies the same.

27. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 27 and denies the same.

28. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 28 and denies the same.

29. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 29 and denies the same.

30. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 30 and denies the same.

31. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 31, and all subparagraphs, and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief

affecting title to the Property must account for and preserve TCB's lien interest.

32. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 32 and denies the same.

33. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 33 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**C. January 25, 2011 – March 1, 2011: Mr. Wentz Approaches the Boards of OroHealth and Oroville Hospital With the Opportunity to Purchase the Property, But Misinforms Them About Key Details About the Potential Acquisition**

34. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 34 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

35. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 35 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

36. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 36 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

37. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 37 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

38. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 38 and denies the same. TCB further alleges that it holds a valid, enforceable,

and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

39. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 39 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

40. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 40 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

41. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 41 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

42. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 42 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**D. May 31, 2011: At a Meeting of the Boards of Trustees of OroHealth and Oroville Hospital, the Boards Approve the MOU, and After the Meeting, OroHealth and Sports Club Enter Into the MOU**

43. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 43 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

44. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 44 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property

must account for and preserve TCB's lien interest.

45. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 45 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

46. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 46 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

47. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 47 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

48. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 48 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

49. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 49 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

50. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 50 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

51. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 51 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property

must account for and preserve TCB's lien interest.

52. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 52 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**E. August 2011 – December 2012: Mr. Wentz Forms Dove's Landing, Mr. Wentz Receives Further Assurances From the Boards of OroHealth and the Hospital That They Will Lease the Entire Property If and Only If Dove's Landing Acquires the Entire Property**

53. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 53 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

54. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 54 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

55. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 55 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

56. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 56 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**F. December 15, 2011: OroHealth Enters Into the Initial Lease With Dove's Landing, Even Though Dove's Landing Has Not Yet Acquired the Property**

57. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 57 and denies the same. TCB further alleges that it holds a valid, enforceable,

and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

58. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 58 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

59. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 59 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

60. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 60 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**G. June 26, 2012 – July 31, 2012: Mr. Wentz Offers OroHealth the Opportunity to Purchase a "Non-Recourse Ownership" Interest in the Property, But Mr. Wentz Subsequently Rescinds the Offer**

61. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 61 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

62. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 62 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

63. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 63 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property

must account for and preserve TCB's lien interest.

64. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 64 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

65. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 65 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**H. December 24, 2012: Dove's Landing Acquires the Property**

66. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 66 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

67. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 67 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**I. January 2013 – August 2015: OroHealth Begins Its Occupancy of the Property, and Builds $7 Million in Improvements on the Property Which Are Paid for By the Hospital**

68. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 68 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

69. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 69 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

70. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 70 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

71. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 71 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

72. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 72 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**J. January 1, 2018 – July 5, 2018: OroHealth Enters the Renewal Lease With Dove's Landing Approximately Four Years Early, and Dove's Landing Refinances Its Initial Loan**

73. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 73 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

74. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 74 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

75. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 75 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

76. TCB lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in Paragraph 76 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

77. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 77 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

78. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 78 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

79. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 79 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**K. February 13, 2019: In the Official Statement Provided to Potential Bond Purchasers Financing Oroville Hospital's Operations Signed By Mr. Wentz, Oroville Hospital's Disclosures Indicate That the Property Is Owned By Oroville Hospital**

80. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 80 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

81. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 81 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

82. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 82 and denies the same. TCB further alleges that it holds a valid, enforceable,

and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

**L. December 8, 2025-Present: Plaintiffs File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code, and Discover Evidence of Disguised Financing and Self-Dealing By Mr. Wentz, and Mr. Wentz Resigns From the Boards of Trustees of OroHealth and Oroville Hospital**

83. TCB admits that each Debtor in the above-entitled parent cases filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. Except as expressly admitted herein, TCB lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 83 and denies the same.

84. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 84 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

85. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 85 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

86. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 86 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

87. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 87 and denies the same. TCB further alleges that it holds a valid, enforceable, and recorded Deed of Trust encumbering the Property and that any relief affecting title to the Property must account for and preserve TCB's lien interest.

///

///

**FIRST CLAIM FOR RELIEF**

**Declaratory Relief/Recharacterization**

**(Plaintiffs Against Dove's Landing)**

88. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

89. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 89 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

90. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 90 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

91. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 91 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

92. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 92 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

93. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 93 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

94. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 94 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property,

TCB denies that Plaintiffs are entitled to such relief.

95. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 95 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

96. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 96 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

97. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 97 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

98. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 98 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

99. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 99 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

100. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 100 and denies the same. To the extent the allegations in the First Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the

applicable promissory note and security agreement, are fully valid and enforceable.

**SECOND CLAIM FOR RELIEF**

**Quiet Title**

**(Plaintiffs Against Dove's Landing)**

101. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

102. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 102 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

103. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 103 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

104. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 104 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

105. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 105 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

106. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 106 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

107. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 107 and denies the same. To the extent the allegations in the Second Claim

for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

108. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 108 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

109. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 109 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

110. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 110 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

111. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 111 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

112. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 112 and denies the same. To the extent the allegations in the Second Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

113. TCB denies the allegations in Paragraph 113, including, without limitation, that Plaintiffs, or any of them, are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

**THIRD CLAIM FOR RELIEF**

**Imposition of Equitable Mortgage [Cal. Civ. Code § 2925]**

**(Plaintiffs Against Dove's Landing)**

114. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

115. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 115 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

116. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 116 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

117. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 117 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

118. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 118 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

119. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 119 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

120. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 120 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property,

TCB denies that Plaintiffs are entitled to such relief.

121. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 121 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

122. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 122 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

123. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 123 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

124. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 124 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

125. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 125 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

126. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 126 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

127. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 127 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property,

TCB denies that Plaintiffs are entitled to such relief.

128. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 128 and denies the same. To the extent the allegations in the Third Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

129. TCB denies the allegations in Paragraph 129, including, without limitation, that Plaintiffs, or any of them, are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

**FOURTH CLAIM FOR RELIEF**

**Breach of Fiduciary Duty [Common Law]**

**(Plaintiffs Against Dove's Landing, the Sports Club, and Robert J. Wentz)**

130. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

131. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 131 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

132. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 132 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

133. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 133 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

134. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 134 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

135. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 135 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

136. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 136 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

137. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 137 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

138. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 138 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

139. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 139 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

140. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 140 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

141. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 141 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

142. TCB denies the allegations in Paragraph 142, including, without limitation, that Plaintiffs, or any of them, are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

143. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 143 and denies the same. To the extent the allegations in the Fourth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

## FIFTH CLAIM FOR RELIEF

**Breach of Fiduciary Duty [Cal. Corp. Code § 5233(c)]**

**(Plaintiffs Against Dove's Landing, the Sports Club, and Mr. Wentz)**

144. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

145. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 145 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

146. TCB lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in Paragraph 146 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

147. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 147 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

148. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 148, and all subparagraphs, and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

149. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 149 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

150. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 150 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

151. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 151 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

152. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 152 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

153. TCB lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in Paragraph 153 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

154. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 154 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

155. TCB denies the allegations in Paragraph 155, including, without limitation, that Plaintiffs, or any of them, are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

156. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 156 and denies the same. To the extent the allegations in the Fifth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

## SIXTH CLAIM FOR RELIEF

**Fraudulent Conveyance [Cal. Civ. Code § 3439.04(a)(1) – Actual Fraud]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

157. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

158. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 158 and denies the same. To the extent the allegations in the Sixth Claim for

Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

159. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 159 and denies the same. To the extent the allegations in the Sixth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

160. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 160 and denies the same. To the extent the allegations in the Sixth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

161. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 161 and denies the same. To the extent the allegations in the Sixth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

162. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 162 and denies the same. To the extent the allegations in the Sixth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

163. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 163 and denies the same. To the extent the allegations in the Sixth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

///

///

## SEVENTH CLAIM FOR RELIEF

**Fraudulent Conveyance [Cal. Civ. Code § 3439.04(a)(2) – Constructive Fraud]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

164. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

165. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 165 and denies the same. To the extent the allegations in the Seventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

166. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 166 and denies the same. To the extent the allegations in the Seventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

167. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 167 and denies the same. To the extent the allegations in the Seventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

168. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 168 and denies the same. To the extent the allegations in the Seventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

169. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 169 and denies the same. To the extent the allegations in the Seventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without

limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

## EIGHTH CLAIM FOR RELIEF

### Fraudulent Conveyance [Common Law]

### (Plaintiffs Against Dove's Landing and Robert J. Wentz)

170. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

171. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 171 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

172. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 172 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

173. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 173 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

174. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 174 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

175. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 175 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

176. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 176 and denies the same. To the extent the allegations in the Eighth Claim

for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

177. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 177 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

178. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 178 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against thc Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

179. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 179 and denies the same. To the extent the allegations in the Eighth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

## NINTH CLAIM FOR RELIEF

### Fraudulent Transfer [11 U.S.C. § 548]

### (Plaintiffs Against Dove's Landing and Robert J. Wentz)

180. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

181. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 181 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

182. TCB lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in Paragraph 182 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

183. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 183 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

184. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 184 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

185. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 185 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

186. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 186 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

187. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 187 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

188. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 188 and denies the same. To the extent the allegations in the Ninth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the

indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

## TENTH CLAIM FOR RELIEF

### Avoidance of Fraudulent Transfer [11 U.S.C. § 544(b)]

### (Plaintiffs Against Dove's Landing and Robert J. Wentz)

189. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

190. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 190 and denies the same. To the extent the allegations in the Tenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

191. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 191 and denies the same. To the extent the allegations in the Tenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

192. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 192 and denies the same. To the extent the allegations in the Tenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

193. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 193 and denies the same. To the extent the allegations in the Tenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

194. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 194 and denies the same. To the extent the allegations in the Tenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

195. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 195 and denies the same. To the extent the allegations in the Tenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

196. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 196 and denies the same. To the extent the allegations in the Tenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

## ELEVENTH CLAIM FOR RELIEF

**Avoidance and Recovery of Post-Petition Transfer of Estate Property**

**[11 U.S.C. §§ 549(b) and 550]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

197. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

198. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 198 and denies the same. To the extent the allegations in the Eleventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

199. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 199 and denies the same. To the extent the allegations in the Eleventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

200. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 200 and denies the same. To the extent the allegations in the Eleventh Claim

for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

201. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 201 and denies the same. To the extent the allegations in the Eleventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

202. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 202 and denies the same. To the extent the allegations in the Eleventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

203. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 203 and denies the same. To the extent the allegations in the Eleventh Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

## <u>TWELFTH CLAIM FOR RELIEF</u>

**Violation of Automatic Stay [11 U.S.C. §§ 105(a) and 362(a)(3)]**

**(Plaintiffs Against Dove's Landing and Robert J. Wentz)**

204. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

205. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 205 and denies the same. To the extent the allegations in the Twelfth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

206. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 206 and denies the same. To the extent the allegations in the Twelfth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

207. TCB lacks sufficient knowledge or information to form a belief as to the truth of the

allegations in Paragraph 207 and denies the same. To the extent the allegations in the Twelfth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

**THIRTEENTH CLAIM FOR RELIEF**

**Accounting**

**(Plaintiffs Against Dove's Landing, Sports Club, and Robert J. Wentz)**

208. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

209. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 209 and denies the same. To the extent the allegations in the Thirteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

210. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 210 and denies the same. To the extent the allegations in the Thirteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

211. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 211 and denies the same. To the extent the allegations in the Thirteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

212. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 212 and denies the same. To the extent the allegations in the Thirteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

213. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 213 and denies the same. To the extent the allegations in the Thirteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

214. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 214 and denies the same. To the extent the allegations in the Thirteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

## FOURTEENTH CLAIM FOR RELIEF

### Constructive Trust

### (Plaintiffs Against Dove's Landing)

215. TCB realleges and incorporates by reference its responses to all preceding paragraphs as though fully set forth herein.

216. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 216 and denies the same. To the extent the allegations in the Fourteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

217. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 217 and denies the same. To the extent the allegations in the Fourteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

218. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 218 and denies the same. To the extent the allegations in the Fourteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

219. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 219 and denies the same. To the extent the allegations in the Fourteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief.

220. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 220 and denies the same. To the extent the allegations in the Fourteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the

Property, TCB denies that Plaintiffs are entitled to such relief.

221. TCB lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 221 and denies the same. To the extent the allegations in the Fourteenth Claim for Relief seek relief that would impair, subordinate, or extinguish TCB's Deed of Trust on the Property, TCB denies that Plaintiffs are entitled to such relief. TCB holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

## ADDITIONAL DENIAL

222. To the extent not expressly and affirmatively admitted herein, TCB denies generally and specifically, conjunctively and disjunctively, each, every, and all allegations set forth in the Complaint, and further denies that Plaintiffs are entitled to any relief prayed for in the Complaint or any other relief whatsoever.

## PRAYER FOR RELIEF

223. TCB denies that Plaintiffs, or any of them, are entitled to the relief sought, or any other relief in any form whatsoever.

## TCB'S DEED OF TRUST AND LIEN INTERESTS

224. TCB holds an interest in the Property which is subject to the Complaint. TCB alleges that it holds a recorded first priority Deed of Trust, Exhibit 1, against the Property, securing the indebtedness and obligations described therein, the indebtedness and obligations secured thereby remain unpaid and are fully valid and enforceable, and the Deed of Trust and the other applicable loan documents, including, without limitation, the applicable promissory note and security agreement, are fully valid and enforceable.

## AFFIRMATIVE DEFENSES

225. By alleging the matters set forth in the affirmative defenses below, TCB does not allege or admit that it has the burden of proof and/or persuasion with respect to any of these matters. As separate affirmative defenses to the Complaint, and the whole thereof, TCB asserts as follows:

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Claim for Relief)**

226. As a separate and affirmative defense, the Complaint fails to state a claim for relief, whether legal or equitable.

**SECOND AFFIRMATIVE DEFENSE**

**(Failure to Do Equity)**

227. As a separate and affirmative defense, the Complaint is barred by principles of equity and fairness. One who seeks equity must do equity.

**THIRD AFFIRMATIVE DEFENSE**

**(Unfair Acts, Conduct, Delays, etc.)**

228. As a separate and affirmative defense, the Complaint is barred by Plaintiffs' unfair, unreasonable and/or inequitable actions, conduct, delays, and/or practices.

**FOURTH AFFIRMATIVE DEFENSE**

**(Laches)**

229. As a separate and affirmative defense, the Complaint is barred by the doctrine of laches.

**FIFTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

230. As a separate and affirmative defense, the Complaint is barred by the doctrine of unclean hands.

**SIXTH AFFIRMATIVE DEFENSE**

**(Consent, Acquiescence and/or Assumption of Risk)**

231. As a separate and affirmative defense, the Complaint is barred by consent, acquiescence and/or assumption of risk.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Estoppel)**

232. As a separate and affirmative defense, the Complaint is barred by estoppel.

///

///

**EIGHTH AFFIRMATIVE DEFENSE**

**(Mitigation of Harm)**

233. As a separate and affirmative defense, the Complaint is barred as Plaintiffs failed to act reasonably to mitigate, minimize or avoid their harm, if any there be. As a result, Plaintiffs' recovery, if any, should be barred or reduced.

**NINTH AFFIRMATIVE DEFENSE**

**(Waiver)**

234. As a separate and affirmative defense, the Complaint is barred by waiver.

**TENTH AFFIRMATIVE DEFENSE**

**(Uncertain)**

235. As a separate and affirmative defense, the Complaint is uncertain.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(No Damages or Loss)**

236. As a separate and affirmative defense to the Complaint, Plaintiffs have not sustained any harm or loss caused by TCB, and to the extent Plaintiffs prove they have suffered harm or loss, such matters were proximately caused by Plaintiffs' and/or other persons' actions, decisions, conduct, and/or omissions.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

237. As a separate and affirmative defense, the Complaint is barred in whole or in part by the applicable statute of limitations including, without limitation, Code of Civil Procedure Sections 320, 337, 338, 339, 340, and 343 and Civil Code §3439.09(a), (b) and (c).

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Intervening, Superseding Acts)**

238. As a separate and affirmative defense, the Complaint is barred by the intervening, superseding, intentional and/or negligent acts of Plaintiffs and/or other persons and/or entities.

///

///

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(No Title Report)**

239. As a separate and affirmative defense, Plaintiffs failed to obtain a title report of the real property subject to this Complaint as required by applicable law.

**FIFTEENTH AFFIRMATIVE DEFENSE**

**(Failure to Join Indispensable and Necessary Parties)**

240. As a separate and affirmative defense, Plaintiffs failed to join indispensable and/or necessary parties whose presence as a party is essential to the adjudication of this action.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**(Superior Equities)**

241. As a separate and affirmative defense, the Complaint is barred by the doctrine of superior equities.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**(Secured Lien)**

242. As a separate and affirmative defense to the Complaint, TCB holds a Deed of Trust, Exhibit 1, against the Property, securing the valid obligations described therein, which remain unpaid, and at all relevant times TCB is entitled to its secured lien status and the priority position thereof.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**(Bona Fide Encumbrancer)**

243. As a separate and affirmative defense, the Complaint is barred as TCB is a bona fide encumbrancer for value.

**NINETEENTH AFFIRMATIVE DEFENSE**

**(11 U.S.C. §548)**

244. The Complaint and each claim for relief are barred, in whole or in part, from recovery under 11 U.S.C. §548, and applicable state law because any amounts allegedly received by TCB were received in good faith, for adequate and fair consideration deemed valuable at law and for reasonably equivalent value and without knowledge of any wrongful act or the avoidability of the alleged transfers (if any) and not avoidable including under 11 U.S.C. §548, including 11 U.S.C. §548(a)(1)(b)(i) and

(d)(2)(a) or applicable state law including under Civil Code §3439, *et seq*., including Civil Code §3439.04 and §3439.08.

**TWENTIETH AFFIRMATIVE DEFENSE**

**(11 U.S.C. § 548)**

245. The Complaint and each claim for relief are barred, in whole or in part, from recovery under 11 U.S.C. §548, including 11 U.S.C. §548(c) and (d), including that TCB is entitled to retain its Deed of Trust and security interests, and the priority position thereof, including as encompassed by the Deed of Trust.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**(Civil Code §3439, *et seq*.)**

246. The Complaint and each claim for relief are barred, in whole or in part, from recovery under Civil Code §3439, *et seq*, including under Civil Code §3439.04 and §3439.08, including that TCB is entitled to retain its Deed of Trust and security interests, and the priority position thereof, including as encompassed by the Deed of Trust.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

**(11 U.S.C. §549)**

247. The Complaint and each claim for relief are barred, in whole or in part, by 11 U.S.C. §549, including 11 U.S.C. §549(c), including on the basis that Plaintiffs may not avoid or recover a transfer of an interest in real property to a good faith transferee that takes for present fair value.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

**(11 U.S.C. §549)**

248. The Complaint and each claim for relief are barred, in whole or in part, by 11 U.S.C. §549, including 11 U.S.C. §549(d).

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

**(11 U.S.C. §550)**

249. The Complaint and each claim for relief are barred, in whole or in part, by 11 U.S.C. §550, including 11 U.S.C. §550(b), on the basis that Plaintiffs may not recover from any transferee that takes for value, including satisfaction of a present or antecedent debt, in good faith, and without knowledge, of

the voidability of the transfer avoided or from any immediate or mediate good faith transferee.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

**(11 U.S.C. §550)**

250. The Complaint and each claim for relief are barred, in whole or in part, as recovery of the alleged transfers (if any) is barred by 11 U.S.C. §550(a) because the alleged transfers (if any) are not avoidable under 11 U.S.C. §§548 and 549.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

**(11 U.S.C. §550)**

251. The Complaint and each claim for relief are barred, in whole or in part, by 11 U.S.C. § 550 including 11 U.S.C. §550(e).

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

**(FRBP Rule 7009)**

252. The Complaint and each claim for relief are barred, in whole or in part, as any claim for fraud or fraudulent transfer must be stated with particularity under Federal Rules of Bankruptcy Procedure, Rule 7009 and applicable state law. Plaintiffs fail to articulate facts related to fraud against TCB in any of the claims for relief.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations/Repose)**

253. The Complaint and each claim for relief are barred, in whole or in part, by the applicable statute of limitations including, without limitation, 11 U.S.C. §546 and applicable state law.

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

**(Lack of Insolvency)**

254. The Complaint and each claim for relief are barred, in whole or in part, as the Debtor was not insolvent during the relevant periods at issue.

**THIRTIETH AFFIRMATIVE DEFENSE**

**(Frustration/Impracticability)**

255. The Complaint and each claim for relief are barred, in whole or in part, by frustration of purpose and/or impracticability.

**THIRTY-FIRST AFFIRMATIVE DEFENSE**

**(Authorization)**

256. The Complaint and each claim for relief are barred, in whole or in part, by authorization.

**THIRTY-SECOND AFFIRMATIVE DEFENSE**

**(No Money or Property Belonging to Plaintiffs)**

257. The Complaint and each claim for relief are barred, in whole or in part, as TCB has not received and/or possessed money or some specific article of property or which has been actually or presumably converted into money, which in equity and good conscience belongs to Plaintiffs.

**THIRTY-THIRD AFFIRMATIVE DEFENSE**

**(Unjust Enrichment)**

258. The Complaint and each claim for relief are barred, in whole or in part, by the doctrine of unjust enrichment.

**THIRTY-FOURTH AFFIRMATIVE DEFENSE**

**(Ratification)**

259. The Complaint and each claim for relief are barred, in whole or in part, because Plaintiffs ratified the acts at issue and now cannot complain.

**THIRTY-FIFTH AFFIRMATIVE DEFENSE**

**(Abandonment)**

260. The Complaint and each claim for relief are barred, in whole or in part, by the doctrine of abandonment.

**THIRTY-SIXTH AFFIRMATIVE DEFENSE**

**(Good Faith)**

261. The Complaint and each claim for relief are barred, in whole or in part, as any conduct undertaken by or on behalf of TCB regarding the allegations in the Complaint or otherwise, if any, were undertaken in good faith, with value, pursuant to reasonable and lawful conduct.

**THIRTY-SEVENTH AFFIRMATIVE DEFENSE**

**(Value)**

262. The Complaint and each claim for relief are barred, in whole or in part, because TCB, to

the extent it took any transfers (if any), took the alleged transfers (if any) for reasonably equivalent value, in good faith and without knowledge of the avoidability of the alleged transfers (if any) or any of the other actions alleged.

**THIRTY-EIGHTH AFFIRMATIVE DEFENSE**

**(No Knowledge)**

263. The Complaint and each claim for relief are barred, in whole or in part, because TCB did not have any knowledge of such facts as would raise any suspicion and/or put TCB on inquiry notice of the alleged fraudulent nature or intent, if any of the alleged transfers, if any, or the misconduct alleged in the Complaint or otherwise.

**THIRTY-NINTH AFFIRMATIVE DEFENSE**

**(Plaintiffs' Conduct)**

264. The Complaint and each claim for relief are barred, in whole or in part, by Plaintiffs' and each of them, carelessness, recklessness, negligence, intentional and/or willful misconduct in the matters alleged in the Complaint.

**FORTIETH AFFIRMATIVE DEFENSE**

**(Election of Remedies)**

265. The Complaint and each claim for relief are barred, in whole or in part, as a consequence of the doctrine of election of remedies.

**FORTY-FIRST AFFIRMATIVE DEFENSE**

**(Privilege and Justification)**

266. The Complaint and each claim for relief are barred, in whole or in part, by the doctrine of privilege and/or justification.

**FORTY-SECOND AFFIRMATIVE DEFENSE**

**(Not for Benefit of Estate)**

267. The Complaint and each claim for relief are barred, in whole or in part, as any alleged recovery is not for the benefit of the estate.

**FORTY-THIRD AFFIRMATIVE DEFENSE**

**(Conduct Not Unlawful and Not Unfair)**

268. The Complaint and each claim for relief are barred, in whole or in part, as TCB's acts were not and are not unfair, unlawful or in violation of the law.

**FORTY-FOURTH AFFIRMATIVE DEFENSE**

**(In Pari Delicto)**

269. The Complaint and each claim for relief are barred, in whole or in part, by the doctrine of *in pari delicto*.

**FORTY-FIFTH AFFIRMATIVE DEFENSE**

**(Other Defenses)**

270. TCB reserves the right to assert additional defenses in the event discovery and/or investigation reveals a factual and/or legal basis for such additional affirmative defenses and to amend or supplement this Answer.

**PRAYER FOR RELIEF**

WHEREFORE, TCB prays for judgment as follows:

1. That Plaintiffs take nothing by way of the Complaint as against TCB;

2. That any judgment entered in this adversary proceeding recognize, preserve, and protect TCB's Deed of Trust lien interest in the Property and its priority position;

3. That if the Court recharacterizes the lease transactions or quiets title to the Property, any such relief be expressly subject to TCB's Deed of Trust and the priority of TCB's lien;

4. For TCB's costs of suit incurred herein;

5. For such other and further relief as the Court deems just and proper.

DATED: ____________________.

BOUTIN JONES INC.
Attorneys at Law

By: ______________________________
THOMAS G. MOUZES
IAN K. MCGLONE

Attorneys for Defendant-Intervenor Tri Counties Bank

**VERIFICATION**

I, Daniel D. Duarte, state and declare:

I am a Senior Vice President and the Director of the Bank's Special Assets Department for Defendant Tri Counties Bank ("TCB" or "Bank"). I am authorized to make this Verification on behalf of Defendant TCB and I make this Verification for that reason. I have read the foregoing TRI COUNTIES BANK'S VERIFIED ANSWER TO OROHEALTH CORPORATION AND OROVILLE HOSPITAL'S VERIFIED COMPLAINT ("Answer") and know the contents thereof. The foregoing matters stated in the Answer are based upon, in part, my own knowledge and, in part, upon my review of the pertinent records, documents and files in this matter and upon information gathered for me by employees of Bank who have a business duty to accurately record such information, and the same is true to my knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true. I am informed and believe that no one person has personal knowledge of all matters set forth in the Answer. Based upon the above, I verify the Answer.

I declare under penalty of perjury that the foregoing is true and correct and that this Verification was executed on this ____ day of ____________ 2026, at ______________________ ______________________.

______________________________
Daniel D. Duarte

16

THOMAS G. MOUZES (SBN 099446)
IAN K. MCGLONE (SBN 315201)
**BOUTIN JONES INC.**
Attorneys at Law
555 Capitol Mall, Suite 1500
Sacramento, CA 95814
Phone: 916.321.4444
Fax: 916.441.7597
Email: tmouzes@boutinjones.com
imcglone@boutinjones.com

Attorneys for Defendant-Intervenor TRI COUNTIES BANK

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

(SACRAMENTO DIVISION)

| | |
|---|---|
| In re<br><br>OROVILLE HOSPITAL, *et al.*,[1]<br><br>Debtor. | **Case No. 2025-26876**<br><br>Jointly Administered with:<br>**Case No. 2025-26877**<br><br>Chapter 11 |
| ☒ Affects All Debtors<br>☐ Affects Oroville Hospital<br>☐ Affects OroHealth Corporation: A Nonprofit Healthcare System | |
| OROHEALTH CORPORATION: A NONPROFIT HEALTHCARE SYSTEM, chapter 11 Debtor and Debtor in Possession, and OROVILLE HOSPITAL, chapter 11 Debtor and Debtor in Possession,<br><br>Plaintiffs,<br><br>DOVE'S LANDING, LLC, a California limited liability company; ROBERT J. WENTZ, an individual; OROVILLE SPORTS CLUB, LLC, | **Adv. Proc. No. 2026-02092**<br><br>**EXHIBIT TO TRI COUNTIES BANK'S PROPOSED VERIFIED ANSWER TO OROHEALTH CORPORATION AND OROVILLE HOSPITAL'S ADVERSARY COMPLAINT**<br><br>Date: N/A<br>Time: N/A<br>Department: B, Crtrm 32<br>501 I Street, Suite 3-200<br>Sacramento, California 95814 |

[1] The Debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, are: Oroville Hospital (4554) and OroHealth Corporation: A Nonprofit Healthcare System (4776). The mailing address for the debtors is 2767 Olive Highway, Oroville, California, 95966.

| | |
|---|---|
| a California limited liability company; and ROB BONTA, as Attorney General of California, a nominal defendant,<br><br>Defendants. | Judge: Honorable Christopher D. Jaime |

| **EXHIBIT** | **DOCUMENT** | **PAGE** |
|---|---|---|
| 1 | Deed of Trust, recorded on July 5, 2018, in the Official Records of Butte County, Document No. 2018-0022898 | 3-16 |

# EXHIBIT 1

2018-0022898

Recorded | REC FEE 54.00
Official Records |
County of | SB2 TAX 75.00
Butte |
CANDACE J. GRUBBS |
County Clerk-Recorder |
| KL
02:16PM 05-Jul-2018 | Page 1 of 13

RECORDING REQUESTED BY:
MID VALLEY TITLE

RECORDATION REQUESTED BY:
TRI COUNTIES BANK
Chico Commercial
525 Salem Street
Chico, CA 95928

WHEN RECORDED MAIL TO:
Tri Counties Bank
Corporate Headquarters
63 Constitution Drive
Chico, CA 95973

AP#013-170-073

FOR RECORDER'S USE ONLY

tri counties bank

# DEED OF TRUST

**THIS DEED OF TRUST is dated June 14, 2018, among Dove's Landing, LLC, a California limited liability company whose address is 2600 Oro Dam Boulevard, Oroville, CA 95966 ("Trustor"); TRI COUNTIES BANK, whose address is Chico Commercial, 525 Salem Street, Chico, CA 95928 (referred to below sometimes as "Lender" and sometimes as "Beneficiary"); and Mid Valley Title and Escrow Company, whose address is 2295 Feather River Boulevard Suite A, Oroville, CA 95965 (referred to below as "Trustee").**

**CONVEYANCE AND GRANT. For valuable consideration, Trustor irrevocably grants, transfers and assigns to Trustee in trust, with power of sale, for the benefit of Lender as Beneficiary,** all of Trustor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Butte County, State of California:**

**See Exhibit "A", which is attached to this Deed of Trust and made a part of this Deed of Trust as if fully set forth herein.**

**The Real Property or its address is commonly known as 2450 Oro Dam Boulevard East, Oroville, CA 95966. The Assessor's Parcel Number for the Real Property is 013-170-073.**

Trustor presently assigns to Lender (also known as Beneficiary in this Deed of Trust) all of Trustor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. This is an absolute assignment of Rents made in connection with an obligation secured by real property pursuant to California Civil Code Section 2938. In addition, Trustor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS DEED OF TRUST, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF THE TRUSTOR UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST. THIS DEED OF TRUST IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Deed of Trust, Trustor shall pay to Lender all amounts secured by this Deed of Trust as they become due, and shall strictly and in a timely manner perform all of Trustor's obligations under the Note, this Deed of Trust, and the Related Documents.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Trustor agrees that Trustor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Trustor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Trustor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Nuisance, Waste.** Trustor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Trustor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Trustor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Trustor to make arrangements satisfactory

to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Trustor's compliance with the terms and conditions of this Deed of Trust.

**Compliance with Governmental Requirements.** Trustor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Trustor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Trustor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Trustor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Trustor agrees neither to abandon or leave unattended the Property. Trustor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Deed of Trust:

**Payment.** Trustor shall pay when due (and in all events at least ten (10) days prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Trustor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Deed of Trust, except for the lien of taxes and assessments not due and except as otherwise provided in this Deed of Trust.

**Right to Contest.** Trustor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Trustor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Trustor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Trustor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Trustor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Trustor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Trustor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Trustor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Trustor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Deed of Trust.

**Maintenance of Insurance.** Trustor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Trustor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Trustee and Lender being named as additional insureds in such liability insurance policies. Additionally, Trustor shall maintain such other insurance, including but not limited to hazard, business interruption, and boiler insurance, as Lender may reasonably require. Notwithstanding the foregoing, in no event shall Trustor be required to provide hazard insurance in excess of the replacement value of the improvements on the Real Property. Policies shall be written in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Trustor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Trustor or any other person. Should the Real Property be located in an area designated by the Administrator of the Federal Emergency Management Agency as a special flood hazard area, Trustor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Trustor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Trustor fails to do so within fifteen (15) days of the casualty. If in Lender's sole judgment Lender's security interest in the Property has been impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If the

proceeds are to be applied to restoration and repair, Trustor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Trustor from the proceeds for the reasonable cost of repair or restoration if Trustor is not in default under this Deed of Trust. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Deed of Trust, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Trustor as Trustor's interests may appear.

**Trustor's Report on Insurance.** Upon request of Lender, however not more than once a year, Trustor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Trustor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Trustor fails to comply with any provision of this Deed of Trust or any Related Documents, including but not limited to Trustor's failure to discharge or pay when due any amounts Trustor is required to discharge or pay under this Deed of Trust or any Related Documents, Lender on Trustor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Trustor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Deed of Trust:

**Title.** Trustor warrants that: (a) Trustor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Deed of Trust, and (b) Trustor has the full right, power, and authority to execute and deliver this Deed of Trust to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Trustor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Trustor's title or the interest of Trustee or Lender under this Deed of Trust, Trustor shall defend the action at Trustor's expense. Trustor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Trustor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Trustor warrants that the Property and Trustor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Trustor in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Trustor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to eminent domain and inverse condemnation proceedings are a part of this Deed of Trust:

**Proceedings.** If any eminent domain or inverse condemnation proceeding is commenced affecting the Property, Trustor shall promptly notify Lender in writing, and Trustor shall promptly take such steps as may be necessary to pursue or defend the action and obtain the award. Trustor may be the nominal party in any such proceeding, but Lender shall be entitled, at its election, to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Trustor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If any award is made or settlement entered into in any condemnation proceedings affecting all or any part of the Property or by any proceeding or purchase in lieu of condemnation, Lender may at its election, and to the extent permitted by law, require that all or any portion of the award or settlement be applied to the Indebtedness and to the repayment of all reasonable costs, expenses, and attorneys' fees incurred by Trustee or Lender in connection with the condemnation proceedings.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Deed of Trust:

**Current Taxes, Fees and Charges.** Upon request by Lender, Trustor shall execute such documents in addition to this Deed of Trust and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Trustor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Deed of Trust.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Trustor which Trustor is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3) a tax on this type of Deed of Trust chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Trustor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Deed of Trust, this event shall

have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Trustor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Deed of Trust as a security agreement are a part of this Deed of Trust:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Trustor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. Trustor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Trustor shall not remove, sever or detach the Personal Property from the Property. Upon default, Trustor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Trustor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Trustor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Deed of Trust:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Trustor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Trustor's obligations under the Note, this Deed of Trust, and the Related Documents, and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Trustor. Unless prohibited by law or Lender agrees to the contrary in writing, Trustor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Trustor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Trustor and at Trustor's expense. For such purposes, Trustor hereby irrevocably appoints Lender as Trustor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Trustor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Trustor under this Deed of Trust, Lender shall execute and deliver to Trustee a request for full reconveyance and shall execute and deliver to Trustor suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Lender may charge Trustor a reasonable reconveyance fee at the time of reconveyance.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Deed of Trust:

**Payment Default.** Trustor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Trustor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Deed of Trust or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Trustor.

**Compliance Default.** Failure to comply with any other term, obligation, covenant or condition contained in this Deed of Trust, the Note or in any of the Related Documents.

**Default on Other Payments.** Failure of Trustor within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Trustor or on Trustor's behalf under this Deed of Trust or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Deed of Trust or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Trustor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Trustor's existence as a going business or the death of any member, the insolvency of Trustor, the appointment of a receiver for any part of Trustor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Trustor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Trustor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Trustor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Trustor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Trustor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Trustor under the terms of any other agreement between Trustor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Trustor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Trustor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Deed of Trust, at any time thereafter, Trustee or Lender may exercise any one or more of the following rights and remedies:

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Trustor under this Deed of Trust, after Trustor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Foreclosure by Sale.** Upon an Event of Default under this Deed of Trust, Beneficiary may declare the entire Indebtedness secured by this Deed of Trust immediately due and payable by delivery to Trustee of written declaration of default and demand for sale and of written notice of default and of election to cause to be sold the Property, which notice Trustee shall cause to be filed for record. Beneficiary also shall deposit with Trustee this Deed of Trust, the Note, other documents requested by Trustee, and all documents evidencing expenditures secured hereby. After the lapse of such time as may then be required by law following the recordation of the notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Trustor, shall sell the Property at the time and place fixed by it in the notice of sale, either as a whole or in separate parcels, and in such order as it may determine, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale. Trustee may postpone sale of all or any portion of the Property by public announcement at such time and place of sale, and from time to time thereafter may postpone such sale by public announcement at the time fixed by the preceding postponement in accordance with applicable law. Trustee shall deliver to such purchaser its deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustor, Trustee or Beneficiary may purchase at such sale. After deducting all costs, fees and expenses of Trustee and of this Trust, including cost of evidence of title in connection with sale, Trustee shall apply the proceeds of sale to payment of: all sums expended under the terms hereof, not then repaid, with accrued interest at the amount allowed by law in effect at the date hereof; all other sums then secured hereby; and the remainder, if any, to the person or persons legally entitled thereto.

**Judicial Foreclosure.** With respect to all or any part of the Real Property, Lender shall have the right in lieu of foreclosure by power of sale to foreclose by judicial foreclosure in accordance with and to the full extent provided by California law.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code, including without limitation the right to recover any deficiency in the manner and to the full extent provided by California law.

**Collect Rents.** Lender shall have the right, without notice to Trustor to take possession of and manage the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Trustor irrevocably designates Lender as Trustor's attorney-in-fact to endorse instruments received in payment thereof in the name of Trustor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Tenancy at Sufferance.** If Trustor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Trustor, Trustor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Trustee or Lender shall have any other right or remedy provided in this Deed of Trust or the Note or available at law or in equity.

**Notice of Sale.** Lender shall give Trustor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Sale of the Property.** To the extent permitted by applicable law, Trustor hereby waives any and all rights to have the Property marshalled. In exercising its rights and remedies, the Trustee or Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Deed of Trust, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable

on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Trustor also will pay any court costs, in addition to all other sums provided by law.

**Rights of Trustee.** Trustee shall have all of the rights and duties of Lender as set forth in this section.

**POWERS AND OBLIGATIONS OF TRUSTEE.** The following provisions relating to the powers and obligations of Trustee are part of this Deed of Trust:

**Powers of Trustee.** In addition to all powers of Trustee arising as a matter of law, Trustee shall have the power to take the following actions with respect to the Property upon the written request of Lender and Trustor: (a) join in preparing and filing a map or plat of the Real Property, including the dedication of streets or other rights to the public; (b) join in granting any easement or creating any restriction on the Real Property; and (c) join in any subordination or other agreement affecting this Deed of Trust or the interest of Lender under this Deed of Trust.

**Obligations to Notify.** Trustee shall not be obligated to notify any other party of a pending sale under any other trust deed or lien, or of any action or proceeding in which Trustor, Lender, or Trustee shall be a party, unless the action or proceeding is brought by Trustee.

**Trustee.** Trustee shall meet all qualifications required for Trustee under applicable law. In addition to the rights and remedies set forth above, with respect to all or any part of the Property, the Trustee shall have the right to foreclose by notice and sale, and Lender shall have the right to foreclose by judicial foreclosure, in either case in accordance with and to the full extent provided by applicable law.

**Successor Trustee.** Lender, at Lender's option, may from time to time appoint a successor Trustee to any Trustee appointed under this Deed of Trust by an instrument executed and acknowledged by Lender and recorded in the office of the recorder of Butte County, State of California. The instrument shall contain, in addition to all other matters required by state law, the names of the original Lender, Trustee, and Trustor, the book and page where this Deed of Trust is recorded, and the name and address of the successor trustee, and the instrument shall be executed and acknowledged by Lender or its successors in interest. The successor trustee, without conveyance of the Property, shall succeed to all the title, power, and duties conferred upon the Trustee in this Deed of Trust and by applicable law. This procedure for substitution of Trustee shall govern to the exclusion of all other provisions for substitution.

**Acceptance by Trustee.** Trustee accepts this Trust when this Deed of Trust, duly executed and acknowledged, is made a public record as provided by law.

**NOTICES.** Any notice required to be given under this Deed of Trust shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Deed of Trust. Trustor requests that copies of any notices of default and sale be directed to Trustor's address shown near the beginning of this Deed of Trust. All copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust shall be sent to Lender's address, as shown near the beginning of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Trustor agrees to keep Lender informed at all times of Trustor's current address. Unless otherwise provided or required by law, if there is more than one Trustor, any notice given by Lender to any Trustor is deemed to be notice given to all Trustors.

**STATEMENT OF OBLIGATION FEE.** Lender may collect a fee, not to exceed the maximum amount permitted by law, for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**JURY TRIAL WAIVER AND ALTERNATIVE DISPUTE RESOLUTION.**

(1) JURY TRIAL WAIVER. THE UNDERSIGNED ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED UNDER CERTAIN CIRCUMSTANCES. TO THE EXTENT PERMITTED BY LAW, LENDER AND THE UNDERSIGNED, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS, HIS OR HER CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THE MUTUAL BENEFIT OF ALL PARTIES, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OTHER DOCUMENT (INCLUDING THE RELATED DOCUMENTS), INSTRUMENT OR AGREEMENT BETWEEN THE UNDERSIGNED AND LENDER.

(2) CLAIMS SUBJECT TO JUDICIAL REFERENCE; SELECTION OF REFEREE. In the event that the Jury Trial Waiver set forth above is not enforceable, the Parties elect to proceed as follows: All Claims, including any and all questions of law or fact relating thereto, shall, at the written request of any Party, be determined by Reference pursuant to Section 638 et. seq. of the California Code of Civil Procedure, as the same may be amended from time to time.

(3) REFEREE. The Parties, by mutual written agreement, shall select a single neutral referee, who shall be a retired state or federal court judge or justice with at least five (5) years of judicial trial experience in civil matters. In the event that the Parties cannot agree upon a referee within ten (10) days of a written request to do so by any party, the referee shall be appointed by the Presiding Judge, or a judge designated by the Presiding Judge, of a court of competent jurisdiction located in Butte County, California. A request for appointment of a referee may be heard on an ex parte or expedited basis, and the Parties agree that irreparable harm would result if ex parte relief is not granted. The Parties shall equally bear the fees and expenses of the referee unless the referee otherwise provides in the statement of decision.

(4) TIME IS OF THE ESSENCE. The Parties agree that time is of the essence in conducting the Reference proceedings. Accordingly, the referee shall be requested, subject to change in the time periods specified herein for good cause shown, to (a) set the matter for a status and trial-setting conference within fifteen (15) days after the date of selection of the referee, (b) if practicable, try all issues of law of fact within one hundred twenty (120) days after the date of said conference, and (c) report a statement of decision within twenty (20) days after the matter has been submitted for decision.

(5) CONDUCT OF REFERENCE. Except as provided in this Agreement, the Reference shall be conducted pursuant to Applicable State Law. The referee shall determine all issues relating to the applicability, interpretation, legality and enforceability of this Agreement. Except as expressly set forth in this Agreement, the referee shall determine the manner in which the reference proceeding is conducted including the time and place of hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding. All proceedings and hearings conducted before the referee, except for trial, shall be conducted without a court reporter, except that when any party so requests, a court reporter will be used at any hearing conducted before the referee, and the referee will be provided a courtesy copy of the transcript. The Party making such a request shall have the obligation to arrange for and pay the court reporter. Subject to the referee's power to award costs to the prevailing party, the Parties will equally share the cost of the referee and the court reporter at trial. The referee shall be empowered to enter equitable as well as legal relief, enter equitable orders that will be binding on the parties and rule on any motion which would be authorized in a court proceeding, including without limitation motions for summary judgment or summary adjudication. The referee shall issue a decision and, pursuant to Section 644 of the California Code of Civil Procedure, as the same may be amended from time to time. The referee's decision shall be entered by the Court as a judgment or an order in the same manner as if the action had been tried by the Court. The final judgment or order or from any appealable decision or order entered by the referee shall be fully appealable as provided by law. The parties reserve the right to findings of fact, conclusions of laws, a written statement of decision, and the right to move for a new trial or a different judgment, which new trial, if granted, is also to be a Reference proceeding under this provision.
(6) PROVISIONAL REMEDIES, SELF-HELP AND FORECLOSURE. No provision of this Agreement shall limit the right of any Party to (a) exercise self-help remedies including, without limitation, set off, (b) foreclose nonjudicially against or sell any collateral, by power of sale or otherwise or (c) obtain or oppose temporary, provisional or ancillary remedies from a court of competent jurisdiction before, after or during the pendency of the Reference. The exercise of, or opposition to, any such remedy does not waive the right of any Party to Reference pursuant to this Agreement.
(7) LIMITATION ON DAMAGES. In the event that punitive damages are permitted under Applicable State Law, the amount thereof shall not exceed a sum equal to the amount of actual damages as determined by the referee.
(8) SEVERABILITY. In the event that any provision of this Agreement is found to be illegal or unenforceable, the remainder of this Agreement shall remain in full force and effect. In the event that the enabling legislation which provides for the appointment of a referee is repealed and no successor statute is enacted, any dispute between the Parties that otherwise would be determined by Reference shall be resolved and determined by binding arbitration in accordance with the California Arbitration Act, Sections 1280 through 1294.2 of the California Code of Civil Procedure, as the same may be amended from time to time. The provisions of this Agreement with respect to a Reference proceeding shall apply to any such arbitrator, who shall have the same qualifications as the referee and who shall be selected in the same manner as the referee stated herein.
(9) MISCELLANEOUS. In the event that multiple Claims are asserted, some of which are found not subject to this Agreement, the Parties agree to stay the proceedings of the Claims not subject to this Agreement until all other Claims are resolved in accordance with this Agreement. In the event that Claims are asserted against multiple parties, some of whom are not subject to this Agreement, the Parties agree to sever the Claims subject to this Agreement and resolve them in accordance with this Agreement. "Applicable State Law" shall mean the law of the State of California; provided, however, that if any Party seeks to (i) exercise self-help remedies, including without limitation, set off, (ii) foreclose against or sell any collateral, by power of sale or otherwise or (iii) obtain or oppose provisional or ancillary remedies from a court of competent jurisdiction before, after or during the pendency of the Reference, the law of the state where such collateral is located shall govern the exercise of or opposition to such rights and remedies. "Claim" shall mean any claim, cause of action, action, dispute or controversy between or among the Parties, whether sounding in contract, tort or otherwise, which arises out of or relates to: (i) any of the Related Documents, (ii) any negotiations or communications relating to any of the Related Documents, whether or not incorporated into the Related Documents or any indebtedness evidenced thereby; or (iii) any alleged agreements, promises, representations or transactions in connection therewith. "Parties" shall mean Borrower, Guarantor and Lender (each, a "Party").

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Deed of Trust:

**Amendments.** This Deed of Trust, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust. No alteration of or amendment to this Deed of Trust shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Trustor's residence, Trustor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Trustor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Governing Law. This Deed of Trust will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Deed of Trust has been accepted by Lender in the State of California.**

**Choice of Venue.** If there is a lawsuit, Trustor agrees upon Lender's request to submit to the jurisdiction of the courts of Butte County, State of California.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Lender, nor any course of dealing between Lender and Trustor, shall constitute a waiver of any of Lender's rights or of any of Trustor's obligations as to any future transactions. Whenever the consent of Lender is required under this Deed of Trust, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Deed of Trust to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Trustor's interest, this Deed of Trust shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Trustor, Lender, without notice to Trustor, may deal with Trustor's successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Trustor from the obligations of this Deed of Trust or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Deed of Trust. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Beneficiary.** The word "Beneficiary" means TRI COUNTIES BANK, and its successors and assigns.

**Borrower.** The word "Borrower" means Dove's Landing, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Deed of Trust.** The words "Deed of Trust" mean this Deed of Trust among Trustor, Lender, and Trustee, and includes without limitation all assignment and security interest provisions relating to the Personal Property and Rents.

**Default.** The word "Default" means the Default set forth in this Deed of Trust in the section titled "Default".

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Deed of Trust in the events of default section of this Deed of Trust.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Trustor's obligations or expenses incurred by Trustee or Lender to enforce Trustor's obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

**Lender.** The word "Lender" means TRI COUNTIES BANK, its successors and assigns.

**Note.** The word "Note" means the promissory note dated June 25, 2018, **in the original principal amount of $4,500,000.00** from Trustor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Trustor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Deed of Trust.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness; except that the words do not mean any guaranty or environmental agreement, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future leases, rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property together with the cash proceeds of the Rents.

**Trustee.** The word "Trustee" means Mid Valley Title and Escrow Company, whose address is 2295 Feather River Boulevard Suite A, Oroville, CA 95965 and any substitute or successor trustees.

**Trustor.** The word "Trustor" means Dove's Landing, LLC.

TRUSTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST, AND TRUSTOR AGREES TO ITS TERMS.

TRUSTOR:

~~DOVE'S LANDING, LLC~~

By: ______________________
Robert Wentz, Member of Dove's Landing, LLC

By: ______________________
Phyllis Jean Ching, Member of Dove's Landing, LLC

By: ______________________
Venu Kondle, Member of Dove's Landing, LLC

## CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

STATE OF California )
) SS
COUNTY OF Sutter )

On June 28, 20 18 before me, J Alarcón Notary Public,
(here insert name and title of the officer)

personally appeared ~~Robert Wantz; Phyllis Jean Ching; and~~ Venu Kondle, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature ______________________

J. ALARCON
COMM. # 2179799
NOTARY PUBLIC CALIFORNIA
COUNTY OF SUTTER
Comm. Expires FEB 11, 2021

(Seal)

# CALIFORNIA ALL- PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California }

County of Butte }

On June 29, 2018 before me, Talia Oropeza, Notary Public, (Here insert name and title of the officer)

personally appeared Robert Wentz,

who proved to me on the basis of satisfactory evidence to be the person~~(s)~~ whose name~~(s)~~ is/~~are~~ subscribed to the within instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~ authorized capacity~~(ies)~~, and that by his/~~her/their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon behalf of which the person~~(s)~~ acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

TALIA OROPEZA
COMM. # 2209582
NOTARY PUBLIC CALIFORNIA
COUNTY OF BUTTE
Comm. Expires AUG. 11, 2021

Talia Oropeza
Notary Public Signature (Notary Public Seal)

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Deed of Trust
(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages _____ Document Date_________

CAPACITY CLAIMED BY THE SIGNER

- ☐ Individual (s)
- ☐ Corporate Officer

  _______________ (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _______________

2015 Version www.NotaryClasses.com 800-873-9865

### INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. ~~he~~/she/~~they,~~ is /~~are~~ ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

# CALIFORNIA ALL- PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California }

County of Butte }

On June 29, 2018 before me, Talia Oropeza, Notary Public, (Here insert name and title of the officer)

personally appeared Phyllis Jean Ching, who proved to me on the basis of satisfactory evidence ~~to~~ be the person~~(s)~~ whose name~~(s)~~ is/~~are~~ subscribed to the within instrument and acknowledged to me that ~~he~~/she/~~they~~ executed the same in ~~his~~/her/~~their~~ authorized capacity~~(ies)~~, and that by ~~his~~/her/~~their~~ signature~~(s)~~ on the instrument the person~~(s)~~, or the entity upon behalf of which the person~~(s)~~ acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Talia Oropeza

Notary Public Signature (Notary Public Seal)

TALIA OROPEZA
COMM. # 2209582
NOTARY PUBLIC CALIFORNIA
COUNTY OF BUTTE
Comm. Expires AUG. 11, 2021

## ADDITIONAL OPTIONAL INFORMATION

DESCRIPTION OF THE ATTACHED DOCUMENT

Deed of Trust
(Title or description of attached document)

(Title or description of attached document continued)

Number of Pages ____ Document Date ________

CAPACITY CLAIMED BY THE SIGNER

- ☐ Individual (s)
- ☐ Corporate Officer

  ______ (Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other ________

### INSTRUCTIONS FOR COMPLETING THIS FORM

*This form complies with current California statutes regarding notary wording and, if needed, should be completed and attached to the document. Acknowledgments from other states may be completed for documents being sent to that state so long as the wording does not require the California notary to violate California notary law.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. ~~he~~/she/~~they~~, is /~~are~~ ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document with a staple.

2015 Version www.NotaryClasses.com 800-873-9865

(DO NOT RECORD)

## REQUEST FOR FULL RECONVEYANCE

(To be used only when obligations have been paid in full)

To: ______________________________, Trustee

The undersigned is the legal owner and holder of all Indebtedness secured by this Deed of Trust. All sums secured by this Deed of Trust have been fully paid and satisfied. You are hereby directed, upon payment to you of any sums owing to you under the terms of this Deed of Trust or pursuant to any applicable statute, to cancel the Note secured by this Deed of Trust (which is delivered to you together with this Deed of Trust), and to reconvey, without warranty, to the parties designated by the terms of this Deed of Trust, the estate now held by you under this Deed of Trust. Please mail the reconveyance and Related Documents to:

____________________________________________________________.

Date: ______________________________

Beneficiary: ______________________________

By: ______________________________

Its: ______________________________

LaserPro, Ver. 18.1.10.007 Copr. Finastra USA Corporation 1997, 2018. All Rights Reserved. - CA C:\LASERPRO\DH\CFI\LPL\G01.FC TR-88424 PR-92

## LEGAL DESCRIPTION

Real property in the City of Oroville, County of Butte, State of California, described as follows:

PARCEL 1, AS SHOWN ON THAT CERTAIN PARCEL MAP, FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF BUTTE, STATE OF CALIFORNIA, ON OCTOBER 25, 2012, IN BOOK 183 OF MAPS, AT PAGE(S) 29, 30 AND 31.

EXCEPTING THEREFROM ONE HALF OF ALL MINERAL, OIL OR OTHER HYDROCARBON SUBSTANCES. SAID EXCEPTION AFFECTS ALL THAT PORTION OF THE HEREIN DESCRIBED PROPERTY LYING WITHIN THE BOUNDARIES OF THAT CERTAIN PARCEL OF LAND DESCRIBED IN DEED FROM ANTHONY C. MORICI, AN UNMARRIED MAN TO SAFEWAY STORES, INC., A MARYLAND CORPORATION, DATED SEPTEMBER 27, 1971 AND RECORDED FEBRUARY 3, 1972, IN BOOK 1733, PAGE 296, OFFICIAL RECORDS.

APN: 013-170-073