38

KEITH C. OWENS (SBN 184841)
kowens@foxrothschild.com
NICHOLAS A. KOFFROTH (SBN 287854)
nkoffroth@foxrothschild.com
CHRISTOPHER R. NELSON (SBN 242859)
crnelson@foxrothschild.com
**FOX ROTHSCHILD LLP**
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone: (310) 598-4150
Facsimile: (310) 556-9828

*Counsel to Oroville Hospital, et al.,*
*Plaintiffs, Debtors, and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| In re:<br><br>OROVILLE HOSPITAL, *et al.*,<br><br>Debtors and Debtors in Possession. | Lead Case No. 25- 26876<br>(Jointly Administered With: Case No. 25-26877)<br><br>**Adv. Proc. No. 26-02092**<br><br>**DCN: CRN-1** |
| ☒ Affects All Debtors<br><br>☐ Affects Oroville Hospital<br>☐ Affects OroHealth Corporation: A Nonprofit Healthcare System<br><br>Debtors and Debtors in Possession. | Chapter 11<br><br>Hon. Christopher D. Jaime<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION** |
| OROHEALTH CORPORATION: A NONPROFIT HEALTHCARE SYSTEM, and OROVILLE HOSPITAL,<br><br>Plaintiffs,<br>v.<br><br>DOVE'S LANDING, LLC; ROBERT J. WENTZ; OROVILLE SPORTS CLUB, LLC; and ROB BONTA, as Attorney General of California (nominal Defendant), | **<u>Hearing Information</u>**<br><u>Hearing Date</u>: October 20, 2026,<br><u>Hearing Time</u>: 11:00 a.m. PST<br><u>Location</u>: Courtroom 32<br>501 I Street<br>Sacramento, California 95814 |

Defendants.

# TABLE OF CONTENTS


I. INTRODUCTION .......... 8

II. STATEMENT OF FACTS .......... 11

A. The Parties and the Bankruptcy .......... 11

B. Wentz's Dominion and Self-Dealing .......... 11

C. The Leases and the MOU .......... 12

D. The Arbitration Clauses .......... 13

III. LEGAL STANDARD .......... 14

A. The Federal Arbitration Act Applies .......... 14

B. Enforceability of the Arbitration Clause .......... 15

C. Bankruptcy Courts have Discretion to Deny Otherwise Enforceable Arbitration Clauses .......... 15

IV. DEFENDANTS' MOTION TO COMPEL ARBTRATION SHOULD BE DENIED..... 16

A. The Arbitration Clauses Are Unenforceable Under Federal Law and California Law .......... 16

a. The Arbitration Clauses Are Unconscionable .......... 16

i. The Arbitration Clauses Are Procedurally Unconscionable .......... 16

ii. The Arbitration Clauses Are Substantively Unconscionable .......... 18

b. The Arbitration Clauses, as Well as the Leases Themselves, Are *Prima Facie* Self-Dealing Transactions in Violation of California Corporations Code § 5233 .......... 19

c. The Arbitration Clauses Are the Products of Undue Influence .......... 21

B. The Arbitration Clause Does Not Cover the Claims Asserted .......... 22

C. Defendant Wentz and Sports Club Are Not Signatories to the Leases and Therefore Cannot Invoke the Arbitration Clause .......... 23

D. The Hospital is Not a Party to the Leases, and Equitable Estoppel Does Not Require It to Be Bound By the Arbitration Clauses Because It Does Not Seek to Enforce Any Rights a Tenant Would Have Under the Leases.......................... 24

E. The Debtors, Exercising the Powers of a Trustee, Are Not Bound by the Arbitration Agreements......................................................................................... 26

E. The Claims Asserted Are Core Bankruptcy Matters, and Compelling Arbitration Would Conflict with the Fundamental Purposes of Bankruptcy Law ............................................................................................................................ 28

1. The Recharacterization, Quiet Title, and Equitable Mortgage Claims (Claims 1-3) Are Core Under § 157(b)(2)(A), (E), and (K). .................... 29

2. The Breach of Fiduciary Duty Claims (Claims 4-5) Are Core Proceedings. .......................................................................................... 29

3. The Fraudulent Transfer Claims (Claims 6-11) Are Core Proceedings Under § 157(b)(2)(H).............................. **Error! Bookmark not defined.**

4. The Automatic Stay Claim (Claim 12) and the Equitable Remedies Claims (Claims 13 and 14) Are Core Proceedings Under § 157(b)(2)(A), (G), and (O)........................................................................................... 32

F. Compelling Arbitration Would Conflict with the Fundamental Purposes of the Bankruptcy Code.............................................................................................. 33

V. DEFENDANTS REQUEST TO STAY THE ADVERSARY PROCEEDING AS TO CLAIM 12 SHOULD BE DENIED........................................................................... 35

VI. ANY APPEAL OF THE OUTCOME OF THE MOTION SHOULD BE CERTIFIED DIRECTLY TO THE NINTH CIRCUIT TO MATERIALLY ADVANCE THE CASE AND AVOID ANY ATTEMPTS BY DEFENDANTS TO DELAY THIS ACTION….36

VI. CONCLUSION…………………………………………………………………..38

## TABLE OF AUTHORITIES

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995) .......... 14

*Armendariz v. Foundation Health Psychcare Services, Inc.,* 24 Cal.4th 83, 117-18 (2000) .......... 18

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) .......... 15

*Bernsley v. Barclay Bank Delaware*, 657 F.Supp.3d 1327, 1336 (C.D. Cal. 2023) .......... 14, 15, 16

*Boucher v. Alliance Title Co., Inc.*, 127 Cal.App.4th 262 (2005) .......... 24, 26

*Carlson v. Home Team Pest Defense, Inc.*, 239 Cal.App.4th 619, 631 (2015) .......... 17

*Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) .......... 36

*Cox v. Ocean View Hotel Corp.,* 533 F.3d 1114, 1119 (9th Cir. 2008) .......... 15, 22

*DMS Services, LLC v. Superior Court*, 205 Cal.App.4th 1346, 1352 (2012) .......... 24

*Dream Theater, Inc. v. Dream Theater,* 124 Cal.App.4th 547, 553 (2004) .......... 14

*Elieff v. Groves*, WL 11601213 at *4 (C.D.Cal. 2010) .......... 16

*Espejo v. S. Cal. Permanente Med. Grp.*, 246 Cal. App. 4th 1047, 1057 (2016) .......... 24

*Ford Motor Warranty Cases*, 17 Cal.5th 1122, 1137 (2025) .......... 25

*Goldman v. KPMG, LLP*, 173 Cal.App.4th 209, 219 (2009) .......... 23, 25, 26

*In re EPD Inv. Co., LLC*, 821 F.3d 1146 (9th Cir. 2016) .......... 15, 32, 33

*In re Harada*, 2026 WL 1429743 at *2 (9th Cir. 2026) .......... 33, 34

*In re Orchid Child Productions, LLC* (Bankr. C.D. Cal., Apr. 22, 2024) 2024 WL 1740741 .......... 15, 22

*In re Thorpe Insulation Co.,* 671 F.3d 1011, 1020 (9th Cir. 2012) .......... 15, 33, 34, 35

*Jenkins v. Dermatology Management, LLC*, 107 Cal.App.5th 633, 643 (2024) .......... 18

*Johnson v. International Business Machines Corp.*, 891 F.Supp. 522, 530 (N.D.Cal. 1995) .......... 21

*JSM Tuscany,* 193 Cal.App.4th at p. 1239 .......... 25

*JSM Tuscany, LLC v. Superior Court,* 193 Cal.App.4th 1222, 1239 (2011) .......... 23

*Kramer v. Toyota Motor Corp.,* 705 F.3d 1122 (9th Cir. 2013) .......... 15

*Lewis v. Regions Bank*, 832 F.Supp.3d 1063, 1068 (E.D.Cal. 2026) .......... 24

*Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 822-23 (2010) .......... 17

*Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) ........... 22
*Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006)........................................ 16, 19
*O'Neil v. Spillane*, 45 Cal.App.3d 147, 153-54 (1975) ............................................................ 21
*Olson v. FCA US, LLC*, 176 F.4th 612, 621-22 (9th Cir. 2026) ............................................... 23, 24
*OTO, L.L.C. v. Kho*, 8 Cal.5th 111, 125 (2019)........................................................................ 16, 18
*Szetela v. Discover Bank,* 97 Cal.App.4th 1094, 1100 (2002)...................................................... 17
*Thomas v. Westlake,* 204 Cal.App.4th 605, 614-615 (2012) ......................................................... 23
*Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1029, fn 6 (9th Cir. 2016)........................................... 16
*Tracer Research Corp. v. National Environmental Services Co.*, 42 F.3d 1292 (9th Cir. 1994)...... 22

**Statutes**

9 U.S.C. § 16(a)(1)......................................................................................................... 36
9 U.S.C. § 3.................................................................................................................. 36
11 U.S.C. § 105(a) ...................................................................................................... 32, 35
11 U.S.C. § 362(a)(3).................................................................................................. 32, 35
11 U.S.C. § 544.............................................................................................................. 26
11 U.S.C. § 544(a)(1)...................................................................................................... 26
11 U.S.C. § 544(b) ......................................................................................................... 26
28 U.S.C. § 157(b)(2) ..................................................................................................... 32
28 U.S.C. § 157(b)(2) (H).................................................................................................. 32
28 U.S.C. § 157(b)(2)(A)................................................................................................... 32
28 U.S.C. § 157(b)(2)(B) .................................................................................................. 32
28 U.S.C. § 157(b)(2)(G)................................................................................................... 32
28 U.S.C. § 157(b)(2)(O)................................................................................................... 32
28 U.S.C. § 158(d)(2)(A)................................................................................................... 37
28 U.S.C. § 158(d)(2)(B) .................................................................................................. 37
Cal. Civ. Code § 1575........................................................................................................ 21
Cal. Civ. Code § 3439.04.................................................................................................... 23

Cal. Corp. Code § 5233(b) ... 19
Cal. Corp. Code § 5233(d)(2) ... 20
Cal. Corp. Code § 5233(d)(2)(D)(i) ... 21
Cal. Corp. Code § 5233(h) ... 21
California Corp. Code § 5233 ... 19, 23
California Corp. Code § 5233(a) ... 9, 19
California Corp. Code § 5233(d)(2)(B) ... 9
California Corp. Code § 5233(d)(2)(D) ... 9

## I. INTRODUCTION

Defendant Robert Wentz ("Wentz") was entrusted with the leadership of a nonprofit healthcare system and hospital that together serve as the healthcare safety net for one of the most medically underserved regions in California. He repaid that trust by looting them. As Chief Executive Officer ("CEO") and trustee of both OroHealth Corporation ("OroHealth") and Oroville Hospital (the "Hospital") (collectively, "Plaintiffs" or "Debtors"), Wentz formed his own company, Defendant Dove's Landing, LLC ("Dove's Landing") and engineered self-dealing Leases (as discussed in the Motion and Complaint, the "Initial Lease" and the "Renewal Lease", collectively the "Leases") of the real property commonly known as 2450 Oro Dam Boulevard, Oroville, California (the "Property") that drained millions of dollars from the nonprofit entities he was duty-bound to protect.

On August 4, 2026, Plaintiffs commenced this adversary proceeding against Defendant Robert J. Wentz ("Wentz"), Dove's Landing, LLC ("Dove's Landing"), and Oroville Sports Club, LLC ("Sports Club") (collectively "Defendants"). While many of the allegations in Plaintiffs' Verified Complaint will undoubtedly be disputed by Defendants, for purposes of the Motion to Compel Arbitration (the "Motion") and this Opposition, several facts cannot be disputed:

1. Wentz served simultaneously as CEO and trustee of both Plaintiffs, and was also a 60% owner of Dove's Landing from 2011 to the present;
2. In May of 2011, Wentz would cause OroHealth to enter into a written Memorandum of Understanding (the "MOU") pursuant to which OroHealth agreed that it would lease the Property from an entity to-be-formed-later, and in return, the MOU promised that if the Hospital remained in possession of the Property for twenty years, the Hospital would receive the interest of the entity-to-be-formed-later;
3. Wentz caused OroHealth to enter into the Leases with Dove's Landing, which were transactions to which OroHealth was a party and in which Wentz had a material financial interest as a majority owner of Dove's Landing as described in California Corporations Code § 5233(a);
4. Dove's Landing delivered possession of the Property to OroHealth in 2013, in derelict condition as a long-abandoned department store, and the Hospital spent over $7 million

to improve it, ultimately having to wait until August of 2015 before the Property could be used to generate revenue;

5. Under the Initial Lease, OroHealth was required to pay the full monthly rent from 2013-2015 without any discount for the condition of the Property, charging rent as though the building were fully improved, which was not fair and reasonable to OroHealth under California Corporations Code § 5233(d)(2)(B);
6. At Wentz's urging, OroHealth entered into the Renewal Lease in 2018, which was five years earlier than the expiration of the term of the Initial Lease;
7. The Renewal Lease increased OroHealth's rent, which was not fair and reasonable to OroHealth under California Corporations Code § 5233(d)(2)(B), and the rent increase makes it self-evident that OroHealth could easily have obtained a more advantageous arrangement with reasonable effort under the circumstances as required under California Corporations Code § 5233(d)(2)(D) because OroHealth could have simply continued performing under the Initial Lease;
8. The Renewal Lease appears to be re-writing or ignoring the MOU by only giving OroHealth a ten-year term with two five-year options to renew, instead of a ten-year term with one five-year option to renew and then granting the promised interest in the Property to the Hospital, which was not fair and reasonable to Plaintiffs and OroHealth would have had a more advantageous arrangement with reasonable effort under the circumstances as required under California Corporations Code § 5233(d)(2)(B) by simply abiding by the terms of the MOU; and
9. The arbitration clauses in both Leases give Dove's Landing unilateral control to force disputes into an arbitral forum, and such unilateral control is not fair and reasonable to OroHealth under California Corporations Code § 5233(d)(2)(B).

All of these facts are self-evident. Wentz is clearly an "interested director" under California Corporations Code § 5233(a), because he appears on both sides of the Leases. His perfunctory efforts to give the Leases the appearance of fairness are facially defective. The disparities between the rental amounts in the Initial Lease and the Renewal Lease are simple arithmetic, and OroHealth's being

forced to pay well above fair market rent for two-and-a-half years of the Initial Lease was patently unfair. The fact that OroHealth was permitted to sign the Renewal Lease—whose terms only work to OroHealth's detriment—at all, speaks to the blatant and incontrovertible self-interest of Wentz.

Having been caught, Wentz and other Defendants now seek to use their own self-dealing transactions to escape this Court's jurisdiction. In their Motion, Defendants have moved to compel arbitration under the arbitration clauses found in the same Lease documents (the "Arbitration Clauses") which form the basis of Defendants' readily verifiable self-dealing. Specifically, the Arbitration Clauses are purely unilateral, meaning only the Lessor (i.e., Dove's Landing and, by extension, Wentz) may invoke them, while OroHealth, as Lessee, has no reciprocal right. *See* Initial Lease § 41 (Compl. Ex. 2); Renewal Lease § 39 (Compl. Ex. 5).[1] The Arbitration Clauses are also narrow in scope, reaching only disputes "arising under the provisions of this Lease Agreement." Leases §§ 41/39. Importantly, the claims in this adversary proceeding go far beyond any lease dispute. They include avoidance actions under Sections 544, 548, and 549 of the Bankruptcy Code; claims for violation of the automatic stay under Section 362; and claims for breach of fiduciary duty, fraudulent conveyance, recharacterization, and constructive trust, none of which "arise" under the provisions of the Lease Transaction documents. Indeed, all of the asserted claims are overwhelmingly core bankruptcy proceedings that this Court has a duty to resolve. Compl. ¶¶ 88–221. Moreover, the Hospital is not a signatory to either of the Leases, and it seeks indivisible property rights.

Under the Ninth Circuit's framework in *Thorpe Insulation Co. v. Insurance Co. of North America* ("*In re Thorpe Insulation*"), arbitration must yield where it would "inherently conflict" with the purposes of the Bankruptcy Code. Compelling arbitration here would split core proceedings and causes of action that must be adjudicated together, cause delays in the administration of the bankruptcy estate and plan confirmation, prejudice creditors, and strip this Court of jurisdiction over claims Congress entrusted to it. The Motion should be denied in its entirety.

---

[1] Collective references to provisions in the Leases as identified in the Complaint will hereinafter be cited as "Leases" followed by the sections separated by "__/__", with the reference to the provision in the Initial Lease appearing before the "/" and the reference to the Renewal Lease appearing after the "/".

## II. STATEMENT OF FACTS

### A. The Parties and the Bankruptcy

Plaintiffs are nonprofit healthcare entities that operate the largest hospital in Butte County, California. On December 8, 2025, Plaintiffs filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. (Lead Case No. 25-26876, E.D. Cal.) On August 4, 2026, Plaintiffs commenced this adversary proceeding asserting fourteen counts against Defendants Wentz, Dove's Landing, and Sports Club (collectively "Defendants").

The Verified Complaint seeks to recharacterize the two self-dealing Leases between Plaintiff OroHealth and Defendant Dove's Landing, as disguised financing, resulting in a single sale-and-finance agreement granting the Hospital an interest and Dove's Landing a deed of trust encumbering the Property; recover millions of dollars in fraudulent transfers; and remedy Wentz's insidious breaches of fiduciary duty, all for the benefit of the estate and its creditors. Compl. ¶¶ 1–10.

The Verified Complaint asserts fourteen causes of action for recharacterization, quiet title, equitable mortgage, breach of fiduciary duty, fraudulent conveyance, avoidance of fraudulent and post-petition transfers, violation of the automatic stay, accounting, and constructive trust. Compl. ¶¶ 88–221.

### B. Wentz's Domination and Self-Dealing

Wentz served as the CEO and a trustee of both OroHealth and Hospital. Compl. ¶¶ 16, 25. In those dual roles, Wentz "completely dominated and controlled the boards of trustees" of both entities and "unilaterally determined all financial operations of Plaintiffs." Compl. ¶ 26. No significant decision was made without his approval, and board members understood that dissent to Wentz's directives would result in "negative personal and professional consequences." Compl. ¶ 138.

In January 2011, the same year that Wentz formed Dove's Landing, he approached the boards of Plaintiffs about acquiring the Property to be used for healthcare and wellness purposes. Compl. ¶ 34. Wentz disguised his true intentions, instructing the boards that the Sport's Club participation would be required; that the Hospital needed to expand and the Property would be the best location to do so; that acquisition by the Hospital would be controversial and a conflict of interest; and that OroHealth did not have the funds or credit to make a purchase. Compl. ¶¶ 35-42. Wentz used these

excuses as the basis for not presenting the purchase of the Property to the Plaintiffs. Instead of permitting the Plaintiffs he served to acquire the Property for their own benefit, Wentz arranged for Dove's Landing to purchase it and then lease it back to OroHealth at terms highly favorable to himself. Compl. ¶¶ 43-79. The trustees vote approving the transaction was merely a "rubber stamp" procured by Wentz's domination of the boards. Compl. ¶ 138.

**C. The Leases and the MOU.**

Much of the context of the Leases is informed by the MOU. Prior to entering the Leases, OroHealth entered into the MOU, dated May 31, 2011, with the Sports Club, another Wentz-controlled entity. Compl. ¶¶ 43, 49. The MOU contemplated that, with the Sports Club acting as the promoter for an entity to-be-formed-later, that to-be-formed entity would acquire the Property and would "gift" its 51% interest in the Property to Hospital after 20 years, but only if the Hospital remained a constant occupant of the space – and still leaving the Hospital to either lease or pay off the remaining 49% interest of the other owner. Compl. ¶¶ 4, 43, 50, Ex. 1.

Dove's Landing acquired the Property in December 2012 for approximately $5.7 million. Compl. ¶ 66. OroHealth entered into the Initial Lease with Dove's Landing on or about December 15, 2011, with the Initial Lease term not beginning until Dove's Landing delivered OroHealth possession of the Property in Janaury of 2013. Compl. ¶¶ 57-61, 68, Ex. 2. OroHealth and Dove's Landing subsequently entered into the Renewal Lease effective January 1, 2018. Compl. ¶¶ 57, 73, Ex. 5.

Under the terms of the Leases, Plaintiffs bore the full burden of improving, maintaining, and operating the Property. *See* Compl. Ex. 2 and Ex. 5. The base rental amount under the Initial Lease was $1.10 per square foot. Compl. Ex. 1. When OroHealth took possession of the Property in January of 2013, the Property was a derelict former Montgomery Ward department store in an undesirable location. Compl. ¶¶ 34, 69. OroHealth spent approximately $7 million in tenant improvements to convert the former retail space into a functional healthcare facility, and paid all real property taxes, insurance premiums, maintenance expenses, and common area maintenance charges ("CAMs"). Compl. ¶¶ 59, 70, 73, 96. OroHealth did not finish the improvements, and was unable to use the Property as a healthcare facility, until August of 2015. Compl. ¶¶ 69-71. Nevertheless, OroHealth

was paying a monthly rental amount commensurate with a completed, updated, and state-of-the-art hospital facility in a desirable area for the entire period from January of 2013 to August of 2015. Compl. ¶ 69. In substance, OroHealth assumed every economic burden of ownership while Dove's Landing and Wentz captured the upside.

OroHealth, at Wentz' urging, entered into the Renewal Lease on January 1, 2018, five years before the expiration of the Initial Lease. Compl. ¶ 73, Ex. 5. Rent commenced at $1.19 per square foot, per month, with annual increases based on the Consumer's Price Index. *Id.* The base rent under the Renewal Lease was higher than the base rental amount under the Initial Lease. Additionally, the Renewal Lease enumerated that it would run for a ten-year term, with OroHealth having two five-year options to renew. Compl. Ex. 5. This undercuts the terms of the MOU, pursuant to which the Hospital was to receive an interest in the Property after 20 years. Compl. Ex. 1. Instead of granting a ten-year term with one five-year renewal option, the Renewal Lease apparently had added five years to OroHealth's leasing obligations before the Hospital was to be given the Property. The manner in which the Renewal Lease served to purely benefit Wentz and Dove's Landing, while only acting to the detriment of OroHealth, is strong evidence that Wentz abused his positions of leadership and trust within Plaintiffs to ensure that OroHealth entered into the Renewal Lease.

In effect, this arrangement was a lucrative financial benefit for Defendants. They captured ownership value twice, first through inflated rent over the life of the Leases, and again through a requirement that OroHealth continue to lease or purchase the remaining half interest in a property that Plaintiffs had improved at their own expense. Compl. ¶ 4, 40.

**D. The Arbitration Clauses**

Sections 41 and 39 of the Initial Lease and Renewal Lease, respectively, each contain an identical arbitration clause that provides in relevant part: "In addition to those provisions specifically subject to arbitration, any question, dispute or controversy arising under the provisions of this Lease Agreement, at the option of Lessor, shall be determined by arbitration." Compl. Ex. 2, 5.

Special focus should be on two notable aspects of the Arbitration Clauses. First, the Arbitration Clauses are purely unilateral. That is, only the Lessor, Dove's Landing (the entity Wentz created and controlled) may invoke arbitration. Whereas OroHealth, as Lessee, has no reciprocal right

to compel arbitration of any dispute. Compl. Ex. 2, 5. This asymmetry is a product of the same unequal bargaining dynamic that pervaded Wentz's relationship with the Plaintiffs. Second, the clauses are limited in scope to disputes "arising under the provisions of this Lease Agreement". Meaning, the Arbitration Clauses do not purport to reach claims sounding in fraud, breach of fiduciary duty, or federal bankruptcy law. Leases §§ 41/39.

Despite these clear limitations, on September 4, 2026, Defendants' filed the instant Motion, asking this Court to send the claims asserted in the Complaint to an arbitration, notwithstanding the fact that, for the reasons stated below, arbitration is improper.

## III. LEGAL STANDARD

### A. The Federal Arbitration Act Applies

Defendants contend that the California Arbitration Act ("CAA") governs the arbitration clause because the underlying lease is an intrastate real property transaction. This is incorrect. The Federal Arbitration Act ("FAA") applies. "The FAA applies to any contract affecting interstate commerce." *Bernsley v. Barclay Bank Delaware*, 657 F.Supp.3d 1327, 1336 (C.D. Cal. 2023) "The 'interstate commerce' provision has been interpreted broadly, embracing any agreement that in its operation directly or indirectly affects commerce between states in any fashion." *Id*. A contract need not itself be an interstate transaction; it is enough that the transaction, in the aggregate, bears on interstate commerce. *See Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995).

The nexus to interstate commerce here is overwhelming. Oroville Hospital is a healthcare provider that receives federal Medicare reimbursement, subjecting it to the broader framework of federal healthcare regulation. The Hospital participates in federal healthcare programs, purchases medical equipment and supplies from out-of-state vendors, and serves patients covered by interstate insurance carriers. The lease at issue involves real property intended to be used for hospital operations that are inextricably linked to interstate commerce. Under the expansive and broad standard articulated in *Bernsley*, the FAA governs and the analysis of why the Court should deny Defendants Motion to Compel Arbitration will be conducted under the FAA. Even if the CAA controlled, California courts often look to federal law when deciding arbitration issues under state law anyway. *Dream Theater, Inc. v. Dream Theater,* 124 Cal.App.4th 547, 553 (2004).

**B. Enforceability of the Arbitration Clause**

In the Ninth Circuit, determining whether to compel arbitration in the bankruptcy context involves a careful balancing of the FAA's strong policy favoring arbitration against the unique purposes and policies of the Bankruptcy Code. *See In re EPD Inv. Co., LLC*, 821 F.3d 1146 (9th Cir. 2016). Under the FAA, a written agreement to arbitrate disputes arising out of a transaction in interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The Court applies a two prong test to determining whether to compel arbitration: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Cox v. Ocean View Hotel Corp.,* 533 F.3d 1114, 1119 (9th Cir. 2008); *In re Orchid Child Productions, LLC* (Bankr. C.D. Cal., Apr. 22, 2024) 2024 WL 1740741, at *23. Only when both conditions are met may a court compel arbitration. *Id.* "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Meaning, the arbitration clause can be invalidated by California contract defenses such as fraud, duress, or unconscionability. *Bernsley*, 657 F.Supp.3d at 1333.

**C. Bankruptcy Courts have Discretion to Deny Otherwise Enforceable Arbitration Clauses**

The Ninth Circuit has held that even if there is a valid arbitration clause found under the FAA, the FAA's mandate may nevertheless be overridden by a contrary congressional command. *In re Thorpe Insulation Co.,* 671 F.3d 1011, 1020 (9th Cir. 2012). The court first considers whether the proceedings are core or noncore proceedings. *Id.* In core proceedings, which are matters that arise under the Bankruptcy Code or are integral to the bankruptcy process, the bankruptcy court has discretion to deny arbitration. *EPD,* 821 F.3d at 1150; *Thorpe Insulation*, 671 F.3d at 1021. The courts in the Ninth Circuit also recognize that the pro-arbitration policy does not extend to non-parties to an arbitration agreement. *Kramer v. Toyota Motor Corp.,* 705 F.3d 1122 (9th Cir. 2013).

## IV. DEFENDANTS' MOTION TO COMPEL ARBTRATION SHOULD BE DENIED

### A. The Arbitration Clauses Are Unenforceable Under Federal and California Law

#### a. The Arbitration Clauses Are Unconscionable

The Arbitration Clauses in the Lease Transaction documents are unconscionable and therefore, unenforceable. A contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party. *OTO, L.L.C. v. Kho*, 8 Cal.5th 111, 125 (2019). Under California law, unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, and the latter on overly harsh or one-sided results. *Bernsley,* 657 F.Supp.3d at 1338. Both procedural and substantive unconscionability must be shown for the defense to be established, but "they need not be present in the same degree." *OTO, L.L.C.,* 8 Cal.5th at 125. Instead, they are evaluated on "a sliding scale." *Id.* The more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to conclude that the term is unenforceable, and vice versa. *Id.* "Because California courts employ a sliding scale in analyzing whether the entire arbitration provision is unconscionable, even if the evidence of procedural unconscionability is slight, strong evidence of substantive unconscionability will tip the scale and render the arbitration provision unconscionable. [Citation.]" *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006), called into doubt on other grounds by *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1029, fn 6 (9th Cir. 2016), and *Elieff v. Groves*, WL 11601213 at *4 (C.D.Cal. 2010).

##### i. The Arbitration Clauses Are Procedurally Unconscionable

The Initial Lease and Renewal Lease meet the standards for procedural unconscionability. Procedural unconscionability focuses on whether circumstances of the contract's formation created such oppression or surprise that closer scrutiny of its overall fairness is required. *OTO, L.L.C.,* 8 Cal.5th at at 126.

Here, Defendant Wentz occupied both sides of the lease transaction. He served as CEO and trustee of OroHealth (the Lessee) while simultaneously owning 60% of Dove's Landing, LLC (the Lessor). The boards of OroHealth were, in practical effect, "rubber stamps" for Wentz's decisions.

This is the quintessential example of oppression. Indeed, oppression arises from an inequality of bargaining power which results in no real negotiation and an absence of meaningful choice. *Carlson v. Home Team Pest Defense, Inc.*, 239 Cal.App.4th 619, 631 (2015). The party with superior bargaining power, Wentz, acting through his dual role, included a clause that benefits only his own entity, Dove's Landing, at the expense of the entity he was supposed to protect.

California courts have repeatedly struck down arbitration clauses exhibiting precisely this type of power imbalance. In *Lhotka v. Geographic Expeditions, Inc.*, 181 Cal. App. 4th 816, 822-23 (2010), the Court of Appeal found procedural unconscionability where one party occupied a position of superior bargaining strength and the other had no meaningful opportunity to negotiate. In *Szetela v. Discover Bank,* 97 Cal.App.4th 1094, 1100 (2002), Plaintiff faced with the option of closing his account or accepting the terms of the agreement established the necessary element of unconscionability by way of oppression even though Plaintiff could simply open an account elsewhere. The *Szeleta* court emphasized that procedural unconscionability focuses on the manner in which the disputed clause is presented to the party in the weaker bargaining position. *Id.*

The circumstances surrounding the Renewal Lease further underscore the disparity in bargaining power. By the time OroHealth entered the Renewal Lease in January 2018, it was in an extremely weak negotiating position. Were OroHealth not to agree to Wentz's rental price demands, it risked violating the requirement under the MOU that the Hospital remain a continuous occupant of the Property for twenty years in order to be given an interest in the Property. Therefore, this risked a forfeiture of the Hospital's entire investment in the Property. OroHealth had already invested approximately $7 million in improvements to the Property. Compl. ¶ 70. Walking away from that investment would have meant a significant financial loss for a small hospital system in a small town, which was an outcome no reasonable hospital board could accept. Compl. ¶¶ 68-73, 136-137. Moreover, at the time OroHealth signed the Renewal Lease, there were still five years remaining on the Initial Lease, which contained more favorable terms for OroHealth. The Renewal Lease terms were drafted to match Dove's Landing's increased debt service costs, added at least five years to the MOU's promise to gift the Property, and not to reflect fair market conditions. Compl. ¶¶ 73-76, 94, 95. OroHealth's early signing of the Renewal Lease, at terms that were less advantageous to

OroHealth than the original Lease, is strong indicia of OroHealth's weak bargaining position.

From the outset of the Initial Lease, the Hospital was paying full rent for a building that required massive improvements to be functional, which is the behavior of a party negotiating from weakness, not strength. Wentz was a member of the board, had recruited every board member, and set their compensation. (Compl. ¶ 28, 31.) The Initial and Renewal Leases both additionally allow Dove's Landing, an entity controlled by Wentz, to set the rental rates upon the renewal of the leases, effectively placing him in position to extract whatever rent he desired, knowing that he had OroHealth over a barrel because OroHealth and the Hospital did not wish to lose their substantial investment. Leases, § 2.

**ii. The Arbitration Clauses Are Substantively Unconscionable**

The Initial and Renewal Leases, and the Arbitration Clauses within them, are also substantively unconscionable. The paramount consideration in assessing substantive conscionability is mutuality. *Jenkins v. Dermatology Management, LLC*, 107 Cal.App.5th 633, 643 (2024). That is, the doctrine is concerned not with 'a simple old-fashioned bad bargain', but with terms that are unreasonably favorable to the more powerful party. *OTO, L.L.C.,* 8 Cal.5th at 130. In *Jenkins*, the California Court of Appeal found that an arbitration provision that required one party to arbitrate and did not mutually require the other party to was substantively unconscionable. *Jenkins*, 107 Cal.App.5th at 644. By the express terms in the Initial and Renewal Leases, arbitration may be invoked only "at the option of Lessor." Dove's Landing, LLC, the entity controlled by Defendant Wentz, reserved to itself the exclusive right to compel arbitration. OroHealth, the Lessee, has no reciprocal right. This asymmetry is the hallmark of a substantively unconscionable provision. Indeed, where one party retains the unilateral right to invoke arbitration while the other has no corresponding right, the clause lacks the basic fairness required for enforcement. *See Armendariz v. Foundation Health Psychcare Services, Inc.,* 24 Cal.4th 83, 117-18 (2000).

The Ninth Circuit has recognized that arbitration agreements that allow one party to the agreement the unilateral right to select a forum are generally unconscionable under California law, even where there is only slight procedural unconscionability. Where the court in *Nagrampa* was faced with an arbitration provision that only allowed a franchisor, MailCoups, Inc., to select whichever

dispute resolution forum it chose as against, Nagrampa, its franchisee, the Ninth Circuit noted: "Thus, this provision is clearly one-sided, effectively giving MailCoups the right to choose a judicial forum and eliminating such a forum for Nagrampa. California courts consistently have found such arbitration provisions unconscionable. [Citations.]" *Nagrampa,* 469 F.3d at 1287. The court in *Nagrampa* so held, "even though the evidence of procedural unconscionability is slight," due to the overwhelming presence of substantive unconscionability. *Id.* at 1293.

As demonstrated above, both elements of procedural and substantive unconscionability are present in abundance. The clauses in question are substantively unconscionable because they are entirely one-sided, and they are procedurally unconscionable because Wentz's dual role and domination of the board deprived OroHealth of any genuine opportunity to negotiate their terms. Under any application of the sliding scale, the Arbitration Clauses are unenforceable.

**b. The Arbitration Clauses, as Well as the Leases Themselves, Are *Prima Facie* Self-Dealing Transactions in Violation of California Corporations Code § 5233**

In addition to being unconscionable, the unilateral nature of the Arbitration Clauses are also *prima facie* demonstrations of self-dealing which the court has the power to set aside under California Corporations Code § 5233 ("Section 5233"). "[A] self-dealing transaction means a transaction to which the corporation is a party and in which one or more of its directors has a material financial interest[,]" and which is not exempt under subsections (b) or (d) of Section 5233. Cal. Corp. Code § 5233(a). Section 5233(b) specifies that the statute does not apply to:

> (1) An action of the board fixing the compensation of a director as a director or officer of the corporation.
>
> (2) A transaction which is part of a public or charitable program of the corporation if it: (i) is approved or authorized by the corporation in good faith and without unjustified favoritism; and (ii) results in a benefit to one or more directors or their families because they are in the class of persons intended to be benefited by the public or charitable program.
>
> (3) A transaction, of which the interested director or directors have no actual knowledge, and which does not exceed the lesser of 1 percent of the gross receipts of the corporation for the preceding fiscal year or one hundred thousand dollars ($100,000).

*Id.*



190763744.1

Similarly, under subsection (d) of Section 5233, a director's action is not self-dealing if:

> (A) The corporation entered into the transaction for its own benefit;
>
> (B) The transaction was fair and reasonable as to the corporation at the time the corporation entered into the transaction;
>
> (C) Prior to consummating the transaction or any part thereof the board authorized or approved the transaction in good faith by a vote of a majority of the directors then in office without counting the vote of the interested director or directors, and with knowledge of the material facts concerning the transaction and the director's interest in the transaction. Except as provided in paragraph (3) of this subdivision, action by a committee of the board shall not satisfy this paragraph; and
>
> (D) (i) Prior to authorizing or approving the transaction the board considered and in good faith determined after reasonable investigation under the circumstances that the corporation could not have obtained a more advantageous arrangement with reasonable effort under the circumstances or (ii) the corporation in fact could not have obtained a more advantageous arrangement with reasonable effort under the circumstances[.]

Cal. Corp. Code § 5233(d)(2).

Clearly, neither of the Arbitration Clauses or the Leases were "fair and reasonable" to OroHealth under any measure. As has been discussed above, the Arbitration Clauses both allowed Dove's Landing to unilaterally choose the arbitral forum, instead of allowing OroHealth the reciprocal right to do so. Leaving OroHealth powerless to choose its tribunal is not "fair and reasonable" to OroHealth, and tilts an enormous benefit in favor of an interested director in Wentz. There was further no objective reason not to allow OroHealth a reciprocal right, which gives the Arbitration Clauses the appearance of serving as an escape hatch for Wentz.

The undisputed facts underlying these transactions also show that the material terms of the Leases themselves were not fair and reasonable, either. The Initial Lease required OroHealth to pay the rental amount for a fully-improved building, despite the fact that the Property was not improved, and would not be capable of producing revenue for several years until it was improved – and the seven million dollars in improvements were paid for by OroHealth. Compl. ¶¶ 2, 69-71. Forcing OroHealth to pay rental rates commensurate with that of an improved building when the Property had not yet been improved was not fair and reasonable to OroHealth, and only served to benefit Dove's Landing and Wentz. Then, OroHealth entered the Renewal Lease five years before the term of the

Initial Lease had expired. Compl., Exs. 2, 5. The terms of the Renewal Lease called for increased rent. *See,* Leases § 3 (Initial Lease renting at $1.10 per square foot, Renewal Lease renting at $1,19 per square foot). The terms of the Renewal Lease also called for twenty additional years of leasing of the Property, when the MOU only required an additional fifteen years. *See,* Leases § 2. Simple arithmetic demonstrates that there was absolutely no justification for the Renewal Lease as a "fair and reasonable" transaction, and under California Corporations Code § 5233(d)(2)(D)(i), there is no possible way that the Renewal Lease, when compared with the prematurely-terminated Initial Lease, was "a more advantageous arrangement" than the existing Initial Lease. *Id.*

Section 5233(h) provides, "If a self-dealing transaction has taken place, the interested director or directors shall do such things and pay such damages as in the discretion of the court will provide an equitable and fair remedy to the corporation[.]" *Id.* Here, the Court has the discretion to deny the Motion as appropriate equitable relief for the self-evident violations of Section 5233 in the Leases.

**c. The Arbitration Clauses Are the Products of Undue Influence.**

Additionally, the facts that OroHealth paid excessive rent it did not have to pay for three years under the Initial Lease, and then gave away its superior rights under the original Lease for no discernible consideration when it signed the Renewal Lease, are *prima facie* evidence that Wentz exercised undue influence over OroHealth. Undue influence occurs when a person in a position of confidence or authority over another, uses that confidence or authority to take advantage of a weaker party. Cal. Civ. Code § 1575; *Johnson v. International Business Machines Corp.*, 891 F.Supp. 522, 530 (N.D.Cal. 1995). Where a transaction self-evidently results in a substantial benefit to a person in a position of confidence or authority, while resulting in a definite detriment to the person over whom the former party has a position of confidence or authority, a presumption of undue influence arises. *O'Neil v. Spillane*, 45 Cal.App.3d 147, 153-54 (1975).

Wentz found himself on both sides of the Lease transactions: as a trustee and the leading executive of OroHealth with a fiduciary duty to guide it, and as a member and part-owner of Dove's Landing. The advantages to Wentz and Dove's Landing are obvious. So are the disadvantages to OroHealth. These disparities demonstrate Wentz's undue influence over OroHealth.

Even assuming, however, that the Court finds that a valid arbitration clause exists, the enforceability of the clause on independent grounds of scope and party standing.

**B. The Arbitration Clause Does Not Cover the Claims Asserted**

Even if the arbitration clause were enforceable, which it is not, it does not encompass the claims asserted in this action; the second prong in determining whether to compel arbitration. *Cox,* 533 F.3d at 1119; *In re Orchid Child Productions, LLC* (Bankr. C.D. Cal., Apr. 22, 2024) 2024 WL 1740741, at *23. The Ninth Circuit has held that the phrase "arising under" must be construed far more narrowly than the broader formulation of "arising out of or relating to." *Mediterranean Enterprises, Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983). The *Mediterranean* court establishes that under an arbitration agreement covering disputes "arising under" the agreement, only those disputes "relating to the interpretation and performance of the contract itself" are arbitrable. *Id.* at 1464. In *Tracer Research Corp. v. National Environmental Services Co.*, 42 F.3d 1292 (9th Cir. 1994), the court similarly held that when a tort claim constitutes an "independent wrong from any breach" of the contract it "does not require interpretation of the contract and is not arbitrable." *Id.* at 1295. *Tracer* further clarified that a tort claim is not arbitrable just because it would not have arisen "but for" the parties' agreement. *Id.* Just like the arbitration clauses in *Mediterranean* and *Tracer*, Section 39 of the Renewal Lease and Section 41 of the Initial Lease both state that the arbitration clause covers only "any question, dispute or controversy ***arising under*** the provisions of this Lease Agreement." (emphasis added.) Under this narrow clause, only disputes that require interpretation or enforcement of a specific lease provision fall within its scope.

None of the claims in this action "arise under" the lease provisions. The present adversary proceeding does not turn on an interpretation of any clause in the contract. And Defendants do not point to any provision of the Initial Lease or the Renewal Lease that Defendants allegedly breached as a cause for compelling arbitration. Indeed Claims 1 through 3, seeking recharacterization of the leases, quiet title, and a declaration of equitable mortgage, challenge whether the leases are leases at all. This inquiry is logically prior to, and therefore cannot "arise under", the provisions of the very instrument whose character is in dispute. Claims 4 and 5, for breach of fiduciary duty, pertain to the usurpation of corporate opportunities from Plaintiff and in favor of Defendants related to the purchase

of the Property. The claims arise under California Corporations Code § 5233, and the common law of fiduciary obligation, and are not related to any interpretation or breach of a lease provision. Claims 6 through 8 relate to fraudulent rental and CAM overcharges arising under the Uniform Voidable Transactions Act, California Civil Code § 3439.04, and common law. Claims 9 through 11, assert similar claims for fraudulent overcharges on rent and CAM as well as fraudulent transfers of interest in the Property, each of which arise exclusively under the Bankruptcy Code, and have no basis in the Leases. Claim 12 for violation of the automatic stay clearly has no relation to the interpretation or performance of the Leases, and arises exclusively under the Bankruptcy Code, and Claims 13 and 14 for accounting and constructive trust, are equitable remedies that also have no basis in the Leases.

Given the above, the arbitration clauses, in the Leases, do not apply to the claims at issue in this adversary proceeding. Moreover, a number of the claims at issue, for example Claims 1 through 3, involve the MOU between Sports Club and OroHealth, which is a separate contractual document that contains no arbitration clause whatsoever.

**C. Defendant Wentz and Sports Club Are Not Signatories to the Leases and Therefore Cannot Invoke the Arbitration Clause**

Defendant Wentz and Sports Club are not within the arbitration agreement. Under both California law and the Ninth Circuit, Defendants argument that Wentz and Sports Club may invoke the arbitration clause on the theory that they are entitled to its benefit as non-signatory agents of signatory defendants, in connection with claims that are subject to the arbitration provision fails. (Mot. p. 17-18.) Defendants cite to numerous California and Ninth Circuit cases, none of which help their theory because the cases consistently state that a nonsignatory may compel arbitration ***only*** when the claims against the nonsignatory are founded in and inextricably bound up with *the obligations imposed by the agreement containing the arbitration clause. Olson v. FCA US, LLC*, 176 F.4th 612, 621-22 (9th Cir. 2026); *Goldman v. KPMG, LLP*, 173 Cal.App.4th 209, 219 (2009); *see JSM Tuscany, LLC v. Superior Court,* 193 Cal.App.4th 1222, 1239 (2011) (finding that nonsignatory may compel arbitration against a signatory only to the extent that those claims are dependent upon, or inextricably intertwined with, the obligations imposed by the arbitration provision); *see also Thomas v. Westlake,* 204 Cal.App.4th 605, 614-615 (2012). Where the rights at issue are grounded in separately-conferred

statutory rights and common law claims that are extrinsic to the contract containing the arbitration clause, a nonsignatory may not compel arbitration. *Olson, supra*, 176 F.4th at 621-22. The claims against Wentz and Sports Club are not "founded in" or "intimately intertwined with" the lease obligations. As explained in the section above, none of the claims alleged in the Adversary Proceeding Complaint are covered by the arbitration clause. The claims against Wentz sound in breach of fiduciary duty, California statutory claims of self-dealing, and fraud, and the claims against Sports Club, while also sounding in breach of fiduciary duty under California common law and statutory law, also arise from the MOU. None of the set of claims against Wentz nor Sports Club depend on interpretation of any of the Leases' terms. Therefore, Wentz and Sports Club cannot invoke the arbitration clause.

**D. The Hospital is Not a Party to the Leases, and Equitable Estoppel Does Not Require It to Be Bound By the Arbitration Clauses Because It Does Not Seek to Enforce Any Rights a Tenant Would Have Under the Leases**

The Hospital cannot be compelled to arbitrate, because it is not a party to either of the Leases, and there is no exception that would require it to arbitrate. Generally, one must be a party to an arbitration agreement to be bound by it. *DMS Services, LLC v. Superior Court*, 205 Cal.App.4th 1346, 1352 (2012). "While '[p]ublic policy favors contractual arbitration as a means of resolving disputes ... that policy does not extend to those who are not parties to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that he has not agreed to resolve by arbitration.'" *Lewis v. Regions Bank*, 832 F.Supp.3d 1063, 1068 (E.D.Cal. 2026), quoting *Espejo v. S. Cal. Permanente Med. Grp.*, 246 Cal. App. 4th 1047, 1057 (2016).

The Motion, relying on the case of *Boucher v. Alliance Title Co., Inc.*, 127 Cal.App.4th 262 (2005), argues that an exception to the general rule applies here, because the Hospital, as a nonsignatory, has relied on the terms of the Leases in this action, and is equitably estopped from escaping the arbitration clauses. This argument is fallacious.

First, the Hospital does not rely on the existence or the terms of the Leases to bring any causes of action, and in fact, believes them to be pretextual. The agreement the Hospital is relying upon is the MOU. The Opposition inherently recognizes this, because it notes that the Hospital is seeking fee

title of the Property, which is mutually exclusive from the terms of the Leases. A petition to compel a nonsignatory to arbitration is “concerned with the doctrine of equitable estoppel. When a plaintiff brings a claim which *relies on contract terms* against a defendant, the plaintiff may be equitably estopped from repudiating the arbitration clause contained in that agreement.” (*JSM Tuscany,* 193 Cal.App.4th at p. 1239, emphasis in original.) The key distinction is whether the party seeking to avoid arbitration is seeking to invoke substantive terms of the agreement at issue:

> [I]t would be inequitable…as parties to arbitration agreements…to use the substantive terms of those agreements as a foundation for their claims against nonsignatories…and at the same time to disavow the arbitration clauses of those very agreements. But, if their claims…are asserted without reliance on any obligations imposed by the [contracts at issue], they have engaged in no conduct that is “contrary to equity,” and there is no basis in equity for requiring them to arbitrate with parties with whom they have no arbitration agreement.
>
> *Goldman*, 173 Cal.App.4th 209, 221.

A nonsignatory’s claim which merely references an agreement with an arbitration clause as part of that claim is not sufficient to trigger estoppel. *Ford Motor Warranty Cases*, 17 Cal.5th 1122, 1137 (2025).

The Hospital does not seek to invoke a single substantive term of the Leases in the Complaint. The Motion twists itself into logical pretzels attempting to cram the causes of action in the Complaint into the rubric of claims “arising under” the Leases. The Motion is attempting to fit a square peg into a round hole. Indeed, the Motion’s argument that the Hospital’s claims “depend on and seek to interpret or recharacterize the Initial Lease and the Renewal Lease” is a linguistically self-defeating argument. The Hospital is seeking title to the Property, which is in diametrical opposition to the terms of the Leases. The Hospital is alleging, in essence, that the Leases were a sham, and that its CEO in fact stole the Property from under its proverbial nose. The Hospital is further not seeking the “benefits” of enforcement of the Leases in any substantive way, either – even if the Hospital were treated as the primary tenant under the Leases, the maximal relief it could get under the Leases is perhaps a credit on rent, but not ownership of the Property. There is simply no relationship between any substantive provision of the Leases—including the arbitration provision—and the rights the Hospital seeks to vindicate. Contrary to the Motion’s assertion, the Hospital is not “claim[ing] the

Leases' benefits and disclaim[ing] their burdens[,]" but simply seeking different rights entirely.

Second, the Hospital's lack of any ability to compel arbitration entirely undermines the rationale of every case cited in the Motion. The main thrust of those cases was the notion that, "a party may not make use of a contract containing an arbitration clause and then attempt to avoid the duty to arbitrate by defining the forum in which the dispute will be resolved." *Boucher, supra,* 127 Cal.App.4th at 272. Even if the Hospital were "making use" of the Leases to bring its claims, it is not defining the forum in which the dispute will be resolved because it has no power to do so under the Leases anyway. As *Goldman* summarizes, "[t]he linchpin for equitable estoppel is equity—fairness." *Goldman,* 173 Cal.App.4th at 220 (internal quotations omitted). The Hospital has not engaged in any gamesmanship. The Hospital has no power to define the forum by which this dispute will be resolved, because it was never capable of demanding that any of the parties arbitrate. Because it would be inequitable to bind the Hospital to the one-sided terms of the Leases, the Hospital cannot be bound to the arbitration clauses in them.

**E. The Debtors, Exercising the Powers of a Trustee, Are Not Bound by the Arbitration Agreements.**

Even if the Arbitration Clauses were enforceable and broad enough to cover some of the claims at issue, and it is neither, the Plaintiffs, as debtors-in-possession exercising the powers of a trustee, are not bound by the arbitration agreements for a separate reason apart from those mentioned above: 11 U.S.C. § 544 ("Section 544") allows them to step into the shoes of non-signatories to exercise *their* rights, and those parties cannot be compelled to arbitrate.

Under 11 U.S.C. § 544(a)(1), "[t]he trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by…a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists[.]" Under Section 544(b), the debtor in possession may avoid any transfer that is "voidable under applicable law by a creditor holding an [allowable] unsecured claim."

Under both subsections of Section 544, the Plaintiffs, as debtors-in-possession, exercising the powers of a trustee, step into the shoes of hypothetical creditors who, in this case, never agreed to arbitrate. Because only the parties to an arbitration agreement are bound by it, the arbitration clause cannot apply to claims brought in the Plaintiff's debtor in possession capacity as a creditor's representative.

This was further confirmed in *EPD*, 821 F.3d at 1146, where the Ninth Circuit held that arbitration agreements signed by the debtors cannot apply to claims brought under Section 544 or Cal. Civ. Code § 3439.04 (which permits a creditor to bring a claim for fraudulent transfer) because for the purpose of these types of claims, the Trustee was standing in the shoes of the creditor and the creditor did not sign the arbitration clause at issue. *In re EPD Inv Co LLC*, 821 F.3d 1146, 1151-52 (2016). This holding applies directly to Claims 6 through 8, as each are fraudulent conveyance claims arising under Cal. Civ. Code § 3439.04 and Claim 10 as a fraudulent conveyance claim arising under Section 544.

The same principle extends to Claim 5 (breach of fiduciary duty under Cal. Corp. Code § 5233(c)). Under Section 544(a)(1), the debtor in possession may exercise the "rights and powers of" any hypothetical creditor, who extends credit to the debtor at the commencement of the case and obtains a judicial lien on all property on which such a creditor could obtain a lien, "whether or not such a creditor exists." The provision is deliberately broad as it creates a legal fiction under which the debtor in possession may assert the rights and powers of a qualifying hypothetical creditor, not merely the rights of the prepetition debtor. The scope of those rights and powers is determined by applicable state law. *Butner v. United States*, 440 U.S. 48, 55 (1979) ("[P]roperty interests are created and defined by state law" and the Bankruptcy Act "generally left the determination of property rights in the assets of a bankrupt's estate to state law."); *see* 11 U.S.C. § 544(a)(1); *In re Thorpe Insulation Co.,* 671 F.3d at 1021–23 (9th Cir. 2012). As such, the hypothetical creditor under § 544 should also include the California Attorney General, allowing the debtor in possession to bring the breach of fiduciary duty under California Corporations Code § 5233, on its behalf. Under California Corporations Code § 5233(c), the Attorney General has standing to bring claims against self-interested directors and trustees of nonprofit public benefit corporations and may seek disgorgement

of all monetary benefits received in connection with the self-dealing transaction. The Attorney General never signed any arbitration agreement with Defendants. By stepping into the Attorney General's shoes under Section 544(a)(1), the debtor in possession exercises rights that are wholly independent of the Lease Transaction documents and their arbitration clause. As such, the Plaintiff is not bound to the Arbitration clause as to Claim 5 either.

Plaintiffs have established that the arbitration clause is unenforceable, does not cover the claims asserted, and does not bind the debtor in possesion in its capacity as representative of creditors. However, even if the clauses were enforceable, each and every one of Plaintiffs claims are a core bankruptcy proceeding and arbitration of these claims would inherently conflict with the purposes of the Bankruptcy Code.

**F. The Claims Asserted Are Core Bankruptcy Matters, and Compelling Arbitration Would Conflict with the Fundamental Purposes of Bankruptcy Law**

Even if the Arbitration Clauses were enforceable, which they are not, the Court should still deny the Motion because this adversary proceeding involves core bankruptcy issues that Congress committed exclusively to the bankruptcy courts. The Ninth Circuit affirmed that the bankruptcy court has discretion to deny enforcement of a valid arbitration agreement where the claims at issue are core bankruptcy matters derived from the Bankruptcy Code, and compelling arbitration would conflict with the fundamental purposes of bankruptcy law. *EPD*, 821 F.3d at 1152; *Thorpe Insulation Co.*, 671 F.3d at 1021. "It is the bankruptcy court's responsibility to determine whether each claim before it is core or non-core." *EPD*, 821 F.3d at 1151 (quoting *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165 (2014)). Core proceedings "normally involve rights derived from bankruptcy law" and "depend on the Bankruptcy Code for their existence." *In re Sheridan*, 362 F.3d 96, 108-09 (1st Cir. 2004). As demonstrated below, every claim in this adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) because they seek to determine the validity, priority, and enforceability of claims asserted against the estate, and to recover estate property for the benefit of creditors.

**1. The Recharacterization, Quiet Title, and Equitable Mortgage Claims (Claims 1-3) Are Core Under 28 U.S.C. § 157(b)(2)(A), (E), and (K)**

Despite Defendants' arguments to the contrary, Claims 1 through 3 are core because they concern the fundamental question of whether the Property is property of the estate. The recharacterization claim (Claim 1) asks this Court to determine that the purported "leases" are actually disguised financing arrangements, and that OroHealth is the equitable owner of the Property. (Compl. ¶¶ 88-100.) The quiet title claim (Claim 2) and equitable mortgage claim (Claim 3) flow from the same core determination that the Leases were not leases at all and that that the economic substance of the transaction vested equitable ownership in the Plaintiffs as the Leases were intended to reflect a true sale and financing security for repayment of the purchase prices paid by Dove's Landing. (Compl. ¶¶ 101-129.) These Claims are unequivocally "core" proceedings as the determination directly involves "orders to turn over property of the estate" under 28 U.S.C. § 157(b)(2)(E) and "determinations of the validity, extent, or priority of liens" under 28 U.S.C. § 157(b)(2)(K). The determination of these claims are also "core" because they concern the "administration of the estate" under 28 U.S.C. § 157(b)(2)(A). Whether this Property belongs to the estate is not a peripheral question; it is central to any reorganization plan. Without a definitive resolution of the estate's interest in the Property, no meaningful plan of reorganization can be proposed, confirmed, or achieved.

**2. The Breach of Fiduciary Duty Claims (Claims 4-5) Are Core Proceedings**

Claim 4 is a breach of duty claim brought under the California common law, which Defendants argue renders this a "non-core" claim. Defendants are mistaken. "A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law." 28 U.S.C. § 157(b)(3). "Courts have defined core proceedings as 'those that are unique to or uniquely affected by the bankruptcy proceedings, or directly affect a core bankruptcy function.' [Citations.]" *McCord v. Papantoniou*, 316 B.R. 113, 119 (E.D.N.Y 2004).

Claims 4 and 5 are core because they implicate, and are subject to, this court's "orders approving the use or lease of property[.]" 28 U.S.C. § 157(b)(2)(M). Should ownership of the Property not be recharacterized, then the breach of fiduciary duty claims necessarily implicate this Court's duty to assess the cure amounts, if any, under 11 U.S.C. § 365(b)(1)(A). There is currently a

controversy over the assumption of the Leases under 11 U.S.C. § 365, which this adversary proceeding seeks to resolve – and indeed, the assumption or non-assumption of the Leases is what precipitated this case. The determination of the extent and nature of a lease to a debtor is a core function of bankruptcy. To the extent the Defendants have any claims under the Leases, such claims "would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 564 U.S. 462, 499 (2011). Only a bankruptcy court (or a federal court vested with power to determine bankruptcy issues) can make such determinations under 11 U.S.C. § 365, and an arbitral tribunal cannot, as a matter of law. These are core estate matters.

Moreover, Claims 4 and 5 are "inextricably intertwined" with the administration of the estate. The Ninth Circuit held that creditors' state-law breach of contract, fraud, and breach of fiduciary duty claims are core proceedings where they were inextricably intertwined with core bankruptcy matters. *See In re Eber*, 687 F.3d 1123, 1130-32 (9th Cir. 2012). The *Thorpe* court found that claims were core where they were "inextricably intertwined with the manner in which [the debtor is] attempting to structure, orchestrate, and obtain approvals for what is likely to be a complex plan of reorganization." *In re Thorpe Insulation Co.*, 671 F.3d at 1020-21. That is precisely the case here. The fiduciary duty claims do not merely seek damages for a private wrong, but they also seek to recover the value that was extracted from the estate through systematic self-dealing by the Plaintiffs' own fiduciary, Mr. Wentz. The recovery on these claims is essential to any viable reorganization.

The Plaintiffs' claims for breach of fiduciary duty and for damages defrauding the Plaintiffs further confirm the core nature of this proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (O) because they allege a direct injury to the Plaintiffs caused by wrongful conduct that impaired company value and estate property that is for the benefit of the creditors. Indeed, Wentz's misconduct as CEO and trustee of both Debtor entities directly caused the estate's losses. He engineered the self-dealing Leases, dominated the boards of trustees, and ensured that no effective oversight existed. The fiduciary duty claims seek to recover the value extracted from the estate through Wentz's self-dealing, which is the value that rightfully belongs to the estate and its creditors.

Additionally, Claim 5 arises under Cal. Corp. Code § 5233(c), which governs self-dealing transactions by directors and trustees of nonprofit corporations. The recovery on this claim directly

benefits the estate and its creditors. Because the fiduciary duty claims are integral to the administration of the estate and the formulation of a plan of reorganization, they are core proceedings.

**3. The Fraudulent Transfer Claims (Claims 6-11) Are Core Proceedings Under 28 U.S.C. § 157(b)(2)(H)**

Even if Claims 6, 7, 8 are fraudulent conveyance claims brought under the California Uniform Voidable Transactions Act and the common law, these claims are nonetheless "core" when asserted by a trustee or debtor-in-possession under § 544(b). These fraudulent conveyance claims constitute core proceedings because they seek recovery of estate property under §§ 157(b)(2)(H). The Plaintiffs allege that Defendants exercised control over and fraudulently extracted value from OroHealth through inflated rental payments, excessive CAM charges, and the more than $7 million in improvements OroHealth made to the Property all while Wentz, through his 60% ownership of Dove's Landing, captured the benefits on both sides of the self-dealing transaction. Although pled as tort claims under state law, the substance of the relief sought is the determination of ownership of the Property, avoidance of transfer of the Property away from the Plaintiffs, and restoration of value to the estate, all of which are matters uniquely within the bankruptcy court's core jurisdiction. And, because the Debtors invoked the strong-arm power of § 544(b) to bring state-law avoidance claims on behalf of the estate, these claims fall squarely within the bankruptcy court's core jurisdiction.

Claims 9, 10, and 11 are statutory avoidance actions that are being brought exclusively under the Bankruptcy Code – Claim 9 under § 548, Claim 10 under § 544(b), and Claim 11 under §§ 549, 550. These claims could not exist outside of bankruptcy, as they are creatures of federal bankruptcy law, created by Congress to enable the estate's representative to claw back transfers that diminished the estate to the detriment of creditors. These claims are quintessentially core under § 157(b)(2)(H).

Critically, these claims do not merely "arise from" the lease, as Defendants suggest. These claims invoke the trustee's avoidance powers to recover property for the estate. They owe their very existence to the Bankruptcy Code and the unique federal powers it confers upon the estate's representative. No private party could bring these claims outside of bankruptcy – they are the exclusive province of the bankruptcy court.

Defendants reliance on Southern District of New York Cases, *Winimo*, *Hagerstown*, *Enron*, and *Cardeli* (Mot. 20-21) are not instructive as the Ninth Circuit has repeatedly confirmed the core status of these fraudulent conveyance claims. In *EPD*, the court held that "[t]he Trustee's fraudulent conveyance, subordination, and disallowance causes of action were core proceedings, thereby giving the bankruptcy court discretion to weigh the competing bankruptcy and arbitration interests at stake." *EPD*, 821 F.3d at 1150; *see* 28 U.S.C. § 157(b)(2)(B), (H). Notably, the *EPD* court held that these claims "remain statutorily core" even after the party argued that *Stern* rendered them "constitutionally non-core." *Id.* at 821 F.3d at 1151.

Defendants themselves conceded in their motion that these claims "might be 'core'." (Mot. at 20.) That concession is correct and should be accepted. The fraudulent transfer claims are unambiguously core proceedings under 28 U.S.C. § 157(b)(2)(H).

**4. The Automatic Stay Claim (Claim 12) and the Equitable Remedies Claims (Claims 13 and 14) Are Core Proceedings Under § 157(b)(2)(A), (G), and (O).**

Claim 12 for violation of the automatic stay under 11 U.S.C. §§ 105(a) and 362(a)(3) is unequivocally core under 28 U.S.C. § 157(b)(2)(A) and (G). Enforcement of the automatic stay is exclusively within the bankruptcy court's jurisdiction. The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws, and its enforcement is a matter that Congress expressly reserved to the bankruptcy courts.

Claims 13 (Accounting) and 14 (Constructive Trust) are core under 28 U.S.C. § 157(b)(2)(A) and (O), as they concern administration of the estate and seek equitable remedies to protect estate property. The accounting claim requires a full accounting of the financial relationship between the Debtors and Defendants, which is an essential determination to the estate's administration. The constructive trust claim asks the Court to recognize that certain assets held by Defendants actually belong to the estate, which is again, another determination that goes to the heart of the bankruptcy court's core jurisdiction over estate property.

In sum, **ALL** fourteen claims asserted in this adversary proceeding are core proceedings under 28 U.S.C. § 157(b)(2). The Court therefore has discretion to deny arbitration if compelling it would conflict with the purposes of the Bankruptcy Code, which it would.

**G. Compelling Arbitration Would Conflict with the Fundamental Purposes of the Bankruptcy Code**

Compelling arbitration in this adversary proceeding, would conflict with the fundamental purposes of the Bankruptcy Code. Under *Thorpe Insulation*, once claims are determined to be core, the bankruptcy court has discretion to deny arbitration if it would "conflict with the underlying purposes of the Bankruptcy Code." *Thorpe Insulation*, 671 F.3d at 1021. The purposes of the Bankruptcy Code include centralizing resolution of bankruptcy disputes and protecting parties from piecemeal litigation. *Id.* at 1022.

In *EPD*, the Ninth Circuit affirmed the bankruptcy court's denial of arbitration, holding that "the bankruptcy court properly applied *Thorpe Insulation* to determine that the arbitration provisions at issue conflicted with Bankruptcy Code purposes of having bankruptcy law issues decided by bankruptcy courts; of centralizing resolution of bankruptcy disputes; and of protecting parties from piecemeal litigation." *Id.* at 1150. The court emphasized that "[w]hen a bankruptcy court considers conflicting policies..., we acknowledge its exercise of discretion and defer to its determinations that arbitration will jeopardize a core bankruptcy proceeding." *Id.*

The *Thorpe Insulation* court also held that there is a conflict between arbitration and the Bankruptcy Code where arbitration of a claim, even if conducted expeditiously, effects the timing of reorganization, prevents the coordinated resolution of debtor-creditor rights, and delays the confirmation of a plan of reorganization. *Id.* at 1023. The case of *In re Harada* recently echoed the delay sentiment by holding that the bankruptcy court did not abuse its discretion in denying arbitration where arbitration-induced delay would frustrate the "twin goals" of the Bankruptcy Code, which it identified as (1) distribution of assets and (2) a fresh start for the debtor. *In re Harada*, 2026 WL 1429743 at *2 (9th Cir. 2026). *Harada* confirms that the structural features of arbitration, that is delay, loss of centralized control, and fragmentation of related proceedings, independently support denial of a motion to compel arbitration of core claims. *Id.* Here, the arbitration provisions at issue conflict with Bankruptcy Codes purposes echoed above.

First, compelling arbitration will conflict with the centralized resolution of debtor-creditor rights. The Bankruptcy Code centralizes all disputes concerning the debtor's legal obligations to

prevent "piecemeal litigation." *Thorpe Insulation*, 671 F.3d at 1023. This centralization is designed to ensure the orderly and equitable administration of the estate for the benefit of all creditors.

This is not a simple two-party commercial dispute as Defendants characterize it. (Mot. p. 4, 23.) Rather, this adversary proceeding involves fourteen claims, multiple theories of recovery spanning contract, tort, equity, and statutory avoidance, the debtor's real property that is essential to hospital operations, and the interests of all creditors of the estate. Piecemealing these interconnected claims across multiple forums would undermine the very centralization that the Bankruptcy Code demands. Even Defendants recognize the risk that splitting claims between arbitration and this Court creates "duplicative litigation" and "a live risk of inconsistent rulings." (Mot. at 4.) This admission is fatal to their position. Specifically, all the issues and claims presented in this proceeding are inextricably intertwined and require a resolution of the same disputed facts. Meaning, separating the claims and allowing litigation to proceed simultaneously in multiple forums will create chaos, piecemeal litigation, a duplication of costs, and a substantial risk of conflicting outcomes. Defendants cannot simultaneously argue that arbitration is appropriate and acknowledge that it will produce the very fragmentation and inconsistency that the Bankruptcy Code is designed to prevent.

Furthermore, this Court has been administering these Chapter 11 cases since December 2025, has overseen contested matters including numerous motions, and possesses specified familiarity with the Plaintiffs' operations, the Property, and the transactions at issue. Conversely, an arbitrator lacks the ability to consider the broader context of the various proceedings, cannot bind the bankruptcy estate, and cannot ensure consistent outcomes across interconnected matters. Thus, sending these disputes to an arbitrator, with no such familiarity, would waste the expertise this Court has already developed and undermine the centralized administration that Congress intended. As such, the Court therefore has both the authority and the responsibility to retain jurisdiction.

Second, compelling arbitration would cause delays in the timing of reorganization and confirmation of a plan and the coordinated resolution of debtor-creditor rights. *Thorpe Insulation* and *Harada* both recognized that even if arbitration is conducted swiftly, there would nevertheless be delay in the administration of the bankruptcy estate because coordinated resolution of debtor-creditor rights will be thwarted. *See Harada*, 2026 WL 1429743 at 2; *Thorpe Insulation*, 671 F.3d at 1023.

For instance, compelling arbitration would allow an arbitrator to make rulings that will determine whether and under what conditions the Plaintiffs can administer and liquidate assets of the estate, without any notice to or participation of the other creditors or this Court, which will in turn delay confirmation of the plan. The bankruptcy court "would lose control over the timing of the reorganization because it would not have control over the timing of the arbitrations *Thorpe Insulation*, 671 F.3d at 1023. The loss of control is of particular concern here where there are fourteen claims, including avoidance actions, recharacterization claims, and fiduciary duty claims that would need to be resolved before any plan could be confirmed.

Third, compelling arbitration would defeat the purpose of providing creditor protection through the bankruptcy courts and the fresh start that the Debtors seek. The estate stands to recover significant assets through this proceeding, including: the Property itself, which is worth more than $5.7 million given the more than $7 million in improvements funded by the Debtors; excess rent of at least $721,329; and post-petition transfers of $380,000. These recoveries represent concrete assets that will be available for distribution to creditors if the estate prevails through this bankruptcy proceeding.

Oroville Hospital is the largest employer in the area, with 133 acute care beds, an emergency room, and 31 clinics serving the surrounding community. The "fresh start" here is the continued ability of a critical community healthcare provider to serve its patients. The stakes extend beyond the Debtors and their creditors, and instead to the thousands of patients and employees who depend on the Hospital's continued operations.

Arbitration would delay these recoveries and jeopardize the reorganization of a hospital system that serves an entire community. The "twin goals" of the Bankruptcy Code would be directly undermined by compelling arbitration of the estate's core claims.

## V. <u>DEFENDANTS REQUEST TO STAY THE ADVERSARY PROCEEDING AS TO CLAIM 12 SHOULD BE DENIED</u>

Defendants concede that Plaintiffs' claim for violation of the automatic stay under 11 U.S.C. §§ 105(a) and 362(a)(3) (Claim 12) is not subject to arbitration. (Mot. p. 25.) Defendants nonetheless seek to stay this claim pending resolution of the other claims. *Id.* This request should be denied.

Here, Plaintiffs allege that Dove's Landing violated the automatic stay by exercising or retaining control over property of the estate post-petition, including by collecting approximately $380,000 in post-petition rent payments and overcharges. (Compl. ¶¶ 84, 198, 204–207.) For the same reasons discussed in the sections above, these allegations require immediate adjudication by this Court to protect the estate and its creditors. Claim 12 is inextricably linked to Claims 1 through 3, which determine whether the Property is property of the estate, and Claim 11, which seeks avoidance of post-petition transfers. Staying Claim 12 while these related claims proceed would be inefficient and could lead to inconsistent determinations regarding whether the automatic stay was triggered and whether estate property was improperly retained. The FAA provides for a stay of proceedings only where "the issue involved" in the suit is "referable to arbitration." 9 U.S.C. § 3. Because Defendants themselves concede that Claim 12 is not referable to arbitration, 9 U.S.C. § 3 does not authorize a stay of that claim. The Court should permit Claim 12 to proceed immediately.

## VI. ANY APPEAL OF THE OUTCOME OF THE MOTION SHOULD BE CERTIFIED DIRECTLY TO THE NINTH CIRCUIT TO MATERIALLY ADVANCE THE CASE AND AVOID ANY ATTEMPTS BY DEFENDANTS TO DELAY THIS ACTION

As the old adage says, "Justice delayed is justice denied." The Motion is a cynical and obvious attempt to delay the administration of this case. Defendants have made no pretense about their willingness to stay this case, and the appeals process provides them with a convenient vehicle to do that if they lose the Motion.

A party may make an immediate interlocutory appeal from an order denying a motion to compel arbitration or staying an action pending the outcome of an arbitration. 9 U.S.C. § 16(a)(1). Subject to certain exceptions, a federal court must stay its proceedings while an interlocutory appeal on arbitrability is ongoing. *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023). One such exception is the direct certification process under 28 U.S.C. § 158, which is an example of an instance where there is no automatic stay of federal court proceedings pending an interlocutory appeal. *Id.* at 744 fn 6. In order to promote justice and ensure that Defendants cannot delay the administration of this case to the prejudice of the Debtors and the constituents they serve, the court should certify its order on the Motion for direct appeal to the Ninth Circuit.

The resolution of the issues in this adversary proceeding is critical to ongoing hospital functions, and to provide clarity so that the largest hospital in Butte County can continue to function. The Property is essential to reorganization of the Debtors. Delay of the administration and outcome of this case only assists Defendants, because it gives them greater ability to take further, possibly prejudicial actions with the Property, and ties up resources the Debtors could use to reorganize in this litigation. Therefore, the Court should certify its order on the Motion for direct appeal to the Ninth Circuit in order to circumvent this prejudicial delay.

The Ninth Circuit Court of Appeals has jurisdiction of appeals from final judgments, orders and decrees if a bankruptcy court, acting on its own motion or on the request of a party, certifies:

> (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;
>
> (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or
>
> (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken[.]

28 U.S.C. § 158(d)(2)(A).

If the Court determines that any such circumstances exist, then the bankruptcy court "shall make the certification." 28 U.S.C. § 158(d)(2)(B).

Here, both the first and third criteria are met. With respect to the first issue, the Motion concerns a matter of public importance, because its outcome affects the entire community of Oroville, and all of Butte County. The Hospital is the largest hospital in the county, and it provides critical healthcare services to resides in the area, which would not otherwise be available. This case presents questions regarding the Hospital's ability to continue operations, and it is imperative that the answer to those questions not be delayed through gamesmanship in the appeals process.

With respect to the third issue, an immediate appeal will materially advance the progress of the case, because it will avoid Defendants' almost-certain appeal in the very likely event that the Motion is denied. Should Defendants lose the Motion, the appeals process provides them with an convenient mechanism to halt the case, even though this Court would have determined that none of

their claims are arbitrable. In this manner, Wentz will continue to hold OroHealth and the Hospital, and by extension, the entire community that depends on their ability to provide healthcare, hostage. Even if the Court is not entirely convinced of the self-serving motives of Wentz and his proxies, the only certain way to ensure that they do not abuse the processes of this Court to their own advantage is to certify any appeal of the Motion directly to the Ninth Circuit. Neither party will be prejudiced by having the issues in the Motion heard directly by the Ninth Circuit, and such certification ensures complete fairness.

## VII. CONCLUSION

For the foregoing reasons, Debtors respectfully request that this Court deny the Defendants' Motion to Compel Arbitration, Stay Defendants' Time to Respond to the Complaint, and Stay this Adversary Proceeding in its entirety, and certify any appeal of it directly to the Ninth Circuit.

Dated: October 6, 2026

**FOX ROTHSCHILD LLP**

By *\/s/ Christopher R. Nelson*
KEITH C. OWENS (SBN 184841)
NICHOLAS A. KOFFROTH (SBN 287854)
CHRISTOPHER R. NELSON (SBN 242859)
*Counsel to Oroville Hospital, et al.,*
*Plaintiffs, Debtors, and Debtors-in-Possession*